UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**************************************************

DAWN PIERCE, Plaintiff

CASE NO. 25-CV-02178-WJC-DPC

v.

TOWN OF GOLDEN MEADOW, ET AL., Defendants.

**************************************************

DEPOSITION OF CHIEF OF POLICE MICHELLE LAFONT, taken on Thursday, July 9, 2026, before Lisa M. Nealy, RPR, CCR, in and for the State of Louisiana, via Videoconferencing, commencing at 10:00 a.m. and concluding at 1:20 p.m.

INDEX


| | PAGE: |
|---|---|
| CAPTION | 1 |
| EXHIBIT INDEX | 3 |
| APPEARANCES | 5 |
| EXAMINATION: | |
| By Mr. Most | 7 |
| WITNESS' CERTIFICATE | 152 |
| REPORTER'S CERTIFICATE | 153 |

# EXHIBIT INDEX


| Exhibit: | | Page: |
|---|---|---|
| Exhibit B | Revised Statute 14:283.2 | 17 |
| Exhibit C | H&M Ad | 22 |
| Exhibit D | Pink Bandeau Top Bikini Ad | 22 |
| Exhibit E | Beach Body Ready Ad | 23 |
| Exhibit M | Photograph | 24 |
| Exhibit P | Police Report | 33 |
| Exhibit ZP | Exhibit M with Red Circle Added | 37 |
| Exhibit N | Photograph | 37 |
| Exhibit G | Photograph | 43 |
| Exhibit ZQ | Photo Circled by Chief Lafont | 47 |
| Exhibit ZB | Arrest Record | 59 |
| Exhibit ZF | "Never ending" Text Messages | 66 |
| Exhibit S | AT&T Logs | 69 |
| Exhibit ZE | "Billboard" Text Messages | 70 |
| Exhibit Z | Bouziga Call Logs | 75 |
| Exhibit A | Traigle Email | 77 |
| Exhibit ZD | Golden Meadow PD Record | 81 |
| Exhibit ZH | Traigle Text Messages | 85 |
| Exhibit T | Amber Sibley Text Messages | 88 |
| Exhibit ZD | Golden Meadow PD Record | 91 |
| Exhibit ZI | Map | 100 |
| Exhibit ZN | Answers to Discovery | 111 |
| Exhibit ZL | Chief Lafont PD Application | 119 |

Exhibits, Continued


| Exhibit: | | Page: |
|---|---|---|
| Exhibit ZM | NCIC Rap Sheet | 129 |
| Exhibit ZO | Verification | 133 |

APPEARANCES:

REPRESENTING PLAINTIFF:

MOST & ASSOCIATES
By: William Most, Esq.
201 St. Charles Avenue, Suite 2500
New Orleans, Louisiana 70170
williammost@gmail.com

REPRESENTING DEFENDANTS:

NIELSEN & TREAS, LLC
By: Keith M. Detweiler, Esq.
3838 North Causeway Boulevard, Suite 2850
Metairie, Louisiana 70002
kdetweiler@nt-lawfirm.com

Also Present:

Miriam Teller

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby taken, for all purposes, under the applicable Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the witness RESERVES the right to read and sign the transcript;

That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * *

LISA M. NEALY, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

CHIEF OF POLICE MICHELLE LAFONT,

after having been first duly sworn by the above-mentioned Certified Court Reporter, did testify as follows:

EXAMINATION

BY MR. MOST:

Q Good morning, Chief. How are you doing today?

A Good morning. Good.

Q Could you give us your full name for the record?

A Michelle Ann Martin Lafont.

Q Okay.

MR. MOST:

And this is a question for Mr. Detweiler: Mr. Detweiler, is there any objection to doing this deposition by Zoom, either recording it or conducting it by Zoom?

MR. DETWEILER:

No.

MR. MOST:

Great. All right.

BY MR. MOST:

Q Well, Chief Lafont, my name is William

Most. I'm an attorney for Dawn Pierce, the plaintiff in this case. And so, we'll be doing this deposition today, but I want to acknowledge that you are the current chief of police, so if you need to be taken away for police business, something comes up, an emergency or whatever, just let us know and we'll handle that as it comes. Okay?

A Yes, sir.

Q Chief, have you ever given a deposition before?

A Yes, I have.

Q Approximately how many have you given?

A One.

Q And what case was that in?

A This was a long time ago. I don't even remember what the case was for.

Q Okay. And was that a case that you were a party in that case? A plaintiff or defendant?

A No.

Q You were a witness in someone else's case?

A Correct.

Q Do you remember what the case was about? Was it a car crash, something else? Family law

thing? I don't know.
A I think it was a car crash.
Q Was it when you were acting as law enforcement for the sheriff's office a long time ago?
A Yes.
Q Okay. Okay. And so, you understand that a deposition is an opportunity for parties to ask questions under oath, correct?
A Correct.
Q And so, you understand that you're under oath here today, and your answers today have the same force as if we were in a courtroom with a judge and jury?
A Yes, sir.
Q Okay. And is there anything that might prevent you from giving truthful and complete answers today, whether it's medication, or substances, or fatigue or illness, or anything else?
A No, sir.
Q Okay. And you may recall this from your prior experience in a deposition. We'll be asking questions. This may take some amount of time, but it doesn't have to be continuous. We can take

breaks, although I'll tell you now that after each break, I may ask you if you talked to anyone during the break, if you reviewed any documents during the break, and there may not be the same attorney-client privilege during a break as there would be in normal times. Okay?

A Correct.

Q Okay. And you're already doing this very effectively, but if you'll wait for me to finish my questions before answering, I'll try and do you the same courtesy of waiting until you're finished answering before I start speaking again. That makes it easer for our court reporter to get an accurate transcript. Okay?

A Yes, sir.

Q And if I ask a question that is not clear or you don't understand the question, will you agree now to tell me that that's the case, rather than just trying to answer it anyway?

A Absolutely.

Q Thank you. And because this is a Zoom deposition, we can't see everyone in your room. Is there anyone in your room besides Mr. Detweiler?

A No, sir.

Q Okay. And do you have any papers on the

table in front of you?
A A sticky note.
Q Okay.
MR. DETWEILER:
My files are on the table.
THE WITNESS:
And Attorney Detweiler has files and papers on the table.
BY MR. MOST:
Q Sure. Okay. What does the sticky note say?
A It's the password for the Internet.
Q Okay. Since we may not be able to see if someone enters the room or tries to communicate with you, will you agree now to tell us if anyone tries to communicate with you during this deposition that's -- that we can't -- that's not audible? So if someone tries to make a hand signal or pass a note to you, or sends you a text message, will you agree to tell us that that's going on?
A Yes, sir.
Q Thank you. Okay. So, aside from what Mr. Detweiler has, have you brought any documents with you to this deposition?
A No, sir.

Q And besides talking to Mr. Detweiler, did you talk to anyone to prepare for this deposition?

A No, sir.

Q Okay. Did you look at any documents or review anything to prepare for this deposition?

A Not today, no.

Q What about before today?

A Um, when we first started planning the deposition, I looked back at the report.

Q And that would be the Golden Meadow police report for the --

A The report that I wrote on the case; yes, sir.

MR. DETWEILER:

Yeah, let him finish his question.

BY MR. MOST:

Q Yeah. That's all right. You know, it's -- this is a little different than a normal conversation. It helps to -- to wait until someone has completed talking.

Okay. So, did you look at any other documents besides that police report to prepare for today's deposition?

A No, sir.

Q Okay. Did you look at any photos or

review any text messages or emails to prepare for this deposition?

A No, sir.

Q Okay. Did you use AI in any way to prepare for this deposition?

A No, sir.

Q Have you used AI at any point related to this case at all?

A No, sir.

Q When I say "AI," you understand I mean artificial intelligence?

A Correct.

Q Okay. Great. So, I understand you are currently the police chief of the town of Golden Meadow. Correct?

A Yes, sir.

Q And you took that office in 2025?

A January 1st, 2025.

Q And that's an elected position; correct?

A Correct.

Q And give me just a nutshell version of your work history before that. I understand you had some law enforcement and some education experience?

A In '94, I was working for the sheriff's

office and resigned to go to school, um, and started in '96. I was teaching at Golden Meadow Middle School when I decided to run for chief of police.

Q Okay. So after college, did you go work for the sheriff's office?

A I'm sorry?

Q Well, let me back up. What's the highest level of education you have?

A A bachelor's degree.

Q Okay. So after that, did you go work in law enforcement?

A After receiving my bachelor's degree?

Q Yeah.

A No, sir. Not until now.

Q So you worked -- how long did you work at the sheriff's office before going into education?

A Two years.

Q Okay. So two years in the sheriff's office and then more than 20 years in education, and then you ran for police chief, won, and became police chief. Is that accurate?

A I had twelve years in education.

Q Okay, twelve. And what made you decide to run for police chief?

A I live in Golden Meadow. This is my town. And I wasn't satisfied with the way the former chief was running the police department, and thought that I could do a better job.

Q Got it. And Golden Meadow also has an elected mayor; is that correct?

A Correct.

Q How often -- in your role as police chief, how often do you and the mayor communicate? Is it a daily, weekly, monthly? Never?

A Probably about weekly.

Q And when you and the mayor communicate, how do you communicate? By telephone calls, text messages? Some other way?

A Telephone and in person.

Q Okay. And you are familiar with the arrest of Dawn Pierce, correct?

A Correct.

Q Okay. You understand she's the plaintiff in this case?

A Yes, sir.

Q Okay. And you were the person who conducted the investigation that led to her arrest. Correct?

A Correct.

Q And you obtained a warrant and then caused her to be arrested. Correct?

A Yes, sir.

Q And this may be obvious, but, as a police officer, you can't arrest someone unless they've committed a crime. Correct?

A Correct.

MR. DETWEILER:

Objection.

You can answer.

BY MR. MOST:

Q Yeah. And something also that you may recall from your prior deposition experience is that Mr. Detweiler may make objections, but generally, unless he instructs you not to answer the question, you can just go on and answer the question after he objects.

MR. MOST:

Is that correct, Mr. Detweiler?

MR. DETWEILER:

Yes.

BY MR. MOST:

Q Okay. So, it could be a false arrest, Chief, if you arrest someone for something that doesn't violate the law. Agreed?

MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Yes, sir.
BY MR. MOST:
Q Okay. And if you want to figure out if someone's conduct constituted a crime, you would have to look at a statute to see if what they did was illegal. Correct?
MR. DETWEILER:
Objection.
You may answer.
THE WITNESS:
Correct.
BY MR. MOST:
Q Okay. So I'm going to pull up on the screen what has been designated as Exhibit B, as in boy.
(Exhibit B was marked for identification.)
BY MR. MOST:
Q Do you see this statute, Chief?
A Yes, sir.
Q Okay. This is Revised Statute 14:283.2,

Nonconsensual disclosure of a private image. Correct?

A Right.

Q And do you understand that, broadly, this statute is what's colloquially called a "revenge porn" statute?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes.

BY MR. MOST:

Q Okay. And so, this statute is pretty specific. It specifically defines what kind of sharing of images is criminal. Correct?

MR. DETWEILER:

Objection. Speaks for itself.

You can answer.

THE WITNESS:

Yes.

BY MR. MOST:

Q Okay. So for someone to violate this law by sharing an image under Subsection A., each of those four things have to be true; correct? One through four?

MR. DETWEILER:
Objection. Can I show her a copy that's a little bit larger for her to read than the screen?
MR. MOST:
Yeah.
MR. DETWEILER:
I've handed her one page.
BY MR. MOST:
Q Yeah. Chief, is what Mr. Detweiler shared with you the same as what's on the screen?
A Yes, sir.
Q Okay. So it says, "A person commits the offense of nonconsensual disclosure of a private image when all of the following occur." Correct?
A Correct.
Q So all four of the things, A(1) through A(4), have to be true for it to violate this law. Correct?
A Correct.
Q Okay. For sharing an image to violate this law under A(3), the person who discloses the image has to have known or should have known that the person in the image did not consent to the disclosure of the image. Correct?

A Correct.
Q Meaning it has to be a private image, like it says in the title. Correct?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Correct.
BY MR. MOST:
Q Okay. So if someone takes a picture of themselves and then puts it publicly on the Internet, on, say, Twitter or Instagram or somewhere else, that's not a private image. Would you agree?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Agree.
BY MR. MOST:
Q Okay. And then another requirement for sharing an image to be illegal under the statute is that it has to show intimate parts, in whole or in part, or a person who's engaged in sexual conduct. Right?

A Correct.

Q And the law defines "intimate parts." Correct?

A Yes.

Q And "intimate parts," under the statute, means: Fully unclothed, partially unclothed, or transparently clothed genitals, pubic area, or anus. Or, if it's a female, also a partially or fully exposed nipple. Correct?

A Correct.

