UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DAWN PIERCE

CIVIL ACTION
NO. 25-CV-02178-WJC-DPC

VERSUS

TOWN OF GOLDEN MEADOW,
ET AL

Deposition of RAY TRAIGLE, given in the above-entitled cause, pursuant to the following stipulation via Zoom Videoconference on March 20, 2026, commencing at 1:30 P.M.

APPEARANCES:

WILLIAM MOST, ESQ.
201 St. Charles Avenue
Suite 2500
New Orleans, Louisiana 70170
Phone: (504)500-7974
Email: williammost@gmail.com
REPRESENTING THE PLAINTIFF

NEILSON & TREAS
BY: KEITH DETWEILER, ESQ.
3838 N. Causeway Boulevard
Suite 2850
Metairie, Louisiana 70002
Phone: (504)837-2500
Email: kdetweiler@nt-lawfirm.com
REPRESENTING THE DEFENDANTS

MIKE JIMENEZ, JR., ESQ.
Chief Legal Officer
200 Canal Boulevard
Thibodaux, Louisiana 70301
Phone: (985)449-4446
Email: mike-jimenez@lpso.net
REPRESENTING LAFOURCHE PARISH SHERIFF'S OFFICE

REPORTED BY:

Cecilia M. Menesses
Certified Court Reporter

EXAMINATION INDEX

Page

MR. MOST ..................................5
MR. DETWEILER .........................39

E X H I B I T   I N D E X

Page

Exhibit P ..............................10
Exhibit A ..............................14
Exhibit B ..............................15
Exhibit C ..............................22
Exhibit D ..............................22
Exhibit F ..............................23
Exhibit G ..............................23
Exhibit H ..............................25
Exhibit I ..............................27

S T I P U L A T I O N

It is stipulated and agreed by an between counsel that the deposition of RAY TRAIGLE is hereby being taken under Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of filing, reading, signing and certification are hereby waived;

That all objections, except those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof may be used in evidence.

* * * * * * * *

CECILIA M. MENESSES, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

RAY TRAIGLE, 805 CRESCENT AVENUE, LOCKPORT, LOUISIANA 70374, AFTER FIRST BEING DULY SWORN IN THE ABOVE-ENTITLED MATTER, DID TESTIFY AS FOLLOWS:

EXAMINATION

BY MR. MOST:

Q Good morning, my name is William Most. I'm the attorney for the plaintiff in this case. Would you give us your full name and rank for the record?

A Yes. Ray Traigle, Lieutenant with Criminal Investigation Division for the Lafourche Parish Sheriff's Office.

Q Thank you, Lieutenant. Have you ever given a deposition before?

A Yes, sir.

Q Approximately how many?

A A handful; five, you know, somewhere in that area.

Q Sure. So you understand that you're under oath today?

A Yes, sir, I do.

Q That your answers here today have the same force as if we're in a courtroom with a judge and jury?

A Yes, sir.

Q Is there anything, whether it's medication, fatigue, substances, injury, anything else, that will prevent you from giving us truthful and complete answers today?

A No, sir.

Q As you've probably seen from prior depositions, this does not need to be continuous. We can take breaks whenever you choose to, whether it's to use the restroom, get a drink of water, attend to business. But I will ask you at the end of every break who you talked to, what you discussed, whether you reviewed any documents, in case it's relevant to this case. Okay?

A Yes, sir.

Q And you're already doing this perfectly, but if you'll wait until I'm done talking to answer, I'll wait until you're done answering to ask the next question for a clean record for the court reporter.

A Okay.

Q Will you agree now to tell me if I ask you a question that you don't understand or a question that is confusing?