Q So if an image doesn't show any genitals, pubic area, anus, or nipples, then it can't be the basis for an arrest under the statute. Would you agree?

A Yes, sir, I agree.

Q And if an image has been shared on the Internet by the person who it's of, it can't be the basis for an arrest under the statute. Would you agree?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Agree.

BY MR. MOST:

Q Okay. So, most bikini photos or lingerie photos, if they don't show genitals or nipples, would not be able to be the basis for an arrest under this statute. Would you agree?
A Agree.
Q Okay. So we're going to look at some photos. This is Exhibit C.
(Exhibit C was marked for identification.)
BY MR. MOST:
Q Do you see that this appears to be a bikini advertisement for H&M?
A Yes, sir.
Q And this is a fairly revealing photo of this person; correct?
A Yes, sir.
Q But it doesn't show any nipples or genitals, and so it couldn't be the basis for an arrest under the statute we're talking about. Correct?
A Correct.
Q Okay. I'm pulling up Exhibit D, as in dog.
(Exhibit D was marked for identification.)

BY MR. MOST:

Q You see that this another advertisement, or appears to be an advertisement for some sort of swimwear?

A Yes, sir.

Q And this is probably an even more revealing, um, set of swimwear; but likewise, since there are no body parts that meet the statutory criteria, this couldn't be the basis for an arrest. Would you agree?

A Agree.

Q So even though this shows some of the area where this woman's leg intersects with her, um, mons, it still doesn't show any of the statutorily required body parts. Correct?

A Correct.

Q Okay. I'm pulling up Exhibit E.

(Exhibit E was marked for identification.)

BY MR. MOST:

Q Same with this photo?

A Correct.

MR. DETWEILER:

(Inaudible).

COURT REPORTER:

I'm sorry, I couldn't hear Mr. Detweiler there.

MR. DETWEILER:

I was going to object because it wasn't much of a question. Just comparing it to the last photo, I guess.

MR. MOST:

Yeah, I can be clearer.

BY MR. MOST:

Q So, looking at Exhibit E, Chief, this, likewise, is a piece of revealing swimwear but it does not show any of the genitals or nipples or other body parts that would be required for this to be the basis of an arrest under the statute we've been discussing. Correct?

A Correct.

Q Okay. And so now I'm going to turn to Exhibit M, as in Mary.

(Exhibit M was marked for identification.)

BY MR. MOST:

Q Do you recognize this photo, Chief?

A Yes, sir.

Q Okay. This is one of the photos that formed the basis for your arrest of Dawn Pierce.

Correct?
A Correct.
Q Okay. Now, in this photo -- do you recognize the person in this photo?
A Yes, sir.
Q Have you ever met her in person?
A No, sir.
Q Okay. Are you aware that it's Amber Sibley?
A Correct. Yes, sir.
Q Okay. And in this photo, Ms. Sibley is wearing lingerie. Correct?
A Correct.
Q Do you see any sexual acts happening here?
A No, sir.
Q Do you see -- let's see. Looking at the statute, do you see any actual or simulated vaginal, anal, or oral sexual intercourse, deviant sexual intercourse, sexual bestiality, masturbation, sadomasochistic abuse, or exhibition of genitals, in Exhibit M?
A No, sir.
Q Okay. Do you see any of the -- do you see any genitals, pubic area, anus, or nipples in

this photo?
A It's hard to see on the screen, but I believe that was one of the pictures that I used to get my warrant.
Q Sure. So I can zoom in as needed. So, do you see -- we can just take it one by one. So do you see any genitals in this photo?
A Um, you -- yeah. Sort of. It's covered somewhat, but it's still the -- the material is clear to see through.
Q So you can see Ms. Sibley's genitals in these photos?
A I can see nipples.
Q Okay. Well, setting aside nipples, do you see any --
A Okay, so we're just talking -- no. No genitals.
Q Okay. So other than nipples, you don't see any genitals in her -- in her underwear area. Correct?
A Correct.
Q You don't see pubic area, anus, anything like that. Correct?
A You can somewhat see pubic area, yes.
Q So does -- and I'll just be frank. Does

Ms. Sibley have any pubic hair?
A No.
Q You can tell that she has no pubic hair?
A Correct.
Q So you can see entirely through the lower part of her lingerie and see the entirety of her pubic area?
A Again, it's -- the screen is a little bit harder to see, but, um...
MR. DETWEILER:
I have Exhibit M, if you want me to show it to her.
BY MR. MOST:
Q Well, I mean, can you see it on the screen, Chief Lafont?
A It's covered up. The material is a little bit darker, that you can't see the pubic area; no.
Q Right. So you can't tell if she has a lot of pubic hair, a little bit, or none. Correct?
A Correct.
Q Okay. Because this is not a fully transparent underwear. Correct?
A Correct.
MR. DETWEILER:

Objection.

You can answer.

BY MR. MOST:

Q You can't tell if she -- her labia, internal or external, for example; correct?

A Correct.

Q So, none of the body parts that violate the statute in her underwear area. Correct?

A Correct.

Q Okay. And now, turning to her --

MR. DETWEILER:

Excuse me. Let me just get a clarification. You said her underwear; you mean the panty part of the underwear, correct?

MR. MOST:

Yes, I mean the panty part of the underwear.

BY MR. MOST:

Q Was that your understanding --

A That was my understanding; yes, sir.

Q Thank you.

Okay. Now turning to the upper part of her lingerie and her breast area, can you see one or more nipples, or no nipples, in this?

A One.
Q Okay. On her -- in the photo on the left or right side?
A In the photo on my left side.
Q Okay. And when you say you can see a nipple, do you mean the sort of somewhat discolored area on the left-hand side?
A (No response.)
Q Let me rephrase the question.
Chief, you know the difference between a nipple and an areola; correct?
MR. MOST:
Oh, maybe she's frozen.
COURT REPORTER:
Yeah, they seem to be frozen.
MR. MOST:
Can we go off the record?
COURT REPORTER:
Going off the record at 10:25.
(Off record.)
COURT REPORTER:
Back on the record at 10:32.
BY MR. MOST:
Q Okay. So we had a break there because of a power outage. Correct, Chief?

A Yes, sir.

Q Did you look over any documents during the break?

A No, sir.

Q Okay. And did you talk about the content of your testimony with anybody?

A No, sir.

Q Okay. So, turning back to Exhibit M, as in Mary, do you see that this is Exhibit M, and I've added a red circle which we can move around?

A Yes, sir.

Q Okay. And you were saying earlier -- we were talking about the statute and what you could see in this photo.

Chief, you understand the difference between an areola and a nipple; correct?

A Correct.

Q Okay. And so, you said that you saw something on the left side of this photo. Correct?

A Correct.

Q And is it sort of this -- this change in color area that I'm circling with this, um -- with this circle here? Red circle? Or is it somewhere else?

A It's somewhere else.

Q Okay. Is it below that or above it?
A Below that.
Q Okay. Tell me where to move the red circle until it's in the right spot.
A A little bit more to the right.
MR. DETWEILER:
I'm going to object, just because we've already produced a photo with her circle already drawn. But you can proceed under the objection.
MR. MOST:
Okay --
MR. DETWEILER:
Just because of the technology.
MR. MOST:
Okay. Sure.
BY MR. MOST:
Q Is this in the right spot, Chief?
A Approximately. Yes, sir.
Q Well, I want to make sure it's correct. Is this circle encircling the nipple that you see?
MR. DETWEILER:
I mean, you -- are you sure? Or -- don't guess.
THE WITNESS:

It's -- it's hard to tell on the phone. I'm trying to remember from my picture, but...

BY MR. MOST:

Q Well, no, I don't want you to remember just based on your memory. I'm trying to figure out where on this image you see a nipple. I mean, do you see a nipple on the image on your screen?

A No.

Q Okay. Did you see a nipple -- so before we just took a break, you were using the laptop screen, right?

A Correct.

Q And you saw a nipple on the laptop screen?

A No, sir.

Q Okay. So you don't see a nipple in this photo, currently?

A Currently, no.

Q Okay. But you agree it's the photo that you saw a nipple in at some point in the -- previously?

A Correct.

Q Okay. So, in 2025, you saw a nipple in this photo, but you don't today?

MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
It's a different -- it's a different view, I guess you could say, because it's on the screen, compared to looking at it, um, as a printed photo.
BY MR. MOST:
Q Okay. So let's look at -- so, I'm pulling up Exhibit P, as in Paul.
(Exhibit P was marked for identification.)
BY MR. MOST:
Q Do you see that this is your police report?
A Yes, sir.
Q Okay. Um --
A It's -- it's a police report. I can't see that it's mine from here.
Q Well, do you see that it says "Primary narrative by Michelle Lafont"?
A I can't read it from here.
Q Okay. So let's --
MR. MOST:

Let's go off the record, because we need to solve this logistical issue.

MR. DETWEILER:

I have Exhibit P.

MR. MOST:

I understand, but we need to be able to make sure we're looking at the same stuff.  So --

MR. DETWEILER:

Well, it's Exhibit P from the prior deposition.

MR. MOST:

Yeah, but if she can't see the exhibits I'm pulling up on the screen, we need to solve that problem.

MR. DETWEILER:

Well, are the Exhibit P's the same -- are you using the same exhibits from the last two depositions?

MR. MOST:

Yeah.

MR. DETWEILER:

I mean, these are the ones you gave me in those depositions that I wrote letters on.  So, I mean, it's up to you,

but...

MR. MOST:

Right, but we're not going to be able to do this deposition if we can't look at exhibits together. Do you want to take a break and then get your computer up and running?

MR. DETWEILER:

Yeah. I can keep trying. I've been trying while y'all were talking.

MR. MOST:

Okay.

MR. DETWEILER:

So.

MR. MOST:

Well, let's reconvene at 11 a.m., and why don't you see if you can work out the tech stuff to get back logged in to the Internet, maybe restart or whatever.

MR. DETWEILER:

Okay. What time is it now?

MR. MOST:

10:38. I mean we could do it -- if you need less time, I don't care.

MR. DETWEILER:

Yeah, eleven is fine. I'm trying right now and it's not getting on, so. I'll figure it out.

MR. MOST:

Okay. Thanks.

(Off record.)

COURT REPORTER:

Back on the record at 10:45.

BY MR. MOST:

Q All right. Welcome back, Chief. Chief, did you review any documents or talk about the subject of your testimony during our break?

A No, sir.

Q Okay. And so, now you are back using the laptop in your room again, correct?

A Correct.

Q Okay. So I want to see if the photos are any better. So, looking at Exhibit M, do you see a nipple in this photo, Chief?

A Yes, sir.

Q Okay. So, moving -- help me move the red circle to where you see the nipple.

Is the red circle now where you see the nipple?

A Move it to the left a little. A little

bit more. Okay.
Q Okay. So that red circle -- you see a nipple within that red circle?
A Correct.
Q Okay. Do you see any other nipples in this photo?
A Not that I can tell, no, sir.
Q Okay. So, zooming back out, that red nipple [sic] is the only part of this photo that you contend could -- if this was a private photo that was shared, could violate the statute we were looking at. Correct?
A On this screen, yes, sir.
Q Okay.
MR. MOST:
So I'm going to save this as Exhibit ZP, which is Exhibit M plus the red circle.
(Exhibit ZP was marked for identification.)
BY MR. MOST:
Q Okay. I'm going to turn to Exhibit N, as in Nancy.
(Exhibit N was marked for identification.)

BY MR. MOST:

Q Do you see this photo, chief?

A Yes, sir.

Q Is this one of the other photos in which you believed formed the basis to arrest Dawn Pierce?

A I believe so.

Q Yeah. And it was just these two photos, Exhibit M and Exhibit N, that you contended were the basis for the arrest of Dawn Pierce. Correct?

A I believe so.

Q Okay. And when you say "I believe so," that's your recollection?

A Correct.

Q Okay. Do you see any genitalia or anus or pubic area in this photo?

A No, sir.

Q Okay. Do you see any nipples in this photo?

A Not on this screen, no, sir.

Q Okay. Zooming in, do you see any nipples?

A It's hard to tell.

Q Okay. So you don't see any part of this photo, even zoomed in, in which you can conclude

you see a nipple. Correct?
A Not on this screen, no, sir.
Q Okay. But you saw a nipple in this photo in 2025?
A I believe so.
Q Okay.
A It's blurry on your screen. It's -- it's not a very clear picture.
Q Did you have a clearer version of this at the time, in 2025?
A Yes, sir.
Q So you had a different, higher resolution version of this image?
MR. DETWEILER:
Objection.
BY MR. MOST:
Q You can answer, Chief.
A It's just harder to see on the screen than it was to have it in my hand and looking at it. It's the same image. It's just more difficult to see it this way than it was to look at it in my hand.
Q And when you say in your hand, you mean on your iPhone?
A Probably the printed copy.