A Yes, sir.
Q And because this is a Zoom deposition, we, obviously, can only see part of what's in your room. Who else is in the room with you right now?
A Myself, and counsel would be Mike Jimenez.
Q Nobody else?
A No, sir.
Q And I don't expect this to happen, but if anybody -- whether it's Mr. Jimenez or anybody else -- tries to send you a message or communicate with you, other than verbally -- whether it's a note, hand signals, face signals, text message or anything else -- will you let us know if that's going on?
A Absolutely.
Q Let's see. What do you know about the case you're here as a witness here for today, even in a broad sense?
A Broad sense was, a call that had came into the Golden Meadow Police Department, which is within our parish, about some images that were shared online, or something to that nature; maybe have been, you know, a little

risque. I'm not sure about the -- I've never seen the photos. I don't need to. And the Chief of Police there, being Michelle Lafont, had called me and just kind of discussed, you know, like, the parameters of -- or whether or not it would meet statutory bounds. And I just told her: Look, I don't know your whole case. And I said, but if you'd like, I'll send you a statute, if you want to read it, yourself, and then you make that determination. That's pretty much any involvement that I had, you know, pertaining to that particular case.

Q Right. And so you understand that this is a civil suit about the arrest that came after that conversation?

A Yeah, I guess. I don't know what the exact suit is for. But, yeah, I'll take your word for it.

Q Yeah. It's about an arrest that occurred after that. I represent the arrestee, no charges -- the DA did not pursue charges. Mr. Detweiler represents the defendants in that case. Do you understand that neither you, nor LPSO is a defendant in

that case; you're just a witness here today?

A Yes, sir.

Q Great. So just touching next on your preparation for this deposition. Did you bring any notes or documents to this deposition?

A No, sir.

Q Other than talking to counsel, did you talk to anyone to prepare for this deposition?

A No, sir.

Q Did you look at any documents or emails or records to prepare for this deposition?

A I briefly looked over the case that Golden Meadow had, just to kind of see what it was even about, before -- you know, this morning, before I came here. But other than that, no.

Q When you say you looked over the case, do you mean the complaint in the civil suit, or do you mean something about the criminal case?

A Yeah. The criminal case, what Golden Meadow Police Department even responded to. I

wasn't fully aware of what was even their involvement or the actions thereof.
Q And when you say you looked over the case, what did you look at?
A I read the narrative. That was it.
Q Any other documents you looked at?
A No, sir. No. I don't remember looking at it. I read the narrative, just to get the gist of what this even was.
Q I'm going to pull up on the screen -- was it just one officer's narrative that you read or multiple officers' narratives?
A There was a narrative from Michelle Lafont and another of their officers, like a supplement, just saying that the person was arrested.
Q So just to see if we're talking about the same document, do you see that this is a -- I'm going to designate this Exhibit P -- as in Paul. Do you see this is a Golden Meadow Police Department document, Case G00493?
A Yes, sir.
Q And is this the document that you reviewed to prepare for this deposition?
A Can you scroll down just a little bit

more?

Q Sure.

A Yes, that is it.

Q And so you looked at the narrative of -- the primary narrative by Michelle Lafont?

A Correct.

Q And then the supporting narrative by Tristan Gaspard?

A That's correct, as well.

Q Besides these two pages, did you look at any other documents?

A No, sir. I don't think there was much other stuff really attached. I wanted to just kind of get -- like I said -- what this was, what was it concerning, and that was it.

Q Sure. Okay. So you still -- you haven't yet reviewed the photos that are referenced in those narratives, correct?

A I don't recall. Maybe -- like I said, I'm not positive. But not to my knowledge.

Q That's Exhibit P -- as in Paul. Okay. Any other documents you looked at to prepare for this deposition, except those two pages?

A No, sir.
Q So backing up, you recall having a phone conversation with Golden Meadow Police Chief Michelle Lafont last July?
A Yeah. I'm not positive on the date. I vaguely remember her calling, giving me a, you know, quick narrative of what she had. She asked my opinion on it. I told her: Look, I don't really have an opinion. You don't work for me. But I will send you the statute so, you can review it.
Q Sure. Do you know why she was calling you? I mean, do you know her? Did she consult with you in the past?
A I met her. I met her when she took office. We just, you know -- I guess out of the niceties between our agencies, I told her: If you ever need something, give us a call.
Q Had you had other --
A Yeah. They are able to -- because they are a smaller department, they're able -- they will sometimes call us for assistance with investigations and stuff like that.
Q And your rank -- you said you're the head of CID in LPSO?

A Well, I'm a Lieutenant, and I have Adult Investigations. We have Adult Investigations, Juvenile and Narcotics falls under our umbrella of criminal investigations. I have the Adult Investigation section.