Q Okay. When say "probably," you mean the printed copy? Or you mean something else?
A The printed copy.
Q Okay. So pulling up Exhibit P, as in Paul, can you see on your screen that this is a Golden Meadow Police Department police report?
A Yes, sir.
Q And this is the police report you reviewed in anticipation of this deposition?
A Correct.
Q Okay. And attached to this police report are some photos, correct? Some printouts?
A Yes, sir.
Q So these are the printed versions you're talking about?
A I assume.
Q I'm sorry; say that again?
MR. DETWEILER:
You mean your black-and-white versions, or the color versions she had at the time?
MR. MOST:
Well, I guess that's what I'm asking.
BY MR. MOST:

Q When you talk about being able to see printouts, are these the printouts you're talking about? Here, I'll go down to, um --

MR. DETWEILER:

Are those the photos that you looked at --

THE WITNESS:

Those are not the photos. These are black and white. The photos I looked at were in color.

BY MR. MOST:

Q So you had color versions of these photos that we're looking at in Exhibit P?

A Yes, sir.

Q Okay. Where are those color photos?

A In Zuercher, which is our program that we use to keep records.

Q Is that an electronic program?

A Yes, sir.

Q It's called Zuercher?

A Yes, sir. Or Central Square. It's got a couple of names. I also have a printed copy.

Q You have a color printed copy?

A Yes, sir.

Q That you printed in 2025?

A Yes, sir.

Q Okay. Where is that?

A Filed in the office.

Q Okay. Do you have a color scanner at your office?

A Yes, sir.

Q Okay. If we took a break, would you be able to scan and email those documents?

MR. DETWEILER:

They were produced in discovery.

MR. MOST:

Okay.

BY MR. MOST:

Q Did you give copies of those color photos to your lawyer, Chief?

A Yes, sir.

Q Did you send the Zuercher files to your lawyer?

A Yes, sir.

Q Okay.

MR. MOST:

And so, Keith, you're saying you turned over the color printouts in the Zuercher files?

MR. DETWEILER:

I turned over what was provided to me from her records, yes.

MR. MOST:

Okay. I'm going to pull up what's been designated G, as in goat.

(Exhibit G was marked for identification.)

BY MR. MOST:

Q Do you see this, Chief?

A Yes, sir.

Q Is this the color printout you're describing?

A Yes, sir.

Q So do you see a nipple, currently, in this photo?

A Not right now, no. It's kind of far away. It's small.

Q Sure. We can zoom in.

Do you see any nipples in this printout?

A Yes, sir.

Q How many?

A One.

Q Okay. And that's the number of nipples you saw that formed the basis for the arrest, regarding this picture, for Dawn Pierce?

A Yes, sir.
Q And is the -- the nipple that you see, is it on the left or right-hand side of this photo?
A My left.
Q Okay. Okay. So I'm going to open up -- and you see we've got Exhibit G here; this is the color printout?
A Correct.
Q And so you see a nipple -- one nipple in this photo?
A I did, when you pulled it up.
Q Okay. Do you see it now?
A No. It's hard to see it now.
Q Sure. What about if I zoom in?
A Yes.
Q Okay. And then switching to Exhibit N, these are the same higher or lower resolution versions of the same photo. Correct?
A Correct.
Q And you had both these. You had this higher resolution electronic version, and you had the sort of lower resolution, printed out version. Correct?
A Yes.
Q Okay. And you looked at both of them.

Correct?

A Correct.

Q And so you see a nipple in Exhibit G, the printed out version, but not in Exhibit N, the higher resolution version?

A I saw it on the printed version. It's -- it was hard to see it on the computer.

Q Right. So --

A On the Zoom call.

Q Yeah. So --

MR. DETWEILER:

Meaning today. Is that correct?

THE WITNESS:

Correct.

BY MR. MOST:

Q Okay. So today, you see a nipple in Exhibit G, but you do not see one in Exhibit N. Correct?

MR. DETWEILER:

Objection.

THE WITNESS:

It's clearer in the other photo than it is in this one.

BY MR. MOST:

Q Okay. So can you see a nipple in both

photos?

A It's kind of difficult to see. This one is not as clear as the other picture.

Q So Exhibit N is not as clear as Exhibit G. Correct?

A Correct.

Q Okay. So do you see a nipple in Exhibit N?

A Not in this image, no.

Q Okay. And you do see the nipple as we go to the lower resolution version here. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes.

BY MR. MOST:

Q And when you were investigating Dawn Pierce, did you look at both the electronic version and the printed out version?

A Yes, sir.

Q And at that time, did you see a nipple in both, or just the printed out version?

A I'm not sure.

Q Okay. So, zooming in on G, can you help

me move this to where you see the nipple?
A A little bit further left. A little bit more. Good.
Q Okay. So you see a nipple within this red circle?
A Correct.
MR. MOST:
I'm going to save this as Exhibit ZQ.
(Exhibit ZQ was marked for identification.)
BY MR. MOST:
Q Okay. So, are you aware that we -- well, let me back up.
Do you know who Lieutenant Traigle is?
A Yes, sir.
Q He's a lieutenant at the Lafourche Parish Sheriff's Office?
A Yes, sir.
Q He's a law enforcement officer you respect and ask for advice on occasion?
A Yes, sir.
Q Okay. Are you aware that we had him take a look at these photos?
A Yes, sir.

Q Would you be surprised to know that he testified he did not see any nipples or genitalia in these photos?
A No, sir.
Q Why doesn't that surprise you?
A He's a man. He's got different views. He's got more experience than I do. Um, there's a number of reasons.
Q So, because he has more experience, he might not be able to see the nipple you see?
A Not necessarily that he doesn't see the nipple I see, but he may not use that as a basis for making an arrest.
Q So you're saying he might have seen the nipple but thought, "This isn't something that warrants an arrest over." Is that kind of what you're saying?
A Possibly.
Q Right. But would it surprise you to know he didn't see any nipple at all when he looked at these photos?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:

Not at all.

BY MR. MOST:

Q That does not surprise you?

A No, sir.

Q If there's a nipple visible in these photos, why are you surprised other people can't see it?

A Different views. Different ideas of what we're looking at.

Q Like, he might have a different idea of what a nipple is?

MR. DETWEILER:

Objection.

BY MR. MOST:

Q You can answer.

A Just -- see things differently.

Q So it wouldn't surprise you if other people looked at this and saw no nipple at all?

A Not at all.

Q Okay. Because this nipple might not be visible to some other people. Agreed?

A Agreed.

Q Do you have any special training or experience that allows you to see nipples where other people might not?

MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
No, sir.
BY MR. MOST:
Q Have you shown these photos to anybody else at any time to see if they could see nipples or genitalia?
A No, sir. Not prior to the arrest, no, sir.
Q Okay. What about after the arrest? And I'm going to set aside talking to your lawyer. But anybody else?
A Um, maybe other officers that looked at the report.
Q Mm-hmm. So after arresting -- so before arresting Dawn Pierce, you did not have anyone else look at these photos. Agreed?
A Agreed.
Q Okay. And then after the arrest, you had some other officers look at the photos. Correct?
MR. DETWEILER:
Objection.
You can answer.

THE WITNESS:
Other officers did supplemental reports, so they would have looked at the report, added to the report. So they may have looked at them.
BY MR. MOST:
Q I got it. So -- and you're talking about Tristin Gaspard?
A Correct.
Q Any other officers?
A Not that I'm aware of, no.
Q Okay. So you think Tristin would have seen these photos in doing his supplemental report? Or you know he looked at the photos?
A I believe he did.
Q Okay. Any other officers that you know of looked at these photos?
A No.
Q Did Tristin say he saw any nipples or genitalia in these photos?
A We -- I believe he did.
Q So Tristin told you he looked at these photos and he saw the nipple?
A I believe he did.
Q Okay. And you say you believe he did.

Do you remember him saying that to you?
A I remember talking about it. Um, I -- I think he said, "Yes, I do see a nipple; I see what you see."
Q And how soon after Dawn Pierce's arrest was that? Was that in the days after, the months after? This year?
A Days after.
Q Okay. And where did that conversation take place? Was that by phone? In your office? Somewhere else in the police station?
A In my office.
Q And were you -- the two of you looking at the photos together?
A Yes.
Q Okay. So you pulled up the photos on your screen?
A No, we had the printed copy.
Q Okay. So the two of you were looking at the color printed copy. Is that correct?
A I believe so.
Q Okay. And he told you, "Yeah, Chief, I see the nipples you see"; something to that effect?
A Correct.
Q Okay. Did he see any -- do you recall

how many nipples he saw?
A No.
Q What about other kinds of genitalia?
A No.
Q Okay. So the basis for the arrest of Dawn Pierce was one nipple in each of these two photos that we looked at. Correct?
A I think we had other photos also that we looked at.
Q Right. But the ones that showed the illegal body parts were -- was the one nipple in each of these two photos we looked at. Correct?
A I don't recall. There may have been more.
Q Okay. But these are the only two body parts, this one nipple in two photographs, that you recall being the basis for the arrest of Dawn Pierce. Correct?
A I believe so.
Q Okay. Okay. So, going back to the police report -- and then going back to what we talked about before, if Amber Sibley herself had put these photos up on the Internet, then it wouldn't be legal to arrest Dawn Pierce for sharing them somewhere else. Agreed?

MR. DETWEILER:
Objection.
THE WITNESS:
Agreed.
BY MR. MOST:
Q Okay. So, we're looking at Exhibit P, as in Paul. Turning to page three, this is one of the photos in your police report, right?
A Yes.
Q And "Amberkayyy," that's an alias or a user name for Amber Sibley. Is that correct?
A Um, I'm sure it is.
Q Okay. I mean, that's what you concluded at the time you were investigating this, right?
A Yes.
Q Okay. And it says -- this appears to be a post of some kind. It says, "Sub to my OF and make me daddies little slut." Correct?
A Correct.
Q And "sub to my OF," do you know what that means?
A No, I don't.
Q Okay. Did you do anything to look up what this might mean?
A No.

Q Okay. And can you tell that this, from the symbols here, that this is a Twitter post, or now called X?

A No, sir.

Q Okay. Did you try and figure out what kind of post this was?

A No, sir.

Q Okay. But you could tell from this that it was some kind of post that Amber Sibley posted, correct? It says "Amberkayyy," and it has the text and the photos. Correct?

A Correct.

Q So at the time, you know that Amber was posting these somewhere on the Internet. Correct?

A Yes, sir.

Q Going down to page four, you can see that this is an image from OnlyFans.com?

A Yes, sir.

Q And you looked up OnlyFans, and you know what OnlyFans is, correct?

A Yes, sir.

Q It's a website where people, typically women, can share photos of themselves and -- for money. Correct?

A Correct.

Q Okay. And so, you see that on some of these, there's a button that says "Subscribe to see user's posts"?

A Yes, sir.

Q So that indicates that what we're seeing is, um, not private; the person hasn't yet -- the viewer hasn't yet subscribed. Correct?

A Correct.

Q Okay. So these are public posts by Amber Sibley. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

As far as I can tell, yes.

BY MR. MOST:

Q Yeah. It looks like -- so turning to page six, you see there's a post by Amberkayyy saying "15 percent off my bundles"?

A Yes.

Q Okay. And there's also a post where she's talking about "sex tapes, bj videos and so on are all coming within the next month," so "Stay tuned"?

A Correct.

Q So you understood that Amber was essentially running a business where she was selling photos of herself or videos on the Internet. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes, sir.

BY MR. MOST:

Q Okay. And so, you understood that she was posting these lingerie photos in public to sort of advertise and invite people to subscribe to her nude content. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes, sir.

BY MR. MOST:

Q Okay. So the lingerie photos that we've been looking at today meet that description. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes, sir.

BY MR. MOST:

Q Okay. For example, on page nine of Exhibit P, we can see there's a button that says, "Share this post with anyone, even if they aren't on X yet," indicating further that these lingerie photos were not private. Agreed?

MR. DETWEILER:

Objection.

THE WITNESS:

These are.

BY MR. MOST:

Q Right.

MR. MOST:

Okay. I'm going to move on to another section. Does anybody need a break?

THE WITNESS:

No, thank you.

BY MR. MOST:

Q Okay. So the next thing I want to do, Chief, is I want to sort of walk through the timeline of the events that led to the arrest of

Dawn Pierce. And was -- to your recollection, was Dawn Pierce arrested on July 8, 2025?

A Yes, sir.

Q Okay. So we're going to look at some documents to try and piece together the timeline. I'm pulling up Exhibit B -- I'm sorry. ZB.

(Exhibit ZB was marked for identification.)

BY MR. MOST:

Q Do you see that these are law enforcement documents related to Dawn's arrest?

A Yes, sir.

Q Okay. Turning to page five. Do you see that this is, um, sort of a log from dispatch from LPSO?

A Yes, sir.