Q Okay. How many rungs down from the Sheriff are you, roughly?

A Oh, way too many. Way too many. Let's see, Sheriff, Chief, Major, Captain and then myself.

Q So what do you recall about what Chief Lafont told you in that conversation? You said she gave you a narrative. What was that narrative?

A It really doesn't stick out. I guess it was so brief that I never really gave it any thought once -- until I was contacted about this. I was, like: Man, I really don't recall. Other than her giving me a rundown of what she had, as far as the nonconsensual disclosure. I told her: Look, you know, there are some things that have to be met to make the statute -- where you would have probable cause for the statute. I do know that that particular statute, you know, has

the wording, of course, "Shall" versus "May" and all that good stuff, right? I said: Just make sure you read and make sure you've got everything that fits. I said: But you're the Chief. I'll send you the statute. And I think I might have -- I don't know if I did it from my cellphone or from my office. I'm not 100 percent positive.

Q Sure.

A The phonecall, itself, was not memorable.

Q Fair enough. This is not a pop quiz. We're not expecting you to have perfect memory of conversations.

A I probably get ten to twelve of those phonecalls a day between my guys, patrol, whatever.

Q Sure. What I'll designate as Exhibits A. Can you see this email from July 8, 2025?

A Yes, sir.

Q And so this is an email that you sent Chief Lafont on Tuesday July 8, 2025 after your phone call with her?

A Yes, I would assume it would be

after, yes.
Q Well, not assuming. Do you recall if it was after?
A Yeah. It would have to be. Like I said, based on the phonecall, I had, I recall saying: Look, I'll send it to you. Review it and then go from there.
Q Yeah. And it refers to an attachment, Louisiana Laws, Louisiana State Legislature. Do you see that?
A Yes, sir.
Q What I'll designate as Exhibit B. -- this was the attachment to that email, a printout of Revised Statute 14:283.2?
A Yes, sir.
Q And so on the phone with her, you just sort of told her that this statute, you know, has certain criteria that have to be met for something to be a crime under the statute, right?
A Yes, sir.
Q Do you recall which of those requirements you sort of talked to her about?
A Not in particular. I do know that this statute comes up a lot more often now

with technology, of course. I do know, you know, that we try to make sure we bring up the points on Subsection A, where it says: "When all of the following occur." And the only other one that we kind of really make sure that we drive into the head of the person doing the investigation is that the person has to be identifiable. It just can't be body parts without either a face or tattoos or text or something that would identify the person. So those are something that we're tutoring people on, just to make sure they're paying attention to that.

Q That's some of what you covered with Chief Lafont on that phonecall?

A Probably so. That's usually the two that I stress whenever I talk to anybody about that particular statute, yes.

Q So it has to meet certain criteria about, like, what body parts are showing and also have to be identifiable. Those are some of the things that have to be met in order to lawfully arrest someone under the statute, right?

A Yeah. That's the way it's written,

correct.

Q And you said she told you a little bit about what she had. Was she describing the images that she had to you?

A I don't think so. When we read her narrative, I do remember the conversations about it being OnlyFans or maybe images were possibly taken from the web, you know, from the website and shared, if I'm not mistaken to, like, some social media. I don't remember whether it was Facebook, Twitter, whatever. But other than that, she didn't really describe to me what it was, that I can remember. Again, like I said, we do get a bunch of these. That's way more popular now, sadly. But to say I remember specifically what she said and, you know, and how she described it -- you know, for the most part the gist of the conversation was improper images that were shared on social media, and she was just asking about what statutes might be the ones to look at.

Q Yeah. You said something about a website. So she suggested these could have come from, like, a publicly available website?

A Yeah, I think so. I think she said they came -- that somebody found it online, whether it was a screen capture or a picture from a phone -- I don't know -- that ended up being shared somewhere else that was public, I guess.

Q And one of the criteria of the statute is, it has to be a private image for it to be illegal, right?

A Yeah. And if I remember correctly, either a private image or the offender knowing or believing that it should be private. And then I want to say, it says something about unauthorized, like an unauthorized capturing or something like that. So, you know, I guess, depending on the interpretation of what unauthorized means.