Q And Golden Meadow Police Department is a small enough police department that you use the sheriff's office for dispatch. Correct?

A Yes, sir.

Q Okay. So if someone calls 911 in Golden Meadow, they're connected to the sheriff's office, and then the sheriff's office can refer calls for service to Golden Meadow Police Department. Correct?

A Correct.
Q And so, on July 8, 2025, at 12:43 p.m., there was a new call for service that called in to the sheriff's office dispatch. Correct?
A Yes.
Q And Ben Constant is a sheriff's office dispatcher who took that call?
A Correct.
Q Okay. And then, you were informed of this at 1:10 p.m., which is 13:10 on this sheet. Correct?
A Um, no. It was actually given to me at 12:48:17.
Q Okay. So you're saying that 12:48:17 is when --
A It was assigned.
Q Okay. And then when did you first acknowledge it? Was that the 1:10 number?
A No. I would have been -- at 12:48, I would have been notified about it.
Q Okay. Okay. So it would be true to say that you received the complaint at 12:48. Correct?
A Correct.
Q Yeah. But it would not be true to say you received it at 12:43. Right?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

It was -- it was put on the board at 12:43.

BY MR. MOST:

Q Right. And then -- but it's not true that you received it at 12:43, correct?

A We have computers in our cars, in our vehicles, and when it's put on the board, we see it. So I'm -- I would have seen it when it would have -- was put on the board.

Q Well, so did you see it at 12:43 or 12:48?

A I saw it at 12:43. I responded to it at 12:48.

Q And where were you when you saw that?

A In my vehicle.

Q Okay.

A In my police unit.

Q Where, physically, was the police unit?

A On Highway 1.

Q Were you driving or were you stationary?

A I was driving.

Q Okay. So as you were driving, you were also watching the screen in your car?

A Correct.

Q And you saw every new call for service that came in to LPSO dispatch?

A It does catch my attention when they come up, yes, sir.

Q Okay. So you can see every -- every time someone calls in to LPSO, even if it's outside Golden Meadow in a different town, you're seeing it come up on your screen?

A Yes, sir.

Q And you're watching that as you drive?

A Yes, sir.

Q Okay. But it didn't actually say anything about what the complaint was until 12:45. Correct?

A Correct.

Q So you didn't see anything about what the complaint was at 12:43. You just saw that it was a new call for service?

A Yes.

Q I'm sorry; is that correct?

A Correct.

Q Okay. So you didn't receive anything

from Amber Sibley at 12:43. Agreed?
A Agreed.
Q Okay. So, call for service comes in at 12:43. It's assigned to you at 1:10. Correct?
A Correct.
Q Yeah.
A No. No, I'm sorry. It was assigned to me at 12:48.
Q Twelve -- okay. 12:48. And then you respond, saying you're available, at 1:10?
A When you say you're available, that means that you are no longer working on this -- on the CFS. You are now available for other calls also.
Q I see. So it was assigned to you at 12:48, you handled it until 1:10, and then you said you were available for other calls?
A Correct.
Q Okay. And so you were working on investigating this case between 12:48 and 1:10?
A Yes, sir.
Q And what were you doing?
A Making phone calls to Amber Sibley.
Q What else?
A I believe that was it. I just talked to Amber at that time.

Q Okay. And did she send you the photos at that point?

A I don't believe. I think it was later on.

Q Okay. And how long did you talk to her for?

A A few minutes, I'm sure.

Q So this is a 22-minute period, correct, between 12:48 and 1:10?

A Yes, sir.

Q And so if you talked to her for a few minutes, what does that mean? Two or three or four minutes?

A I don't remember how long I stayed on the phone with her.

Q Okay. But less than a quarter of that 22 minutes?

A Probably a good bit of that 22 minutes, because the whole complaint was handled over the telephone.

Q Okay. And were you taking notes?

A Yes, sir.

Q How did you take notes?

A On a notepad.

Q You keep a notepad in your vehicle?

A Yes, sir.
Q Do you save those notepads?
A Until they're used up.
Q And then what do you do with them when they're used up?
A Throw them away.
Q You still do that?
A Yes, sir.
Q Okay. Do you remember when that -- how long that notepad lasted?
A No, I really don't.
Q Okay. Do your notepads last a couple days? a couple months? a couple of years?
A It all depends on how many notes I take, how many complaints I go on, what I need it for, how long it -- if it gets wet. There's all kind of things that go into that.
Q In your year and a half on the job, do you know how many notebooks you've gone through?
A No.
Q Do you scan your notepads or do anything to save that information?
A No, I don't save the notepads. I write the reports in Zuercher, or Central Square, um, and then the notes are destroyed or thrown away or --

there's no reason to keep them once I put them into my report.

Q Okay. So -- so that takes us through 1:10 p.m. So between 12:48 and 1:10 p.m., you talk to Amber Sibley, you take some notes on your notepad. Do you do anything else to investigate this potential crime?

A Not at that point, no. I don't believe so.

Q Um --

A I think that was all talking to Amber and getting the information from her.

Q Okay. So then -- I'm pulling up Exhibit ZF.

(Exhibit ZF was marked for identification.)

BY MR. MOST:

Q Do you recognize this text message exchange?

A I can't read it. I can't make out what it says.

Q If I zoom in, can you read "it's never ending"?

A Yes.

Q Okay. And then it says "OMGGGGG,"

exclamation point, exclamation point. Do you see that part?
A Yes, sir.
Q Do you remember this text message exchange?
A I do.
Q Who is this with?
A Tristin and me.
Q Okay. And then, at some point you talk to Dylan on the telephone, correct? Well, let me back up. Do you know who Dylan is?
A Dylan Rousse? Yes, sir.
Q And you understand that that's Amber Sibley's romantic partner?
A Yes, sir.
Q Okay. And you had a telephone call with him at 2:51 p.m. Is that consistent with your recollection?
A Yes, sir.
Q Okay. How long did you talk to Dylan for?
A I really don't know.
Q Okay. And what did Dylan tell you?
A Dylan called me and asked me if there was anything that I could do. Wanted to know if

charges were going to be pressed, wanted to tell me the situation. I think that was the extent of our phone call.

Q And what did you tell him?

A I told him that I was looking into it, that he was going to have to give me some time to investigate and see -- and I wasn't sure if there were any charges that I could press, that I was not familiar with the social media laws, and that I was going to have to investigate and get back to him.

Q Sure. And did you know Dylan or Amber before July 8, 2025?

A No, sir.

Q Okay. Had you ever met them before?

A No, sir.

Q Did you even know who they were in any way?

A No, sir.

Q Okay. Did you know their families?

A No, sir.

Q Okay. And then, less than 40 minutes later, you get a call from Mayor Bouziga. Correct?

A Somewhere in that timeline, yes, sir.

Q Yeah. So we can pull up Exhibit S, as in Sam.

(Exhibit S was marked for identification.)

BY MR. MOST:

Q Turning to page 23. Your phone number is 985-691-4640? Or it was in July 2025?

A It is, yes.

Q It is. Okay. It both is today and was then?

A Yes, sir.

Q Okay. And so, Mayor Bouziga's number ends in 5163, is that right?

A I'm not sure.

Q Okay.

A I don't know his number.

Q Or one -- you don't know what his phone number is?

A No, I don't.

Q So you wouldn't be able to recognize it as this 1252 number?

A I have no clue.

Q Okay. That's okay. But less than approximately, you know, 30 or 40 minutes after you spoke to Dylan, you get a call from the mayor. Correct?

A Somewhere around there.

Q Yeah. And what did the mayor say to you?
A He asked me if I was working a case with Dylan Rousse. And I told him yes, I was. He asked me what was happening with it and I told him I was investigating, and he asked me if charges were going to be pressed and I told him I didn't know, that I was -- I was going to have to investigate and make myself aware of what the social media laws were, because I had no clue. I didn't work with social media laws before. So, um, that was the extent of it.
Q Right. So at that point you weren't even sure if what Dawn was accused of was even a crime. Correct?
A Correct.
Q Okay. And so, pulling up Exhibit ZE, these are more text messages between you and Tristin Gaspard. Correct?
A I can't read them.
(Exhibit ZE was marked for identification.)
BY MR. MOST:
Q Do you see that it's Tristin's face at the top?
A Correct.

Q And that's how he appears when you have text messages with him on your phone?
A Yes, sir.
Q Okay. And so then going down, um, you see these texts that say "this dude needs to grow some balls"?
A Yes, sir.
Q And a responding text message in blue, saying "Dude. It is his fault," and then going on?
A Yes, sir.
Q These are text messages you recall having with Tristin Gaspard?
A Yes.
Q Okay. And so, it looks to me like Tristin sent you a photo of the computer screen, the law enforcement computer screen?
A Yes, sir.
Q And he texted you, "this dude needs to grow some balls." Correct?
A Yes.
Q And did you understand him to be referring to Dylan Rousse?
A I believe so.
Q And there's a reference that "he's going to purchase a billboard and display it," with four

crying laughing emojis?

A Yes, sir.

Q Okay. And then you wrote back to Tristin, "Dude. It is his fault. He called and was bitching that he wanted charges on her and when I told him I didn't know if there was anything I could charge her with he called the mayor," two exclamation points.

A Yes.

Q So you told Dylan, I guess, that you didn't know if there was anything you could charge Dawn Pierce with. Correct?

A Correct.

Q And then you seem sort of peeved that he had responded by calling the mayor and, I guess, trying to go over your head. Is that a fair characterization?

A Yes, sir.

Q Okay. And then Tristin responds, "I laughed lol when he said that lol." And you respond, "Yeah I bet you did." Is that a reference to the billboard thing?

A Yes.

Q Okay. So, fair to say that you and Tristin -- or at least you, in your communications

with Tristin, thought this was kind of funny, maybe a little annoying, and the two of you were joking about it. Is that correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes.

BY MR. MOST:

Q Okay. Funny, in part, because this seems like just not a big deal at all. Would you agree?

A No, sir.

Q Why is that wrong?

A I'm sorry?

Q Why is my statement wrong?

A Because it was -- we were talking about it because the complaint came in at 12:43, and if I remember correctly, Tristin was still texting me at 10:35 p.m. that night, about the same complaint. We dealt with it -- I dealt with it all day long, because I kept getting phone calls from Dylan and Amber asking me what was going on with the case, and then Tristin dealt with it after he came on that night.

Q Got it. And that was kind of frustrating

because this did not seem like a big enough deal that should tie up much of the Golden Meadow Police Department for a whole day. Would you agree?

A No, sir.

MR. DETWEILER:

Objection.

BY MR. MOST:

Q You disagree with my statement?

A Yes, sir.

Q Okay. How many police officers did Golden Meadow have at the time, including yourself?

A At that time, I believe we had three, including myself. We may have had four including me. I'm not positive.

Q So, either a half or two-thirds of the police department was spending much of that day responding to this particular call for service. Right?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

I was the only one, and then Tristin came on that night and ...

BY MR. MOST:

Q Okay. And you think that was a good use of police resources, given the -- the nature of the complaint?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

It has nothing to do with the nature of the complaint. It was just that we kept working -- we kept getting calls about it.

BY MR. MOST:

Q Yeah. And if you hadn't kept getting calls about it, you might have just let it go?

A No. I was trying to investigate, but had to stop investigating to answer their calls.

Q I see. Okay.

And then, at some point, at -- well, let me just pull up -- I'm pulling up what's been designated as Exhibit Z.

(Exhibit Z was marked for identification.)

BY MR. MOST:

Q Do you see this these are the call logs for Mayor Joey Bouziga?

A I can't read it.

MR. DETWEILER:

Are you asking her to identify that?

BY MR. MOST:

Q Well, let me rephrase the question.

Does this appear to be consistent with a call log for Joey Bouziga, Chief?

A It appears to be.

Q Yeah. And then, going down to 3:36, is this your phone number, the 9030 number?

A No, sir.

Q Let's see. You're the 46 -- I see. You're the 985-691-4640, correct?

A Correct.

Q Okay. And so you called Mayor Bouziga at 3:36 p.m.?

A I called him or he called me.

Q Well, it appears to me that, given this is Bouziga's call log, if it says "incoming," that it would have been from you. But you tell me if that's right or wrong.

A I may have had to call him.

Q Okay. And do you remember -- do you remember that call?

A I don't remember if I was asked to call

him, or if I called him to let him know what was going on with the case. I'm not sure.

Q Okay. So, I mean, how many phone calls do you remember having with the mayor on July 8th?

A One or two.

Q Okay. But you're not sure which it is?

A Correct.

Q Okay. And then, at some point you called and spoke to Lieutenant Traigle at LPSO. Correct?

A Yes, sir.

Q And then, was it -- and then he sent you an email, correct, after that?

A I believe so.

Q Yeah. I'm pulling up Exhibit A.

(Exhibit A was marked for identification.)