Q So if something is on a public website, it's publicly available; sharing that can't trigger the statute, right?

A Yeah. Again, I guess that's the argument for you guys as attorneys. I think that, and if I'm not mistaken, it said something about within a public place -- or in a public place -- if an image is captured or

someone is exposing in a public place and you capture it, I think there's some type of defense to that. That's the best of my recollection.

Q Yeah. We can pull up the statute during this deposition. You don't need to be quizzed on your recollection related to the statute. We can always just pull it up. Did the Chief mention to you that there might be some involvement of the Mayor in this? Was that something she mentioned or didn't mention?

A No, sir, not to me.

Q And then later that evening, she texted you and asked for Judge Robichaux's phone number. Do you recall that?

A Yes, yes. I just replied with the contact information that was saved in my phone.

Q So you have one phonecall with her that day and then one text exchange, and that was it?

A Yes, yes, and the email.

Q Anything else you recall about that conversation, the phone conversation with her?

A No, nothing really sticks out. Like I say, it was, I guess, an unremarkable conversation, but -- business as usual type deal.

Q Sure. Okay. So then going back to the statute. So as you pointed out, this is a narrowly written statute. There are certain things -- criteria that need to be met for sharing this image to be illegal under this law, right?

A Correct.

Q And some -- it says: "All of the following have to occur," 1 through 4 here, right?

A Yes, sir.

Q And so as we discussed, it has to be unauthorized access or in a circumstance that someone would expect it to be private. We talked about that already. So if someone, say, posted photos to a publicly available Twitter account, that's not the kind of thing that could violate this statute, sharing those images, right?

A Yeah. I guess everybody's interpretation would be different of it. You

know how that goes. I think Articles 3 and 4 under A are pretty -- those are usually automatic when someone didn't intend for it, of course. If they would, they wouldn't have called us. You know, 1 and 2 are the ones that are, I guess, more in play with whether or not they're going to trigger those to make it to where all of the following occur. So I imagine that if you put it on Twitter or you put it on Facebook or a public domain, there is -- it's questionable as what's the expectation of privacy at that point.

Q Right. Because this is a disclosure of private images, so if you make them public, they're no longer private is kind of what you're saying?

A Yes, sir.

Q And so A(1), one of the requirements, it has to be -- for sharing an image to be illegal, it has to either expose intimate parts, in whole or part, or show sexual conduct, right?

A Correct.

Q And then the statute provides a very specific definition for intimate parts and

sexual conduct, right?

A Yes, sir.

Q And intimate parts is defined to be -- to show fully unclothed or partially unclothed or transparently clothed genitals, pubic area or anus, or for female people a partially or fully exposed nipple, correct?

A Yes, sir.

Q So most bikini photos would not trigger this statute, right?

A Correct.

Q And so I'm just going to show a couple of adds of bikini photos and see if you agree. So, for example, this is an H&M ad. This is Exhibit C. You see that this shows a woman's body, but it would not trigger this statute because no intimate parts are showing, right?

A Correct.

Q Exhibit D, this is similarly -- you know, a fairly revealing bikini, but still no intimate parts showing and so would not trigger this statute, correct?

A Correct.

Q A more humorous one here is a

BuzzFeed article -- this is Exhibit F -- where now they've recreated bikini photos. Going down to page 5, here is both a man and a woman posing on the beach in bathing suits. Sharing these images would not trigger the statute because no intimate parts or sexual conduct are being depicted, right?

A Correct.

Q And so now I'll show you Exhibit G, which is one of the photos from this case. This is an image of a woman in a lingerie top. Here, again, no intimate parts are showing, right?

MR. DETWEILER:

Objection. You can answer.

THE WITNESS:

You want me to answer?

BY MR. MOST:

Q Uh-huh.

A I guess the opinion would be whether or not the clothes is translucent, transparent. That would be the argument, I guess, that could be made with that one.

Q Right. But you still have to see a nipple for it to trigger the statute, right?

Even if it's through translucent clothing, correct?

MR. DETWEILER:

Objection. You can answer.

THE WITNESS:

I'm not sure if it would be in whole or in part. This particular photo, I guess you could say there is an area of areola that could be possibly viewed through the lace at the top. I'm not positive if that's the color of the fabric or not.