BY MR. MOST:

Q Is this an email you received from Lieutenant Traigle about this matter?

A I can't read what it says.

Q Sorry. Okay. Zooming in. You can always ask me to zoom in. Thank you for being clear.

Does this -- is this an email from Ray Traigle to you after your phone call with him?

A It looks like it.
Q Okay. And did he email you a few minutes after you spoke to him?
A I believe he emailed me while we were on the phone.
Q Okay. So if you had a phone call with the mayor at 3:36, then after that, then you had the phone call with Lieutenant Traigle?
A I'm not sure of the timeline.
Q Okay. But we know you were on the phone with Ray Traigle at 3:56. Right?
A Correct.
Q And from the call logs, it appears you were on the phone with the mayor at 3:36. Correct?
A From the call logs, yes.
Q Okay. So is that consistent with your recollection, that you spoke to the mayor, and then shortly thereafter you spoke to Ray Traigle?
A I believe so.
Q Okay. Did the mayor suggest you call LPSO?
A No.
Q Did the mayor make any suggestions to you at all?
A No.

Q Did the mayor encourage you to investigate or charge Dawn Pierce with anything?
A No.
Q Did the mayor put any pressure on you at all about this matter?
A No, sir.
Q So you spoke to Lieutenant Traigle because -- you called him because you weren't sure if what Dawn did was a crime, right?
A Correct.
Q And so you called Lieutenant Traigle to ask for advice about that situation. Right?
A Yes, sir.
Q And you sort of described the situation to him but you didn't show him any photos. Right?
A I don't believe so.
Q Okay. And then, in response to your verbal description, he sent you back to the statute, the law that we've been looking at. Correct?
A Correct.
Q Okay. And then, is it consistent with your recollection that, after that, you spoke to Amber Sibley at 4:43 p.m.?
A I'm not sure of the timeline.

Q Okay.
A I know I spoke to her several times during the day.
Q Do you recall how many phone calls you had with her?
A No, I don't.
Q Okay. Do you know parish council member Brian Zeringue?
A He's not a parish council member.
Q Okay. Do you know Brian Zeringue?
A Yes, sir.
Q Was he a parish council member at the time?
A No, sir.
Q Okay. It looked to me from the phone logs like shortly after you spoke to Amber, you spoke to Brian Zeringue. Do you recall that?
A Yes, sir.
Q Was Brian calling you about the Dawn Pierce situation?
A No.
Q Okay. And then from the phone logs, it looks like you called Tristin Gaspard at 5:33. Do you recall that?
A I spoke to him during the day. I'm not

sure what time.

Q Okay. And what did you -- and did you talk to him about the Dawn Pierce situation?

A Probably so.

Q Do you recall what you said?

A That was probably when we got the warrant and he was coming to work.

Q Okay. And did you ask him to execute the warrant by going and picking up Ms. Pierce?

A I probably told him about the warrant, but I didn't tell him he had to execute it.

Q Okay. Did you suggest that he execute it?

A No, sir.

Q Generally, as chief, if you tell one of your officers, hey, I got a warrant for this person, do you expect that they will then go and pick that person up?

A Typically, yes.

Q Okay. Okay. So then -- pulling up Exhibit ZD.

(Exhibit ZD was marked for identification.)

BY MR. MOST:

Q Do you see that this is another version

of the Golden Meadow Police Department records?
A Appears to be. You can scroll up.
Q Yeah.
A Yes.
Q Okay. And going down, you see that we have these photos of the posts by Amber that have been reposted by Dawn?
A Correct.
Q Okay. And do you see, at the very bottom, it says, "https://mail-attachment.googleusercontent," and then a long string of text?
A Yes, sir.
Q Does that indicate to you that this was a printout of a Gmail email?
A It appears to be.
Q Yeah. And then, in the upper right-hand corner -- I'm sorry, upper left-hand corner, it says July 8, 2025, 5:42 p.m. Do you see that?
A Yes, sir.
Q Does that indicate the time it was printed out?
A Possibly.
Q Okay. Did you print out these photos?
A Yes, sir.

Q Okay. And then, according to the phone records, it seems like you had three more phone calls with Tristin Gaspard between 5:46 p.m. and 7:02 p.m. Does that match your recollection?
A Yes.
Q Okay. Were you talking to him about the Dawn Pierce matter?
A Possibly.
Q Possibly, but I want to know what you recall. So do you recall talking to him about the Dawn Pierce matter in each of those three phone calls?
A Not in -- I don't recall what we talked about, no.
Q Okay. And then the phone records suggest you called Michael Kreamer at 7:32 p.m. Is that consistent with your recollection?
A That I called Michael Kreamer?
Q Mm-hmm.
A No, I don't remember.
Q Do you remember him calling you?
A No.
Q Do you remember speaking to Michael Kreamer on the phone at all on July 8, 2025?
A I don't recall. I don't remember talking

to him. I may have. I don't remember.
Q Did you know who Michael Kreamer was on that day?
A Yes.
Q Who was he, as far as you know?
A He was a sergeant with the sheriff's office, the Lafourche Parish Sheriff's Office.
Q And did you know him socially, or how -- how do you know Michael Kreamer, or how did you know him?
A I knew him as a work colleague.
Q Because the sheriff's office and Golden Meadow Police Department work together fairly often?
A Yes, we do.
Q Okay. And that's how you knew Michael Kreamer?
A Yes, sir.
Q Okay. And then, the phone records appear to show two phone calls from Tristin Gaspard to you, at 7:33 and 7:37 p.m. Is that consistent with your recollection?
A Possibly. I'm sure, if that's what the phone records show. I don't remember, but.
Q So you don't recall those phone calls?

A No. I know we talked, but I don't know what time or how many.

Q And then, pulling up Exhibit ZH.

(Exhibit ZH was marked for identification.)

BY MR. MOST:

Q Do you see these text messages here?

A Yes, sir.

Q And do you recall that these are text messages between you and Lieutenant Traigle?

A Yes, sir.

Q Okay. So you texted Lieutenant Traigle at 6:43 p.m. on July 8th to ask him for Judge Robichaux's phone number?

A It appears that way.

Q I mean, do you recall doing that?

A Yes, sir.

Q Okay. And then he gave you Judge Robichaux's phone number?

A Correct.

Q Okay. And why were you asking for Judge Robichaux's phone number?

A I don't recall.

Q Okay. Well, do you recall if it had something to do with the Dawn Pierce case?

A I'm sure it did.

Q You're sure it did based on your memory, or just because you were asking for that number around that time?

A Because I was asking for that number around the time.

Q Okay. So today, you don't actually remember why you were asking for Judge Robichaux's number, but you speculate that it was for the Dawn Pierce case?

A Correct.

Q Okay. And then going back to Exhibit ZD, do you see that this is the -- ZD at page 31, do you see that this is the affidavit for arrest warrant?

A Yes.

Q Okay. And this is something that you wrote?

A Yes, sir.

Q And then you submitted it electronically to Judge Robichaux?

A Yes, sir.

Q And Judge Robichaux signed it at 7:06 p.m. on July 8, 2025?

A Yes, sir.

Q And do you remember how long it took for her to approve the warrant? Was it a few minutes after you submitted the warrant application, or a few hours, or do you recall?
A I'm not sure what time I submitted it.
Q Yeah. Do you recall roughly approximately how long it took? Was it a fast warrant to obtain, or a slow one?
A I'm guessing it was fairly quick. I probably submitted it late afternoon and then she signed it at the time you said.
Q So you think you submitted this before 5 p.m.?
A Probably.
Q Well, so, I actually don't want you to guess. I want to know if you recall. So if --
A I do not recall. Sorry. I do not recall the time I submitted it.
Q Yeah, it's okay. Do you have any records that show when you submitted it?
A Yes.
Q What system is that in?
A That is in WarrantNow 2.0.
Q Okay. So you still have access to the records that would show when you submitted this

warrant application, correct?
A Yes, sir.
Q Okay. And did you talk to Judge Robichaux on the telephone that day?
A I don't recall.
Q Okay. But what we're looking at here on this page, this is the entirety of what you submitted to the judge to obtain the warrant, correct?
A Correct.
Q You didn't send the judge photos or other documents or anything like that. Correct?
A Correct.
Q Okay. So then, pulling up Exhibit T, as in Tom.
(Exhibit T was marked for identification.)
BY MR. MOST:
Q Do you see that this is -- these are text messages between you and Amber Sibley? Or are these text messages between you and Amber Sibley?
A Yes.
Q Okay. So, shortly after you obtained the warrant, Amber texts you?
A Correct.

Q And she says, "Do you have a moment to call. I have a question." And you say "Yes." Correct?

A Mm-hmm.

Q Did you speak to her on the phone at that point?

A I don't recall.

Q Do you recall what her question was?

A No, I don't.

Q Okay. And then, were you aware that Dawn Pierce was arrested that evening?

A Yes.

Q How did you find that out?

A Tristin called me and let me know. Or texted me and let me know. One or the other.

Q And then, going back to Exhibit Z, the Bouziga call logs, going down to July 9, 2025 -- actually, going to July 10, 2025, do you see that there is a 3:32 p.m. call from the mayor to you on --

A Yes.

Q Do you recall that phone call?

A Absolutely not.

Q Okay. Do you remember talking to the mayor about the arrest of Dawn Pierce after the

arrest of Dawn Pierce?
A No.
Q Okay. You never called to follow up about what happened?
A I don't believe.
Q And you don't recall ever telling him what happened?
A I don't believe. I may have. But -- we may have just talked about that she was arrested and ...
Q Sorry -- you're saying you may have told him that she was arrested?
A May have.
Q Do you recall telling him that?
A No.
Q Okay. And then, do you know Michael Kreamer's phone number?
A Not offhand; no, I don't.
Q Okay. So do you recall having a July 10th, 2025, 5:24 p.m. call with Michael Kreamer?
A I had several calls with Michael.
Q Okay. Was the one on July 10th about Dawn Pierce?
A Probably not.
Q Okay. Why do you say that?

A Because Michael and I -- he was there to assist my officer, and we didn't have any reason to talk about it.

Q Okay. And then pulling up Exhibit ZD, page four -- page three to four.

(Exhibit ZD was marked for identification.)

BY MR. MOST:

Q This sort of shows a log of different things that happened related to this case, right? This is a case log, right?

A Okay.

Q Is that correct?

MR. DETWEILER:

It's not up.

THE WITNESS:

I don't see it.

BY MR. MOST:

Q Oh, I'm sorry. Thank you.

Okay. Is Exhibit ZD on your screen?

A Yes.

Q And is this a Golden Meadow Police Department case log that shows different things that happened related to a case?

A Correct.

Q Okay. And so Dawn Pierce was arrested on July 8, 2025, right?
A Yes.
Q And then, on July 11th, you add a primary narrative? Is that correct?
A Correct.
Q So you added your narrative three days after the arrest?
A Evidently.
Q Okay. Does that match your recollection?
A I don't remember.
Q Okay. And so, if you wrote your narrative several days later, would you have -- what would you have been basing that on? Was that based on your notes, or recollection, or something else?
A My notes.
Q Okay. Is it normal for you to write up a narrative several days after an incident?
A Yes.
Q Okay.
MR. MOST:
Okay. I'm going to turn to another section. Does anyone want to take a break to get food or anything?

THE WITNESS:

No.

MR. DETWEILER:

No.

MR. MOST:

Lisa, do you need to take a break?

COURT REPORTER:

I'm fine, thanks.

MR. MOST:

Okay.

BY MR. MOST:

Q Okay. So, do you recall, Chief, if you discussed bail or bond for Dawn Pierce with Judge Robichaux?

A No.

Q And you don't --

A (Inaudible).

Q I'm sorry?

A I would not have.

Q Because that's not something you typically talk to judges about?

A No.

Q Okay. But when you say "I would not have," you don't have a recollection; you're just figuring that, based on your regular conduct, you

would not have discussed that?

A No. I know I did not speak to Judge Robichaux about bond.

Q How do you know that?

A Because I don't speak to the judges about the bond.

Q Okay. Do you recall talking to Judge Robichaux at all about Dawn Pierce?

A No, I don't.

Q Okay. So then, pulling up Exhibit P, I want to talk now about the warrant and application. So this is -- looking at Exhibit P at page 15, this is the warrant application you submitted to effect the arrest of Dawn Pierce. Correct?

A Correct.

Q Okay. And it says -- and you swore this under oath. Correct?

A Correct.

Q Okay. And so you say in this that, "at 1243 hours, I, Chief Michelle Lafont, received a complaint from Amber Sibley." Correct?

A Correct.

Q But that's not exactly true. You didn't receive anything from Amber Sibley at 12:43. Correct?

MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
I received the complaint through the sheriff's office, through Zuercher; yes.
BY MR. MOST:
Q But I think we established there was nothing in the electronic system about what the complaint was at 12:43, right?
A Not at 12:43, no.
Q Right. So you didn't receive any complaint from Amber Sibley at 12:43. Correct?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
The complaint -- the call for service came in at 12:43. That's why I put that time.
BY MR. MOST:
Q Right. And then the complaint from Amber Sibley came in a few minutes later. Right?
MR. DETWEILER:
Objection.

THE WITNESS:

The call for service was the complaint from Amber Sibley.

BY MR. MOST:

Q And then, we discussed that the images described in this warrant application, Amber Sibley had posted them on the Internet. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

That Amber Sibley posted them on the Internet? Yes.

BY MR. MOST:

Q So these weren't private photos. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

To my recollection and from our conversation, I understood that they were on her OnlyFans page.

BY MR. MOST:

Q Okay. But we also established you looked

at the photos and saw that they were not private photos. Agreed?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Some of them were.

BY MR. MOST:

Q Some of them were. Okay. But the ones with the nipples, those were not the private photos. Correct?

A I'm not sure.

Q Okay. So you weren't sure if the ones with the nipples were private or not. Correct?

A I thought the ones with the nipples were private.

Q You're guessing, or you're recalling?

A No. I'm saying, from my recollection, I believe they were.

Q Okay. So Amber told you that some of these photos were private and some were public?

A She said that some of them were under her subscribe page and some of them were not.

Q Okay. And did you tell the judge that there was a button that said -- well, let me back

up.

You understood that these lingerie photos were advertisements for Amber's business, right?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes.

BY MR. MOST:

Q Okay. Did you tell the judge that?

A What I told the judge is what's in my probable cause on the warrant.

Q Okay. So it doesn't say anything here about her having advertisements or lingerie advertisements for her private nude photo business, right?

A Not in my probable cause, no.

Q And you had seen the button that said you could share this photo with anybody, right?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

On a couple of the photos, yes.

BY MR. MOST:

Q Okay. And you didn't mention that to the judge?
A No, sir.
Q And then you characterized Amber's underwear as see-through underwear?
A Correct.
Q Okay. But we've already established, you couldn't see whether Amber had pubic hair or not, or internal or external labia. Correct?
A In the images that I saw on the screen at the time you were questioning me.
Q Okay. In the printouts, could you see Ms. Sibley's labia?
A No.
Q Okay. So these were not complete see-through underwear. Right?
MR. DETWEILER:
Objection to form.
You can answer.
THE WITNESS:
Some of the area was.
BY MR. MOST:
Q But not the part covering the genitals. Correct?
MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Her vaginal area? No.

BY MR. MOST:

Q Okay. Moving on to another topic, do you know where Mayor Bouziga lives?

A Yes.

Q Okay. So I'm pulling up what's been designated as Exhibit ZI.

(Exhibit ZI was marked for identification.)

BY MR. MOST:

Q Does he live at 2005 North Bayou Drive?

A I'm not sure of the address, but he does live on North Bayou Drive.

Q Where this top arrow is pointing, the corner of Toups Lane and North Bayou Drive, is that his house there?

A It appears to be.

Q Okay. And then, down the block somewhat, or a couple blocks, at the corner of Eddie Lane and North Bayou Drive, do you see there's an arrow pointing to 1707 North Bayou Drive?

A Yes, sir.

Q And is that a house that the mayor uses also?

A I have no idea.

Q Okay. Do you know if the mayor has like a man cave at a separate location from his house?

A No.

Q Okay. And do you know who lives down at the bottom here, at 1703 North Bayou Drive?

A No.

Q Okay. I'm going back to Exhibit P, as in Paul. You see that the complainant lives at 1703 North Bayou Drive?

A Yes, sir.

Q Okay. So it looks like the mayor's house is -- is just a couple of houses away from Amber Sibley's and Dylan Rousse's house. Correct?

MR. DETWEILER:

Objection.

THE WITNESS:

Appears to be.

BY MR. MOST:

Q And so -- Dawn Pierce doesn't live in Golden Meadow. Right?

A Correct.

Q And so she's outside of your police

department's jurisdiction. Correct?
A Dawn Pierce is, yes.
Q Okay. And so how is it that Golden Meadow Police Department officer -- an officer went out and effected an arrest of her outside the jurisdiction?
MR. DETWEILER:
Objection.
THE WITNESS:
That's where Michael Kreamer came in.
BY MR. MOST:
Q Okay. So by including someone from the sheriff's office, Tristin Gaspard was able to arrest Dawn Pierce outside of Golden Meadow Police Department?
MR. DETWEILER:
Objection.
THE WITNESS:
Tristin did not arrest Dawn Pierce. Michael Kreamer did.
BY MR. MOST:
Q What makes you think that?
A Because it was in his jurisdiction. It was outside of our jurisdiction. Tristin went to

assist. Michael Kreamer is the one who made the arrest.

Q Okay. And how do you know that? I mean did someone tell you that? Did you watch the body camera footage? How do you know who made the arrest?

A Body camera footage.

Q So you've watched the body camera footage of the arrest of Dawn Pierce?

A Yes, sir.

Q When did you watch that?

A A few days -- or sometime after the arrest.

Q Why did you watch it?

A Um, because the lawsuit was coming into play.

Q Okay. So within a few days of the arrest, you knew that the lawsuit was coming into play?

A When we were advised of the lawsuit, that's when I watched it. I did not watch it before.

Q Okay. But it's your recollection that was within a few days of the arrest of Dawn Pierce?

MR. DETWEILER:

Objection.

THE WITNESS:

That was after the, um, court appearance when she was dismissed and the lawsuit was put into action. So no, I did not watch it a few days after the arrest. It wasn't until after her court appearance.

BY MR. MOST:

Q Okay. So after there was a court appearance -- so let me back up. You're aware of a court appearance where the charges against Dawn Pierce were dismissed?

A Yes, sir.

Q Okay. And then the fact -- and then what indicated to you that there was a lawsuit coming?

A I was served the lawsuit.

Q Okay. So after you were served with the lawsuit, that's when you watched the video?

A Correct.

Q Okay. And so, you saw in the video that Tristin Gaspard told Dawn Pierce what she was being arrested for?

A I don't recall.

Q Okay. Do you recall him reading her her

Miranda rights?
A If I'm -- I'm -- if I remember correctly, it was Michael Kreamer that did that.
Q Do you recall whose vehicle Ms. Pierce was put into?
A She was put into Tristin's.
Q Okay. So if Tristin was present, told Dawn Pierce what she was being arrested for, read her her Miranda rights, and then put her in his vehicle, would you agree he was participating in the arrest?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
It was not him that handcuffed her, which means it wasn't him that made the arrest. And it was Michael Kreamer that read her her Miranda rights. He put her in Tristin's vehicle.
BY MR. MOST:
Q Okay. So GMPD had Kreamer come out there to be the one to put the handcuffs on Dawn Pierce so that she could be arrested for this?
A Correct.

Q Do you know who called LPSO to do that?
A Tristin did.
Q Okay. Is that what y'all do every time you get an arrest warrant for someone outside the Golden Meadow boundaries?
A Yes, sir.
Q Okay. So, when you were working this case, did you consider alternatives to an arrest, like a warning or anything like that?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
No, sir.
BY MR. MOST:
Q You didn't consider any alternatives besides getting a felony arrest warrant for the arrest of Dawn Pierce?
A Correct.
Q You didn't consider just telling these people, like, stop talking to each other?
MR. DETWEILER:
Objection. Asked and answered.
You can answer.
THE WITNESS:

I did tell them. I told Amber and Dylan.

BY MR. MOST:

Q You told Amber and Dylan, "You guys should just stop talking to Dawn"?

A Correct.

Q Okay. And why was that insufficient to solve the problem, if that was your advice?

A Because the way things were, she had broken the law, so -- and it wasn't the first time that they went through this kind of situation, so, I followed --

Q What was --

A -- (inaudible) the arrest.

Q There was a previous time?

A From what I understood, yes.

Q What was that?

A I'm not sure. I don't remember. But it was -- they had been in arguments before, and she was asked -- Amber and Dylan asked Dawn Pierce to take the pictures down, and she refused. She said she was leaving them up. And then she was making comments on the Facebook posts, from what I remember. And since she refused to take them down, I executed the warrant.

Q Okay. So you weren't aware of, like, a prior photo incident prior to July 8th, 20- --
A Correct.
Q Okay. So you decided to get the arrest warrant for Dawn Pierce because she wouldn't take the photos down?
A Correct.
Q So, you were considering that if she took the photos down, you wouldn't arrest her. Is that correct?
A Possibly.
Q Well, what's your recollection? I don't want guesses.
A If she would have taken them down, then there was no reason for a warrant.
Q Okay. Because it wasn't the sharing of them on Facebook, it was the leaving them up there. Is that correct?
A It was sharing them on Facebook and leaving them up.
Q Okay. Did you look up Ms. Pierce's criminal history before you had her arrested?
A No, sir.
Q Okay. Are you aware that Ms. Pierce was arrested in front of her children?

A She was not.
Q Okay. How do you know that?
A Body camera footage.
Q Do you know if the children were watching from the house?
A They did not appear to be.
Q Okay. So you didn't see her being arrested in front of her children?
A No.
Q But you don't know if she really was or not. Correct?
A I wasn't there, so I -- I just went off of body camera footage.
Q Okay. So, knowing everything you know today, would you do all the same things with regards to Dawn Pierce, all over again?
A Absolutely.
Q Okay. And you arrested her for a violation of 14:283.2. Right?
A I believe so.
Q Yeah.
A Yep.
Q How many times have you arrested someone for a violation of that statute?
A That is the first time.

Q Okay. Any times since?
A No.
Q Do you know of any times your department has arrested someone for that -- a violation of that statute besides Dawn Pierce?
A No.
Q Okay. So as far as you know, this is the only 14:283.2 arrest in the history of the Golden Meadow Police Department?
A In the history that I've been chief of police.
Q Yeah. And you haven't found any other arrests under that statute anywhere else. Correct?
A I haven't looked.
Q Okay.
Chief, have you ever been arrested?
A No, sir.
Q Okay. So the photos that we were looking at of Amber Sibley, how did you get those?
A I don't remember.
Q Okay. So, in pulling up Exhibit ZN, do you see that these are answers to discovery on behalf of people, including you, Police Chief Michelle Lafont?
A Yes, sir.

(Exhibit ZN was marked for identification.)

BY MR. MOST:

Q So, going now to page three, one of your answers is that, "I also reviewed the photos provided to me by Amber Sibley." Correct?

A Correct.

Q So, the photos were sent from Amber Sibley to you?

A Yes, sir.

Q Okay. And you've never met with her in person, correct?

A Never.

Q So she somehow sent them to you electronically. Correct?

A Correct.

Q Do you recall if she emailed them to you, texted them to you? How did she transmit them to you?

A I don't remember.

Q Okay. But do you remember it was some form of electronic communication?

A Correct.

Q Okay. We'll come back to that.

So, the next topic is the town of -- you

lead the police department. Correct?
A Yes, sir.
Q And does your police department have a policy manual?
A No, sir.
Q Do you have any sort of set of directions for police officers about what they're supposed to do and not supposed to do?
A Yes, sir.
Q What is that set of directions?
A Louisiana state statutes.
Q Okay. Now, the Louisiana state statutes generally tell you what's a crime and what's not a crime. Right?
A Yes.
Q It doesn't say how to effect an arrest. Right?
A Correct.
Q So what are the directions for officers in your department for how to effect an arrest?
A All of my officers are POST certified and went through the police academy and learned how to effectively effect an arrest.
Q Okay. So your department has no policies about how to effect an arrest?

A Correct.
Q It has no policies whatsoever.
A We follow the laws and they, um, follow the rules from what they have learned in the police academy.
Q What rules are you talking about?
A How to abide by the laws and to effectively, um -- I don't know the word I'm looking for. Effectively, um, put them towards the -- the public. Towards criminals. Or just -- do their job.
Q Okay. So, I mean, are there rules about whether someone's hands should be cuffed behind them or in front of them?
A Everyone's hands should be cuffed behind them.
Q At all times, correct?
A At all times.
Q Okay.
A That is our policy.
Q That's your policy?
A Yes.
Q Okay. And now, are you -- have you told that policy to anybody?
A They know that policy, yes. We have

talked about that policy.

Q Okay. So you have policies that are verbal policies that you convey to your officers?

A Yes, sir.

Q So, if Tristin Gaspard unhandcuffed Dawn Pierce's hands before putting her into the vehicle and then recuffed her hands in front of her, he would be violating your verbal policy?

A As far as I know, she was never handcuffed behind her back. She was just handcuffed in the front.

Q That's your recollection from the video?

A I believe so. That's what I remember.

Q Wait, she was never handcuffed from the back? She was only handcuffed from the front?

A I believe so.

Q So then, the entirety of her time with her hands cuffed was a violation of your verbal policy?