BY MR. MOST:

Q I'm assuming -- do you see any nipples here?

A Yeah. Unsure of the part to the left, if that is or is not. I would definitely say that it would need to be more examples than that to say whether or not -- again, I don't know if that's a color of a fabric or if that's actually areola of a nipple.

Q And the statute talks about nipples, not areolas, right?

A Yes.

Q So we'd have to see some part of the nipple?
A Yeah. I guess so, yeah.
Q So you don't see any intimate parts in this photo?
MR. DETWEILER:
Objection. You can answer.
THE WITNESS:
My answer to that, I guess, would be no.
BY MR. MOST:
Q And then Exhibit H, here's another photo of a young woman from this case. This is about as revealing as those bikini photos we looked at, correct?
MR. DETWEILER:
Objection. You can answer.
THE WITNESS:
Yes, sir.
BY MR. MOST:
Q So no intimate parts under the statute appearing here, correct?
MR. DETWEILER:
Objection. You can answer.
THE WITNESS:

No, sir.

BY MR. MOST:

Q So these two images of this young woman we looked at, if these were shared, it wouldn't be illegal under this statute, correct?

MR. DETWEILER:

Objection. You can answer.

THE WITNESS:

I would say, as is written, no.

BY MR. MOST:

Q As the statute is written?

A Yes, sir.

Q And so you can't arrest someone -- you wouldn't feel comfortable arresting someone for sharing these images, correct?

MR. DETWEILER:

Objection. You can answer.

THE WITNESS:

I'm sorry. I talked over you. You said I can answer?

MR. DETWEILER:

Yes.

THE WITNESS:

Yeah, I would probably want to

have different examples than that.

BY MR. MOST:

Q And so if Lafont -- if Chief Lafont had showed you these photos, you would have probably cautioned her against arresting someone for sharing them; is that fair to say?

MR. DETWEILER:

Objection. You can answer.

THE WITNESS:

I guess her being the Chief, I wouldn't advise either way. If it was our case to work, I would need different examples than that.

BY MR. MOST:

Q And so I'm turning now to what I'm going to designate as Exhibit I. Do you see that this is a -- does this appear to you to be a public Twitter post with the two of the pictures that we've been looking at here?

A Yeah. It has, I guess, the characteristics of some type of social media post, yeah. I'm not sure what platform.

Q Sure. And so it looks like this -- the owner of this account is publicly posting these photos for some reason; would you agree?

MR. DETWEILER:
Objection. You can answer if you can.
THE WITNESS:
Yeah, I guess. I don't know the person's name or their social media handle or anything. But, yeah.
BY MR. MOST:
Q But if you saw this, this would suggest to you that these might not be private photos, right?
A Yeah.
Q So are you aware that an LPSO deputy assisted in the arrest that flowed from the sharing of these photos?
A Up until this morning, no.
Q LPSO is not a defendant. The deputy is not being sued. I just wanted to ask a little bit about sort of what happened, why someone might use a deputy from another jurisdiction to effect an arrest.
So let's talk first just about LPSO. If you have a crime victim in Lafourche Parish but the perpetrator is in another parish, whose jurisdiction is that case in, in your

understanding?

A The jurisdiction of the investigation or the actual arrest?

Q Well, what department is going to make that arrest?

A Yeah, so if we have an open charge warrant and the suspect is -- or the charged person is in another parish, it would be that jurisdiction to make the arrest, then we put a detainer and have them transferred back to the jurisdiction that issued the warrant to face their criminal charges.

Q So if the perpetrator was in another parish, you might go to a judge, get a warrant, and then the warrant goes into the electronic system, and then another agency might go pick up that person?

A Yeah, correct.

Q Would LPSO, like, send deputies to go get that person with deputies from the parish where they are?

A Sometimes. Like, we can -- in my unit, if we have some type of -- I guess, not super secretive investigation, but it's common for us to do surveillance and have contact

with their agency, because we have no arrest power there. We've contacted other agencies prior to and say: Hey, look we're looking for this vehicle. It's currently parked at this address. Can you send us somebody to assist with making an arrest or see if the person is there to make an arrest?