A There are exceptions, and the officers do have discretion on whether or not to handcuff them in the back or the front.

Q I thought you just told me that your policy is hands should always be cuffed behind. Right?

A We do have a policy that you handcuff people in the back, but there are exceptions. There's exceptions to every policy. To every rule.
Q Sure. So what are those exceptions?
A It's officer discretion.
Q So your policy with regard to handcuffing is, always cuff a suspect's hands behind their back, unless the officer doesn't want to?
A Unless there's a reason that you wouldn't want to, yes.
Q And that's what you've told your officers, "You must handcuff people behind their back unless you decide there's a reason not to"?
A Correct.
Q Okay. What is your department's use of force policy?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Whatever they need to get home at night at the end of shift.
BY MR. MOST:
Q And that's what you have verbally conveyed to your officers?

A That is our -- yes.
Q They can do any use of force if they deem that necessary to get home at night?
A Yes.
Q And so, it's -- it's, um, it's not an escalating allowance of use of force depending on the resistance of the suspect, it's a -- it's a different policy. Correct?
MR. DETWEILER:
Objection.
THE WITNESS:
We do have an escalation policy. They do have nonlethal weapons to be able to apprehend a suspect, yes.
BY MR. MOST:
Q What's your escalation policy?
MR. DETWEILER:
Objection.
THE WITNESS:
It's the officer's discretion.
BY MR. MOST:
Q Okay. So use of force, the GMPD's policy under your leadership is, officer discretion to use force. Correct?
A Correct.

Q Okay. So no limits on the use of force, just whatever the officer, in their discretion, feels is appropriate?
A Correct.
Q Okay. Do you have an alternatives to arrest policy?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
We can write citations.
BY MR. MOST:
Q Okay. And so, what's your policy about when they should make arrests or issue citations?
A Officer discretion. If it's a misdemeanor and the person is cooperating, you write a citation. If the person is not cooperating, handcuff them and arrest them.
Q Okay. So --
A If it's a (inaudible), it's an arrest.
Q I'm sorry?
A If it's a felony, it's an arrest.
Q Okay. So your policy is, officers must arrest for any felony charge?
A Yes, sir.

Q Okay. What's your -- do you provide any training to your officers?
A Yes, we do.
Q What training do you provide to officers?
A So they've all been POST certified. They've all gone through the police academy. They are, um, weapons certified. They go to the shooting range. They all have to do 20 hours of training a year. They are taser certified. They are, um -- some of them are intoxilyzer certified. There's other certifications, and anything that they -- any training that they would like to do, then they have the ability to do.
Q Do you provide any training to officers about declining to comply with unconstitutional directives?
A Not formally, no.
Q Okay. Do you have any informal policies about that?
A No.
MR. MOST:
Okay. I'm going to move to another subject. Does everyone want to just keep moving, or does anybody want to take a break?

THE WITNESS:
Keep moving.
MR. MOST:
Let's do it.
BY MR. MOST:
Q Okay. So I'm pulling up Exhibit ZL.
(Exhibit ZL was marked for identification.)
BY MR. MOST:
Q This is your personnel file. Well, let me back up. This is your police department application. Correct?
A Yes, sir.
Q And so, even though you were elected police chief, you still filled out a police department application. Correct?
A Yes. I was asked to fill it out after I was elected.
Q Sure. And so, going to page nine, you signed this certification, certifying that this application is true and complete to the best of your knowledge. Correct?
A Yes, sir.
Q Okay. And that's a truthful statement; your application was true and complete. Right?

A Yes, sir.
Q You didn't leave anything out that it asked for. Correct?
A No, sir.
Q Okay. So going to page eight, it says "Miscellaneous." And this page asks about traffic violations, arrests, convictions, drugs, alcohol, stress. Is that correct?
A I can't read it.
Q Sure. So you see at the top, this is a "Miscellaneous" page, on page eight of ZL?

THE WITNESS:
Do you have it, or...?
MR. DETWEILER:
(Inaudible.)
THE WITNESS:
Okay. Yes.

BY MR. MOST:

Q Okay. And it asks you about traffic violations, and you answered you have not received any traffic violations during the past three years. Right?
A Correct.
Q And then you answered the question about arrests, you had never been arrested. Right?

A Right.
Q And then you answered the question about you've never been convicted. Right?
A Correct.
Q And then for drugs, you said you have not illegally used drugs and have never sold or distributed illegal drugs. Right?
A Right.
Q Because you wanted to completely disclose answers to these questions. Right?
A Right.
Q And then for alcohol, you did not answer the alcohol questions, did you?
A I guess I didn't.
Q Okay. Why did you choose not to answer the alcohol questions?
A I must have skipped it, I guess. Not intentionally, but I did.
Q Okay. I mean, you were suspended from a prior law enforcement job for driving under the influence of alcohol, right?
A No, I was not.
Q What part -- were you suspended from a prior law enforcement job?
A Yes, I was.

Q Was there an accusation that it was for driving under the influence?
A No.
Q What was the suspension for?
A For asking a friend to say that she was driving instead of I was.
Q So, you were driving and you asked a friend to say she was driving?
A Correct.
Q Okay. And so, were you pulled over by the police?
A I was in an accident.
Q Okay. You were in an accident where you were the driver?
A Yes, sir.
Q And you asked your friend to tell the police that she was the driver?
A Correct.
Q Why did you ask her to do that?
A So I could keep my job.
Q Mm-hmm. And had you consumed any alcohol or drugs that day?
A Alcohol.
Q And you were worried that if you were found to be the driver in an accident when you had

consumed alcohol, you might lose your job?
A Correct.
Q And so you asked your friend to lie to the police to cover that up. Correct?
A Yes, sir.
Q And you were suspended because of asking that friend to lie to the police?
A I was suspended because the police officer heard me ask her, and told the supervisor.
Q Okay. And so, you are saying that that has no connection to the fact that you did not fill out the alcohol portion of this form?
A Correct.
Q Okay. Going up to page five, you noted that you worked for the Lafourche Parish Sheriff's Office. Correct?
A Correct.
Q And it asked you to list disciplinary action taken against you by the sheriff's office. Right?
A Right.
Q And you omitted the fact that you had been suspended for asking a friend to lie to the police. Correct?
A Correct.

Q Why did you omit that?
A Because I didn't need to put it. The application was just to have on record, to put in my file.
Q Okay. But you just told us a few minutes ago that this application was complete, right? That you didn't leave anything out. Right?
A I wasn't aware that I didn't do it. I didn't -- I didn't look at the application before you asked me these questions.
Q Okay. So now that you've looked at it, it's not complete. Agreed?
A Agreed.
Q You left out the fact that you asked a friend to lie to the police and got in trouble for it.
A Yes, sir, I did.
Q Okay. So, your predecessor, the prior police chief, is Chief Dufrene, right? Former Chief Dufrene?
A Yes, sir.
Q And he's been indicted for destroying official records, right?
A Yes.
Q So I would imagine that you have been

extra careful as chief to make sure no records are getting destroyed?

A Yes.

Q So what steps have you implemented to prevent the destruction of records?

A We use Zuercher. And our records are uploaded into our cases and electronically filed.

Q Mm-hmm. What about paper records?

A We have -- some things get filed.

Q And you're careful not to destroy any paper records?

A Those that we need to keep on file, yes.

Q Well, what paper records do you generate that you don't need to keep on file?

A Notes. Emails.

Q So you don't preserve the emails?

A No.

Q Emails get deleted?

A Some do. Some just sit in -- on my computer until they get old enough to be deleted automatically.

Q Okay. And so you have an automatic deletion function of your email system; correct?

A Once it -- yes.

Q And have you turned that off at any

point?
A No.
Q So even after this lawsuit was filed, your automatic deletion program is still running. Correct?
A Yes.
Q Okay. And you've continued destroying your paper notes?
A Yes.
Q Even after this lawsuit was filed?
A Yes, sir.
Q Okay. And we know that there were some paper notes about Dawn Pierce's case, correct?
A Yes.
Q Okay. And you destroyed those?
A Yes.
Q But you don't know when?
A Once my report was complete.
Q So you destroyed them after you wrote your narrative?
A Once my -- once everything was uploaded into our, um, our program, yes.
Q So that would have been, like, three days after Dawn Pierce's arrest?
A Some of them, yes.

Q Well, no, I'm just asking, like, when was it -- the file complete? Was it three days after Dawn Pierce's arrest?

A Um, that's what it appears to be.

Q Okay. So, three days after Dawn Pierce's arrest, you wrote up the narrative, and then you tore out the notes related to that and threw them away?

A I don't recall. I can't tell you that I did that three days later, once the report was done I tore out the notes, or if I just kept it until I threw the notebook away, little notepad, I...

Q Okay. Well, I'm just trying to figure out which it was, because I think I've heard you say both today. I think you said earlier that you would wait until the notepad was full and then throw it away, and now you're telling us you would throw away the notes once the narrative is complete. So which is it?

A Both. It depends. My written notes that I take in my little notepad, I don't tear them out. I throw that away after the notepad is -- is done. Emails, text messages, stuff like that, once I upload the evidence, or once I upload what I need from them, then they're deleted and -- so it -- it

all depends on the notes and what it is.

Q Okay. So at least, then, the paper notes related to Dawn Pierce have been destroyed. Right?

A Correct.

Q And there could be emails related to Dawn Pierce that have been destroyed by the automatic deletion program?

A Correct.

Q Okay. So you haven't taken any steps specific to this case to preserve documents, you've just done your sort of normal process. Correct?

A Correct.

Q And, you know, Golden Meadow is a little different than some towns. In some towns, the chief of police is appointed by the -- somebody else, right?

A Right.

Q And in Golden Meadow, you're elected. Correct?

A Correct.

Q So, for police business, you're the final decision-maker. Right?

A Right.

Q And you also talked about how you issue policies verbally to your officers. Correct?

A Correct.
Q So you're the final policymaker for police business. Correct?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Correct.
BY MR. MOST:
Q Okay. So I'm going to pull up what's been designated as Exhibit ZM, as in Mary.
(Exhibit ZM was marked for identification.)
BY MR. MOST:
Q Do you see --
A Make it bigger, please.
Q Sure. Do you see that this is a Golden Meadow Police Department State/NCIC Query?
A Yes, sir.
Q And so, NCIC, that's a national database of criminal history?
A Correct.
Q And so, this document is the results of looking at state and federal databases for Dawn Pierce's criminal history. Right?

A I can't see that it's for Dawn Pierce.
Q Sure. Do you see further down, it says "Criminal record of: Pierce, Dawn M"?
A Yes, sir.
Q Okay. So this is a search for -- to state and federal databases for the criminal history of Dawn Pierce?
A Correct.
Q Okay. And the only thing on her criminal history -- this is also called a -- let me back up. This is also called a rap sheet. Is that correct?
A Correct.
Q And the only thing on her rap sheet is the one arrest that you caused. Correct?
A Correct.
Q Okay. So before you had her arrested, she had a 100 percent clean criminal record, as far as you can tell. Correct?
A Correct.
Q Are you able to take things out of these databases?
A No, sir.
Q As far as you know, is this now a permanent record for her?
A Yes, sir.

Q This could affect her employment in the future?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

It possibly could.

BY MR. MOST:

Q Yeah. I mean, you're aware that employers sometimes do criminal background checks on their potential employees?

A Yes, sir.

Q And this kind of rap sheet can be pulled up through a -- a criminal background check?

A Depending on who they do the background check through, yes.

Q Yeah. So if Dawn Pierce applies for a job in the future, this arrest might show up and make it harder for her to get that job. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

It could.

BY MR. MOST:

Q Do you know if Dawn Pierce's DNA was taken when she was arrested?
A No, it was not.
Q How do you know that?
A Because they didn't bring her to the hospital, and I didn't do a warrant for it.
Q Okay. So they don't do a cheek swab once someone is booked into LPSO's facility?
A That's not my -- I don't have anything to do with that. So if they do it, I'm not aware of it.
Q Okay. So her DNA might have been taken, but you don't know?
A Correct.
Q Okay. I'm going to shift to another section. We're getting close to the end, and then I want to take a break and then wrap up, and then Mr. Detweiler can ask any questions.
Okay. Pulling up Exhibit ZN, as in Nancy, these -- as we looked at before, these are your discovery responses. Correct?
A I can't read it.
Q Yeah. It says: Answer to Discovery, Police Chief Michelle Lafont.
A Okay.

Q And looking at ZO -- wait.

(Exhibit ZO was marked for identification.)

BY MR. MOST:

Q ZO at page two, you see this is your signature?

A Correct.

Q So you looked at the responses to some of the discovery requests and saw that they were all accurate?

A Yes, sir.

Q And you swore under oath that all of the discovery responses were accurate?

A Yes, sir.