Q So actually sending an LPSO deputy to assist in effecting an arrest in another parish, that would be for a particularly sensitive or atypical criminal investigations?

A It's not uncommon. But like I said, we don't have a jurisdiction -- we can't effect any type of law enforcement action, other than, saying we're riding up and down a public street and we see a red truck that we think is involved in our investigation. At that point, you would contact that agency and give them all the information and go from there.

Q Is it common for a lieutenant with Golden Meadow to go out and assist LPSO in arresting people outside of Golden Meadow?

MR. DETWEILER:

Objection. You can answer.

THE WITNESS:
It's not uncommon for them to respond to something that's maybe an emergency type situation. But as far as, do we make a habit of calling Golden Meadow to come outside of their jurisdiction? No.
BY MR. MOST:
Q Yeah, I guess -- so in this situation, my understanding is that Golden Meadow got the arrest warrant for the person who showed these photos. That person lived outside Golden Meadow. And so Golden Meadow asks LPSO to go get the person. And a Golden Meadow officer went with the LPSO deputy to go get that person. Is that a common scenario or is that unusual?
A I wouldn't say it's, like, way outside of the realm. Same thing. They may have had some knowledge of where this person currently was. I don't know the particulars of this particular arrest. I mean, I've gotten phonecalls from other outside -- even outside of our parish, saying that: Hey, we're looking at this car. Can you send some

guys to come and assist. We'll do that. This particular arrest, I'm not -- I don't know how it came to be that LPSO effected the arrest pursuant to the warrant or if Golden Meadow did and we were there to provide -- I don't even know where this person was arrested, the location. I'm not positive.

Q Sure. Okay. So those photos that we looked at -- those two photos we looked at of the young woman in the lingerie, you expressed your opinion that you didn't see any intimate parts visible, right?

MR. DETWEILER:

Objection. You can answer.

THE WITNESS:

Correct.

BY MR. MOST:

Q You didn't see any sexual conduct, as defined in the statute, in those images, right? I can pull up the statutes. Is that correct?

A Yes.

Q Also, you saw the social media posts indicating that these might have been publicly available on the internet, correct?

MR. DETWEILER:
Objection. You can answer.
THE WITNESS:
That's the way it seemed, yes, sir.
BY MR. MOST:
Q So if one of the deputies in your CID department came to you with these photos, you wouldn't go out and allow the deputy to arrest the person who shared them under that statute, correct?
MR. DETWEILER:
Objection. You can answer.
THE WITNESS:
I wouldn't be comfortable with that case, no, sir.
BY MR. MOST:
Q Because you would be worried that it might be a false arrest because it doesn't meet the statutory criteria, right?
MR. DETWEILER:
Objection. You can answer.
THE WITNESS:
Yeah. I don't feel that it would meet the criteria.

BY MR. MOST:
Q So, therefore, arresting someone for it might be a false arrest?
MR. DETWEILER:
Objection. You can answer.
THE WITNESS:
I assume, yes.
BY MR. MOST:
Q Okay. So I want to shift gears now a little bit and talk about your background and training. So could you give me sort of the nutshell version of your education and professional experience?
A Yes, sir. Prior to -- I started law enforcement in 1999, Assumption Parish Sheriff's Office. I worked there until 2016. I had a brief little stint between '05 and '06 where I had worked for Thibodaux Police Department. Didn't stay very long, a whole year. I went back home to Assumption. In 2016, I came to Lafourche Parish Sheriff's Office. Most of my -- through now, most of my career has been criminal investigations. I attended Nicholls State University. I didn't finish. I had a surprised daughter. Out into

the real world, I was cast. I've been to plenty -- multiple trainings, too many to list. Throughout my career, I've attended a lot of trainings, mostly directed or concentrated in criminal investigations.

Q So when you first became a law enforcement officer, did you go through a police academy or law enforcement academy?

A Yes, sir. I attended Louisiana State Commission of Law Enforcement POST Training Academy in 2000. That was actually held here. Lafourche Parish Sheriff's Office hosted it. Since that point, like I said, very numerous trainings. You pretty much get something at least once a year, if not more. And like I said, I've been doing this now 26 years.