Q Okay. So, going to Interrogatory Number 2 for Chief Lafont, you were asked to identify any photo related to the arrest of Dawn Pierce depicting sexual conduct. Right?

A I can't read it, but...

Q How about that?

A Yes.

Q Okay. And you were asked to identify photos with sexual conduct. Right?

A Yes.

Q Okay. And you said photos one and two

that you circled. Right?
A Correct.
Q And those are Exhibit G here, without the red mark, you can see?
A Right.
Q What sexual conduct do you see in this photo?
A There is no sexual conduct. It was what we discussed.
Q Right. Okay. What about Exhibit H. Do you see any sexual conduct in this photo?
A No, sir.
Q So when you answered -- when you were asked about sexual conduct and you pointed to these two photos, that's -- that's not accurate, is it?
A No, sir.
Q Okay. So at least this interrogatory response is not correct. Agreed?
A Correct.
Q Okay. And do you see Interrogatory Number 9, about identifying all facts supporting probable cause to arrest Dawn Pierce?
A Yes, sir.
Q And you said, "After studying the photos, I believed the photos showed nipples through the

lace on the bra and showed her vaginal area through the lace on the panties," correct?

A Correct.

Q But I think we established earlier that the vaginal area is not something you can see through the panties. Is that correct?

A On the picture in -- on the screen, yes.

Q So you -- well, could you see the vaginal area through any of the photos of Amber Sibley?

A You can see her vaginal area, yes.

Q You can see the vagina?

A You can see the area, yes.

Q What do you mean by "the area"? Do you mean the vagina, do you mean the labia? What do you mean?

A The vagina.

Q So you could see the vagina through some of the photos?

A You can make out that it's there, yes. You can't see the labia, but you can -- there you cannot.

Q Okay. So -- and you're talking about Exhibit H here, with the circled area?

A Correct.

Q So in this photo, you can't see the

labia, but you can see the vagina?
A In that photo, no, you can't.
Q You can't see any of it in this photo. Right?
A Correct.
Q But that's the photo you circled. Right?
A Yes, sir.
Q So you circled it to say you can see the vaginal area?
A On the screen right here, no, you cannot see anything.
Q But when you were looking at it and circled it, you could see it?
A Yes. The lace is see-through.
Q Okay. And so you still have a copy of the printed out version you could see through?
A I believe so.
Q Okay. Would you make sure not to destroy that, so that we can take a look at that?
A Yes, sir.
Q Okay. And where is the copy that you can see the vagina?
A In the office in the filing cabinet.
Q Okay. And in that version that's in the filing cabinet, can you see the labia?

A No, sir.
Q Can you see the pubic hair?
A I don't recall.
Q So, in that photo that's in your filing cabinet, you can see the vagina but you cannot see labia. Is that correct?
A Correct.
Q And are you aware that the vagina is a hole that is inside the labia?
A Yes, sir.
Q Okay. So I'm having trouble understanding. How could you see the vagina but not the labia?
A I'm looking at the whole picture. I'm not looking at just the hole of the vagina.
Q Okay. So, back at Exhibit ZN, at page ten, you see that these are requests for admissions to all defendants?
A Yes.
Q And you looked at these to make sure they were truthful?
A Yes, sir.
Q And they are truthful?
A As far as I know, yes.
Q Okay. So for Request for Admission

Number 2, you denied that some of the photos said "Subscribe to see user's posts." Right?

A I did not deny that.

Q It says, "Response: Denied."

A I'm confused.

Q Let me phrase it as a question. Does it say "Response: Denied"?

A Yes, it does.

Q Okay. So you denied that the -- any of the photos said "Subscribe to see user's posts." Right?

A Is this my response?

Q Yeah, we can go to the top. You see it says, "Now into Court come Defendants," including Police Chief Michelle Lafont?

A Including.

MR. DETWEILER:

Yeah, we didn't differentiate who answered which ones.

BY MR. MOST:

Q Mm-hmm. Right. So, this denial is on behalf of you and all the other defendants. Right, Chief?

A Could be. Yes.

Q Okay. But is that your understanding?

A Yes, sir.
Q Okay. And you checked to make sure they were accurate. Correct?
A Mine. Yes, sir.
Q Okay. So you denied that any of the photos say "Subscribe to see user's posts." Correct?
A None of my photos say that.
Q None of the photos in your police report say that?
A Correct.
Q Okay. And so that's why you denied that any of the photos say "Subscribe to see user's posts." Correct?
A Probably, yes.
Q Well, I don't want guesses. Is that your understanding?
A That's -- that's my understanding, yes.
Q Okay. So if we go to Exhibit P -- this is your police report, right?
A Yes.
Q Okay. And so if we go to page seven, here's one that says "Subscribe to see user's posts." Right?
A Yes.

Q Okay. So at least --
A But it's not -- it's a text message. It's not a photo. The photos I have, none of them say "Subscribe to user's posts." Text messages do say that.
Q Okay. And so you think that this button is in a text message?
A Yes, sir.
Q Who do you think was texting who here?
A Amber was texting me -- or that was from the OnlyFans page that Amber took screenshots of and sent to me.
Q Okay. And you have a private Gmail account, right?
A Yes, sir.
Q And you forwarded these images from your Gmail account to your police account, right?
A I'm not sure.
Q Okay. Well, we know Amber sent them to you. Right?
A Correct.
Q And we know that somehow they got into the police department's email account. Right?
A I don't recall.
Q Okay. Have you looked in your Gmail

account for emails from Amber?
A Yes, sir.
Q And you couldn't find any?
A No, sir.
Q And you've looked in the police department's email and you couldn't find any?
A Yes, sir.
Q And you've looked in your text messages?
A Yes, sir.
Q So somehow, she -- Ms. Sibley was communicating with you electronically, but we no longer have those documents. Is that correct?
A We have the documents. We no longer have the original.
Q Right. We no longer have Ms. Sibley's communications to you by which she transmitted those photos. Correct?
A Correct.
Q And do you conclude they've been deleted by one of these automatic deletion programs?
A No. I deleted them personally.
Q You deleted them from what?
A Whatever source they came from, whether it was email or text messages.
Q So you don't remember how she got them to

you, but you remember going back and deleting them?
A Correct.
Q When did you delete them?
A After they were uploaded into the program.
Q Why did you delete them?
A Why did I delete them? Because I didn't need to keep them in the source. Once evidence is uploaded, we typically delete it.
Q Mm-hmm. So you somehow transmitted the photos she sent you to your police systems and then uploaded the photos themselves. Right?
A Correct.
Q But you didn't save Amber's communication with you. Correct?
A Correct.
Q That's correct?
A Correct.
Q Yeah. So if she had some -- you know, some explanatory text, that's been deleted. Correct?
A That would have all been added in with the rest.
Q You're guessing that that's what you would have done?

A No. I'm telling you, all of the evidence, anything that Amber would have sent to me, was uploaded into the police report. Uploaded into the case.

Q Right. But we don't have the email or text message by which she sent it to you, right?

A I don't need to keep it. Once everything is uploaded, there's no need to have it on my source.

Q But you don't have any way of explaining how you got these photos. Right?

A No, I don't.

Q Isn't that a giant chain-of-custody problem for your police department?

A No, sir.

Q If you can't say this is how I got them, you don't think that is a chain-of-custody problem?

A No, sir.

Q Why not?

A Because there's no reason to keep an email. I get emails every day for stuff that goes along with a case. I upload it to the cases and delete the email.

Q You upload the attachments and then delete the email?

A Upload whatever needs to be uploaded into the case, and then delete the email.

Q And sometimes that means uploading the attachments and then deleting the email. Correct?

A We don't just upload the attachment. We upload the whole email, or whatever is necessary, yes.

Q Okay. But you didn't do that with Amber Sibley's communication. Correct?

A I did. I uploaded everything that she sent me.

Q Okay. But she sent you documents in an email or text message. Right?

A Correct.

Q And you saved the documents she sent you, right?

A Yes.

Q And you did not save the email or text message by which she transmitted it. Correct?

A I -- yeah. I cannot tell you how she transmitted it.

Q Okay. So then going back to Exhibit ZN, going down to page eight, do you see that there was a request for production of text messages, emails, social media, and other correspondence that had

certain key words?

A Yes, sir.

Q So how did you go about looking for documents responsive to this request for production?

A Searched -- did a search for each one of those key words, looking for those documents.

Q And what did you search in?

A Emails, text messages, phone calls, phone logs, Zuercher, every email account that I have, every email account that the officers have.

Q Okay.

MR. MOST:

Let's take a ten-minute break, and then -- because I want to review my questions, and then I may have a few more questions, and then we'll be close to the end. Does anyone want to take a longer break to eat or --

MR. DETWEILER:

No.

MR. MOST:

Keith, are you going to have questions?

MR. DETWEILER:

Probably not. But no, I'd rather move forward, if everybody else wants to.

MR. MOST:

Lisa, does that work for you? Just taking a short break and then wrapping up?

COURT REPORTER:

Sure, that's fine.

MR. MOST:

Okay. Let's take ten. Let's reconvene at 1:15, and then we'll finish it up. Thank you.

(A recess was taken.)

BY MR. MOST:

Q Okay. So, Chief, did you review any documents or talk about the substance of your testimony with anyone during that break?

A No, sir.

Q Okay. So we talked a little bit about how Lieutenant Traigle sent you this statute, right?

A Correct.

Q And you -- did you do any research about it? Did you look up any discussion or cases or other statutes or anything else?

A No, sir.
Q You just looked at the text of that statute and then -- and then based the arrest based on that?
A Correct.
Q And I think we -- I understand from your testimony today, that you determined that two photos matched that statute, and there was one nipple visible in each photo. Right?
A Correct.
Q Okay. So, given -- and you were then asked to circle on a piece of paper all the nipples or genitalia that you could see. Right?
A Yes, sir.
Q And so you circled one nipple on each photo. Right?
A I believe so.
Q Okay. So looking at Exhibit ZQ, looks like you -- did you draw these handwritten circles?
A Yes, sir.
Q And there's actually two handwritten circles on here, right?
A Yes, sir.
Q So initially you saw one nipple when you arrested -- had Ms. Pierce arrested, and then when

you were drawing the circles, you saw two nipples? On this one photo?

A I guess so.

Q Well, what's your recollection? I mean, you recall drawing these circles, right?

A Yes, sir.

Q Okay. So you recall seeing two nipples when you drew the circles?

A That's what it appears.

Q Okay. But you don't remember?

A I wouldn't have circled it if I didn't see something.

Q Sure. So when you arrested -- had Dawn Pierce arrested, you saw one nipple in this photo, then when you did the circling, you saw two? Is that your understanding?

A If you read the statute, you only need to see one. So I went off of what I saw at the time and did my probable cause.

Q Okay. So you did the probable cause based on one nipple in this photo and --

A Because I saw -- I'm sorry.

Q Sure. So, you did the probable cause based on seeing one nipple in this photo. Right?

A Correct.

Q And then later, when you were doing the circling, you saw two nipples?
A Well, I circled what I saw. Yes, sir.
Q Okay. And then today, how many nipples do you see on this photo?
A Looking at it good, I see one.
Q Um --
A As I said, it's different on the screen compared to what I saw in pictures.
Q Okay. And then, we talked a little bit about your experience as an LPSO deputy. And you were caught asking someone to lie to the police about the truth of a -- a crash. Right?
A Correct.
Q That would be felony obstruction of justice. Correct?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Yes, sir.
BY MR. MOST:
Q Okay. And if that happened, and -- if you found someone doing that in Golden Meadow, you would have them arrested for a felony. Correct?

A Possibly.
Q Okay. So you should have been arrested for felony obstruction of justice but weren't?
MR. DETWEILER:
Objection.
THE WITNESS:
We didn't follow through with it. He just heard me ask my friend. And after I asked her, I -- I told her not to -- that we weren't going to do it, that I was just going to take my punishment.
BY MR. MOST:
Q So you asked her to lie to the police, and then you told her: Actually, don't lie to the police?
A Correct.
Q Okay.
MR. MOST:
Barring any redirect -- Keith, do you have any questions you would like to ask?
MR. DETWEILER:
No, I'm good.
MR. MOST:
Well, thank you for your time,

Chief. I appreciate it. Let's go off the record.

(Whereupon, the deposition was concluded.)

* * *

WITNESS' CERTIFICATE

I, POLICE CHIEF MICHELLE LAFONT, do hereby certify that the foregoing testimony was given by me, and that the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

Dated: __________ Signed:________________

POLICE CHIEF MICHELLE LAFONT

_______ Signed with corrections as noted.

_______ Signed with no corrections noted.

DATE TAKEN: July 9, 2026

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, LISA M. NEALY, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that POLICE CHIEF MICHELLE LAFONT, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 152 pages;

That this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangement for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

*Lisa M. Nealy*

LISA M. NEALY, RPR, CCR
Certificate No. 23040