Q And you lead your section of the department in terms of, you know, assessing evidence, determining whether it's criminal, executing arrests; you have a leadership role in those areas, correct?

A Yes, sir.

Q And you receive ongoing training on a yearly or more than yearly basis on those topics?

A Yes, sir.
Q And you've been POST certified throughout your career?
A Yes, sir.
Q Are you a member of any associations, like professional associations?
A I was prior to. When I was in Assumption Parish Sheriff's Office, I was pretty involved in a lot of that stuff. Louisiana Sheriff Association, National Sheriff Association. In 2009, I attended and graduated from FBI National Academy in Virginia. I was part of that association for multiple years after. I think that might be about it. As I got older, in my career, I kind of slowed down with all that stuff. I was being pulled in too many different directions.
Q Sure. Any other training or education that sort of contributes to your sort of knowledge of Louisiana law and applying it to evidence and determining what behavior is criminal or not?
A I guess -- yeah. But, I mean, a lot of it is self-initiated and things to that

nature. You kind of control what your education is going to be in this career. But we do have yearly updates with any -- obviously, when the legislature passes bills and that goes into effect, we get that every year. We review that. From that point on, we try to -- may seek advice, whether in-house counsel or a district attorney's office, you know, depending on our investigations and what charges we're looking to go forward with.

Q When you say self-educated, you're talking about sort of acts that you take to keep yourself abreast of evolving law enforcement standards, what's proper police practice, best practices, things like that?

A Yeah, correct, along with mandated yearly updates that POST does provide and say that you have to -- if you want to keep your commission current, do the -- whether it's the sexual harassment, the ethics and stuff like that. Legal updates, we have to do so many hours every year to keep your POST certification current.

Q And then, this statute, the nonconsensual disclosure mentioned in this

statute, have you arrested people under that statute or has your office?

A Yes.

Q Can you give us an example of what sort of legitimate arrests under that statute?

A For the most part, I guess, the common one we see most of the time is two people are involved in a romantic relationship. A video may have been taken, mostly, you know, sexual encounter. It could be -- we've had one recently where it was an elderly lady getting out of a shower, and a guy took a picture of it and shared amongst friends. We made an arrest on that. But the garden variety is usually romantic partners that split up and one is sour about it and may share photos to a person. Or maybe somebody has a photo that they sent to their romantic partner and had the intention it remaining private, and that person shared it.

Q So like if someone shares a private image of their penis or vagina or breasts, you know, unclothed, and it's supposed to be private between romantic partners, but then the recipient shares it with other people?

A Yeah. That's mostly -- like I said -- the garden variety that of what we see.

MR. MOST:

Keith, would you like to ask some questions?

MR. DETWEILER:

Sure. You're tendering?

MR. MOST:

Yeah, saving any potential redirect.

EXAMINATION

BY MR. DETWEILER:

Q Good afternoon, Lieutenant. My name is Keith Detweiler. I'm an attorney. I represent Golden Meadow, its Police Chief and Officer Tristan Gaspard and Mayor Bouziga in this lawsuit. I take it from your testimony, you were not involved in the decision process as to whether or not to pursue an arrest of Dawn Pierce?

A No, sir.

Q Did Chief -- other than calling you and asking you about the statute, did Chief Lafont include you in any of her deliberations

as to whether or not she should apply for an arrest warrant?

A Not to my knowledge, no.

Q So as her reasons, you weren't a part of coming up with those reasons or consulted as to whether or not those reasons were legitimate?

A No, sir.

MR. DETWEILER:

I have no further questions.

MR. MOST:

None for me, either.

Lieutenant Traigle, thank you very much for your time. We appreciate it.

THE WITNESS:

Yes, sir.

MR. MOST:

You're good. Let's go off the record here.

(OFF-THE-RECORD DISCUSSION)

MR. JIMENEZ:

We'll waive reading and signing. I have all faith in Cecilia.

* * *

C E R T I F I C A T E

I, CECILIA M. MENESSES, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that RAY TRAIGLE after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 40 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

Dated this 6th day of April, 2026

CECILIA M. MENESSES, CCR
CCR #84099
STATE OF LOUISIANA