UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**************************************************

DAWN PIERCE, Plaintiff

CASE NO. 25-CV-02178-WJC-DPC

v.

TOWN OF GOLDEN MEADOW, ET AL., Defendants.

**************************************************

DEPOSITION OF SERGEANT MICHAEL KREAMER, taken on Tuesday, July 14, 2026, before Lisa M. Nealy, RPR, CCR, in and for the State of Louisiana, via Videoconferencing, commencing at 10:00 a.m. and concluding at 11:00 a.m.

INDEX

| | PAGE: |
|---|---|
| CAPTION | 1 |
| EXHIBIT INDEX | 3 |
| APPEARANCES | 4 |
| EXAMINATION: | |
| By Mr. Most | 6 |
| WITNESS' CERTIFICATE | 54 |
| REPORTER'S CERTIFICATE | 55 |

EXHIBIT INDEX


| Exhibit: | | Page: |
|---|---|---|
| Exhibit ZA | Email from Mike Jimenez | 11 |
| Exhibit P | Police Report | 14 |
| Exhibit B | Revised Statute 14:283.2 | 25 |
| Exhibit C | H&M Ad | 28 |
| Exhibit D | Pink Bandeau Top Bikini Ad | 29 |
| Exhibit E | Beach Body Ready Ad | 29 |
| Exhibit M | Photograph | 29 |
| Exhibit N | Photograph | 31 |
| Exhibit G | Photograph | 31 |
| Exhibit H | Circled Photo | 32 |
| Exhibit ZB | Arrest Record | 43 |

APPEARANCES:

REPRESENTING PLAINTIFF:

MOST & ASSOCIATES
By: William Most, Esq.
201 St. Charles Avenue, Suite 2500
New Orleans, Louisiana 70170
williammost@gmail.com

REPRESENTING DEFENDANTS:

NIELSEN & TREAS, LLC
By: Keith M. Detweiler, Esq.
3838 North Causeway Boulevard, Suite 2850
Metairie, Louisiana 70002
kdetweiler@nt-lawfirm.com

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby taken, for all purposes, under the applicable Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the witness RESERVES the right to read and sign the transcript;

That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * *

LISA M. NEALY, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

SERGEANT MICHAEL KREAMER,
after having been first duly sworn by the above-mentioned Certified Court Reporter, did testify as follows:

EXAMINATION

MR. MOST:
And this is a question for Keith. Mr. Detweiler, can we agree that there's no objection to conducting and recording this deposition by Zoom?
MR. DETWEILER:
No objection.
BY MR. MOST:
Q Okay. Good morning, Officer. My name is William Most. I'm the attorney for Dawn Pierce, the plaintiff in this case. How are you doing today?
A I'm doing good, sir.
Q Good. Could you give us your full name and rank for the record?
A My name is Michael Joseph Kreamer, Jr. I'm a sergeant on patrol within the town of Golden Meadow.
Q And Sergeant, do you understand that you are not being sued in this case, you are only a

witness? Is that your understanding?
A That is my understanding; yes, sir.
Q Great. And Sergeant, have you ever given a deposition before?
A I've done a couple; yes, sir.
Q Okay. Roughly, how many?
A I believe this is my third one.
Q And were those related to your actions as a law enforcement officer, or were they separate from that?
A Law enforcement.
Q And were you a party to any of those cases, or were you a witness in those cases?
A I was a witness in each of them.
Q Okay. And so you understand that you are under oath here today?
A Yes, I do.
Q And you understand that your answers here today have the same force as if we were in a courtroom with a judge and jury?
A Yes, I do.
Q And is there anything, whether it is medication, illness, fatigue, substances, or anything else today, that would prevent you from giving us truthful and complete answers to

questions?
A No, sir, there's not.
Q Okay. And one thing you're already doing perfectly is you're waiting for me to finish my questions before you answer. And in return, I'll try and do you the same courtesy, so that we have a clean transcript for our court reporter. Okay?
A Yes, sir.
Q And if I ask a question that is not clear or you don't understand my question, will you agree now to tell me that that's the case rather than just trying to answer the question anyway?
A Yes, sir.
Q Thank you.
Okay. And because this is a Zoom deposition, I got a couple questions, which is, is there anyone besides Mr. Detweiler in the room with you today?
A No, sir. There's just me and the attorney.
Q Okay. And, you know, because it's Zoom, I won't necessarily be able to see if someone is trying to communicate with you off screen. So will you agree now to tell me whether anyone, whether it's Mr. Detweiler or someone else, tries to

communicate with you during the deposition, whether by a note, or hand signals, or face gestures, or text message or anything else?

A Yes, sir, I will.

Q Thank you. And have you brought any documents with you to the deposition?

A No, sir. I have my cell phone but it's on silent. That's all I have.

Q Great. And what did you do, if anything, to prepare for this deposition today?

A I spoke with the attorney yesterday.

Q Okay. Did you speak to anyone besides the attorney?

A No, sir.

Q Did you look at any documents to prepare for this deposition?

A No, sir.

Q Have you -- do you know what this case is about?

A My understanding, a lawsuit regarding an arrest that was made in July of last year.

Q Okay. Since July of last year, have you looked at any documents about that case?

A No, I have not.

Q Okay. And did you take any notes to

prepare for this deposition?
A No, sir.
Q Okay. So, in July of 2025, you were a deputy with the Lafourche Parish Sheriff's Office, correct?
A I was a sergeant on patrol for the Lafourche Parish Sheriff's Office.
Q Okay. And at the time, your phone number was 985-859-0454?
A Yes, sir, it was.
Q Did you use any other phone numbers at that time?
A No, sir, not for patrol. Or -- that was just my personal cell. That's it.
Q So that number is your personal cell?
A It is no longer that -- no longer my number, but at that time, yes.
Q Okay. And did you have a work cell phone or any other cell phone you used at that time?
A No, sir.
Q And roughly, when did you transfer from that phone number to your new phone number?
A It was just before my divorce. Um, so, um, three months ago maybe, four months ago. It's been recent.

Q Okay. And do you know who Dawn Pierce is?

A I don't know her at all, other than going there that day.

Q Okay. And when you say "going there that day," you mean the day that you went to her house to assist with the arrest of her?

A That is correct.

Q Okay. And just broadly, what do you remember about that day?

A So, I received a phone call from Tristin, stating that he would like to -- was wanting to know if we were busy that day. And when I told him we weren't, he asked if we would be able to go to an address to make contact with a subject, Ms. Pierce, due to an active warrant that was issued by the 17th Judicial for her arrest.

Q Okay.

A We -- that's all you -- you need me to go further?

Q Yeah, that's a good start.

A Okay.

Q I'm going to pull up what is designated as Exhibit ZA.

(Exhibit ZA was marked for

identification.)

BY MR. MOST:

Q Do you see that this is an email between myself and Mike Jimenez?

A Can I pull the screen a little closer so I can read it?

Q Sure. And at any point during this deposition, I can zoom in as needed.

A Perfect. Thank you.

Q And do you see that this is an email -- first of all, do you know who Mike Jimenez is?

A Yes, sir, I do.

Q And did you talk to him about your interactions with Dawn Pierce?

A I spoke with him briefly about the incident, yes.

Q Okay. And do you see that -- that here -- and does this email accurately reflect your recollection of your involvement with the arrest of Dawn Pierce?

A Can I finish reading it for just a moment, please?

Q Of course.

A (Reading.)

Okay.

Q So does this email from Mike Jimenez accurately reflect your recollection of those events?

A The only thing I don't recall is the -- where it says the phone or online harassment. I don't remember that exact statement. But I do remember speaking with him regarding a case with Ms. Pierce.

Q Okay. So, is it true that you didn't know, on July 8, 2025, why Ms. Pierce was being arrested? Is that accurate?

A I knew she had an arrest warrant. And when I read the warrant, it stated for disclosure of private images, if I remember correctly.

Q Okay. So on July 8, 2025, you got -- you received a copy of the warrant?

A Tristin had a copy of it, and I seen it from him. He provided me with a paper copy of it.

Q Okay. Did you meet with him before arriving at Ms. Pierce's house?

A Yes, I did.

Q Okay. So you and Mr. Gaspard met somewhere. Where did you meet before going to Ms. Pierce's house?

A Yes, sir. We met at an old -- I believe

at one point it used to be an O'Reilly's or auto -- it was an auto parts store that had closed down right at the front of the street.

Q Okay. And what did Mr. Gaspard tell you during that meeting?

A During the meeting, he told me that they had an arrest warrant for Ms. Pierce. It was signed by the 17th Judicial. I don't recall what judge signed. He provided me a copy of the form, the paper, the warrant. I looked over it, showed that they did have an active warrant, and that it was signed by a judge. And then I told him to follow me to the residence.

Q Okay. Do you remember him telling you anything other than that about the details of what Ms. Pierce was to be arrested for?

A The only thing I was -- what was on the arrest warrant, for the disclosure of private images.

Q Okay. So I'm going to pull up Exhibit P, as in Paul, at page 16.

(Exhibit P was marked for identification.)

BY MR. MOST:

Q Is this the arrest warrant you're talking

about?

MR. DETWEILER:

Can you see it?

THE WITNESS:

I can't see it, sir.

BY MR. MOST:

Q Okay. I can zoom in. How about now?

A That's fine, sir.

Q Okay. So is this the arrest warrant you looked at?

A That does appear to be the one I looked at, yes.

Q And did you also get the warrant application, or just this -- the one-page warrant?

A I believe it was only that portion.

Q Okay.

A I didn't look any further into anything. He may have given me more forms, but I just looked for the warrant itself. I wasn't concerning myself over what the warrant was about.

Q Sure. So, to the best of your recollection, you only looked at this one page, the signed warrant by the judge. Is that correct?

A Correct. Yes, sir.

Q And that one page didn't say anything

about the details of what Ms. Pierce might have done to result in this arrest warrant. Is that correct?

A That is correct.

Q Okay. And so, you never saw any images, bikini photos or lingerie photos or nude photos, that might have been the basis for this arrest?

A No, sir.

Q Okay. And so, you met briefly with Mr. Gaspard at the -- perhaps an old O'Reilly auto parts shop. He gave you the paper copy of the warrant, and then you went to Ms. Pierce's house?

A That is correct.

Q And then once there, you assisted while Mr. Gaspard executed an arrest of Ms. Pierce?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

So, when we got there, I was there with Tristin. I walked up, she was, um, cleaning out a pot. I made contact with her, told her there was an arrest warrant, and I placed the handcuffs on her, and advised her she was under arrest

for a warrant.
BY MR. MOST:
Q Okay. So, from the video, it looks like you put the handcuffs on her, and then Tristin tells her what she's being arrested for and reads her her rights, and then Tristin places her in his vehicle. Correct?
A Yes. That's correct.
Q Okay. And so you both participated in effecting the arrest of Ms. Pierce?
MR. DETWEILER:
Object.
You can answer.
THE WITNESS:
I'm the one that informed her of the arrest and I'm the one who put the cuffs on her and then gave her to Tristin. So he was there when it occurred, yes, sir.
BY MR. MOST:
Q Okay. And maybe this is a stupid question, but, like, who arrested her? You or him, or both of you together?
A We were both there. And I'm the one that told her she was under arrest and placed the cuffs on her, and he walked her to his car.

Q Okay. So --
A He -- he did the arrest form, if what you're asking -- he did the paperwork for the arrest.
Q Okay. I mean, who would you say arrested her? One of you? Both of you?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
We were both on scene. I arrested her. I put her in cuffs, and I gave custody of her to him, where he then did the paperwork. So.
BY MR. MOST:
Q Okay. And you effected that arrest at the request of the Golden Meadow Police Department?
A With the active warrant that was provided for me, yes.
Q Okay. So -- and is it normal for Golden Meadow Police Department to ask Lafourche Parish Sheriff's Office to effect an arrest outside of Golden Meadow's boundaries?
A It does happen. It -- it's not as often as, you know, as you would think it is. But we --

they do call and ask for assistance to do this, yes.

Q I mean, roughly how often is your understanding that happens?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Oh, I've -- in my 20 years, I've done it -- I've assisted a couple of times, but to tell you a number, I can't tell you.

BY MR. MOST:

Q Okay. So it happens sometimes, but it's fairly rare. Is that fair to say?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes.

BY MR. MOST:

Q Okay. And Golden Meadow obtained this arrest warrant for Ms. Pierce. Correct?

A Yes. That is my understanding.

Q And so, it sounds like sometimes when

Golden Meadow obtains an arrest warrant, they -- and it's for someone outside of Golden Meadow, it sounds like sometimes they ask for LPSO's help to go arrest that person. Correct?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Golden Meadow will contact us and advise of an active warrant, and they will come out there. And we'll -- we'll place the cuffs and turn them over to them on the case. Now, if it's an arrest where the subject is non-compliant or if it was a, you know, an incident that occurs outside of their jurisdiction, then we will handle whatever occurs outside their jurisdiction. So whether she would be -- whether some person would be -- you know, resisted or -- you know, where we would have to physically do anything to take the person into custody.

BY MR. MOST:

Q Sure. So, if Golden Meadow gets an arrest warrant for someone outside Golden Meadow,

one option is for them to ask the sheriff's office for assistance in arresting the person that day. Right?

A Yes.

Q And another option is, they could just put the warrant into the system, and then that person might eventually be picked up if -- on a traffic stop or something else. Correct?

A Yes. That's correct.

Q So Golden Meadow did not have to, um, loop in another law enforcement agency to arrest Dawn Pierce on July 8, 2025. Correct?

A I would -- I wouldn't guess they would have to. But they decided to do so. For what reason, I can't tell you.

Q Sure. Okay. And then, so -- and Ms. Pierce did not resist arrest in any way, correct?

A No, sir, not at all.

Q She was completely compliant with officer instructions?

A Yes, she was. She was kind of hard of hearing at the time, so we had to, you know, talk a little bit louder to speak with her and sometimes repeat ourselves. But other than that, she was very -- she was compliant with me.

Q Okay. And then, did you follow and meet her and Officer Gaspard at the jail?

A I did not follow them to the Galliano substation.

Q Okay. So you didn't participate in the booking process at all?

A No, sir.

Q Going back to Exhibit P, at page 16, you arrested Ms. Pierce for a violation of Revised Statute 14:283.2A2?

A Nondisclosure of a private image? That is what the warrant was for, yes.

Q Okay. And that's what you arrested her for?

A That was what I arrested her for, for the active warrant; yes.

Q Did you look up -- at any point, have you looked up what that law is?

A I have seen what the law is. But in the case for this one, no, I did not, um, pull up the case or review what the law states or what the circumstances were related to the case.

Q Sure. And what was the context when you looked up this law at a different time?

A Um, my understanding, it was just some

type of messages or, um, images that are sent, um, without the permission of the other party.

Q Yeah. And my question is -- so I think you said at some point you looked up this law, right? Sometime in your career?

A Yes, I have reviewed it. But to what extent that I've -- I don't recall all the logistics on the -- what the law states.

Q Sure. And this -- this is not a pop quiz. I don't expect you to have it memorized. We can pull it up if we need to. But what I want to know is, what was the context that you looked up this law? Like, were you investigating another, unrelated crime and so you looked up this law? Were you studying for something? Like, how did you come to look up this law whenever you looked it up?

A If I recall correctly, it was when the law became enacted, um -- because I believe it just recently had become enacted not too long ago. And when we go to an in-service with the sheriff's office, any new laws that come about, they will -- the attorney, Mike Jimenez, would come in, and he would just give us a rundown of some of the laws that recently passed. And so, after that, they had a few instances where there was some images sent,

um, from one person to another person. And I just would review it to see if it would be, you know, something that would meet that statute.

Q Yeah. So, you understand that this is a statute that's commonly described as a "revenge porn" statute?

A I wouldn't say a revenge porn. I would just say some images that were disclosed of, um, you know, private -- private photos.

Q Yeah. So -- and we can look at the statute if you need to. But, broadly, it's your understanding that, for statutes -- for photos to be criminal under this statute, they have to be private photos that are shared, and they have to show either a sex act, or nipples, genitals, pubic area, or anus. Correct?

A From my recollection, that would be correct. But I would have to review to tell you, you know, 100 percent.

Q Sure. So, I'm going to pull up as Exhibit B here -- you see that this is Revised Statute 14:283.2?

A Can you zoom in a little bit? Sorry.

Q Yeah.

A Thank you. Yes, I do.

(Exhibit B was marked for identification.)

BY MR. MOST:

Q So, and it says that for a person to commit the offense of nondisclosure of a private image, all of the following have to occur. Right?

A (Reading.) Yes. I do.

Q Okay. And one of the requirements is that it has to show intimate parts, exposed in whole or in part, or a person engaged in sexual conduct. That's one of the requirements, right?

A The portion you highlighted, that's correct.

Q Okay. And the statute defines -- specifically defines "intimate parts" to mean the fully unclothed, partially unclothed, or transparently clothed genitals, pubic area, or anus; or in the case of a female person, a nipple. Correct?

A I'm reading it, if you don't mind, sir.

Q Mm-hmm.

A (Reading.)

The part you highlighted, yes, sir.

Q And then sexual conduct, um, it defines to mean: Actual or simulated vaginal, anal, or

oral sexual intercourse, deviant sexual intercourse, sexual bestiality, masturbation, sadomasochistic abuse, or exhibition of the genitals. Correct?
A The portion you highlighted, yes, sir.
Q Okay. So if a -- if someone shares a photo and it doesn't contain any of these intimate parts or sexual conduct, it can't be criminal to share it under the statute. Right?
A Under the portions that you highlighted, that's correct.
Q Okay. I mean, do you want to read the rest of the statute? Is there any other portion of it?
A I would like to review the whole thing, if you don't mind, so I can just --
Q Sure.
A -- make sure there's nothing I'm missing.
Q Yeah, of course. Just tell me when to move down.
A All right, sir. Thank you.
MR. DETWEILER:
I have a copy of it if you want me to show it to him.
MR. MOST:

Yeah, that's probably easier.

THE WITNESS:

Thank you.

(Holding up document to screen.)

Just so you know.

(Reading.)

MR. DETWEILER:

And by the way, you're correct, the mayor is at 2.

MR. MOST:

Okay. Great.

THE WITNESS:

Okay.

BY MR. MOST:

Q So if a photo doesn't contain one of these specifically defined intimate parts or sexual conduct, then it can't be illegal to share that photo under the statute. Agreed?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Under the statute, that's correct.

I'm going to give him the copy back, okay?

BY MR. MOST:
Q Sure. Thank you.
So I'm going to pull up Exhibit C.
(Exhibit C was marked for identification.)
BY MR. MOST:
Q Do you see that this appears to be an advertisement for a swimsuit?
A That is an -- it's a swimsuit, yes. A model in a swimsuit; that's correct.
Q Right. And so, if someone shared this photo on social media, you wouldn't be able to arrest them under the statute because it's not private and there's no intimate parts or sexual conduct here. Right?
MR. DETWEILER:
Objection to form.
You can answer.
THE WITNESS:
I'm sorry, can you repeat that again? I'm sorry.
BY MR. MOST:
Q Sure. So, if someone asked, you know, can you arrest someone for sharing this photo, you would not be able to under the statute we just

looked at, for one thing because it's not a private photo, right? It's an advertisement.

A Correct.

Q And also, because there's no genitals, nipples, or other intimate parts or sexual conduct visible. Right?

A Yes, sir, that's correct.

Q Okay. Pulling up Exhibit D, as in dog.

(Exhibit D was marked for identification.)

BY MR. MOST:

Q Same with this photo, right? No intimate parts or sexual conduct visible?

A I do not see anything visible. That's correct.

Q Looking at Exhibit E, same thing here?

A I do not see anything, sir.

(Exhibit E was marked for identification.)

BY MR. MOST:

Q Okay. Exhibit M, as in Mary.

(Exhibit M was marked for identification.)

BY MR. MOST:

Q Same thing here?

MR. DETWEILER:
Objection. State a question, please.
BY MR. MOST:
Q Sure. Do you see any intimate parts or sexual conduct as defined in that statute visible here?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
I do not see any -- anything on the, um -- no.
BY MR. MOST:
Q Okay. So you wouldn't be able to arrest someone for sharing this photo under this statute. Agreed?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
The picture you provided, I -- I wouldn't say so, for the statute that you provided.
BY MR. MOST:

Electronically signed by lisa nealy (501-046-859-1498) 79288697-0db6-49d0-91a5-7627e788ffd3

Q Exhibit N, as in Nancy.

(Exhibit N was marked for identification.)

BY MR. MOST:

Q Same here?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

I can't see the whole photo, if that's the -- is there anything further -- okay. It doesn't appear, no.

BY MR. MOST:

Q You don't see any nipples or vaginas or pubic area or other intimate parts or sexual conduct in this photo, right?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

I do not.

BY MR. MOST:

Q Okay. I'm just going to look at two other versions. This is Exhibit G.

(Exhibit G was marked for

identification.)

BY MR. MOST:

Q This is a -- you see that this is a lower-resolution version of the photo we just looked at?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

It does appear to be the same photo, just a lower resolution. You're correct.

BY MR. MOST:

Q And so, still, you can't see any intimate parts or sexual conduct in this photo?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Nothing I can see right off, no.

BY MR. MOST:

Q Okay. And Exhibit H.

(Exhibit H was marked for identification.)

BY MR. MOST:

Q Any intimate parts or sexual conduct in

this photo?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

I don't see anything -- I see somebody circled something down at the bottom, which would make your eyes go to it, but I don't see anything that would show anything sexual.

BY MR. MOST:

Q Okay. And no intimate parts either, correct?

A No intimate, no.

Q Okay. And you can't tell whether this young woman has pubic hair or not, right?

A Not according to this photo. But I'm not looking that good.

Q Yeah. So -- because these are not see-through underwear. Right?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

There are portions of the top that

you can see a little flesh, but other
than that, no.

BY MR. MOST:

Q Okay. But the underwear is not see -- you wouldn't describe it as see-through underwear, right?

MR. DETWEILER:
Objection.
You can answer.

THE WITNESS:
I wouldn't describe that as see-through underwear; you're correct.

BY MR. MOST:

Q Okay. So, if Chief Lafont told the judge this is see-through underwear, where she can see the vaginal area, that's not true, is it?

MR. DETWEILER:
Objection.
You can answer.

THE WITNESS:
The photos you provided me, I don't see where there would be any to see through. But I'm not sure if there's any other photos that were provided.

BY MR. MOST:

Q Sure. And if those photos were posted somewhere on the Internet, where people 18 and up could see them, then they wouldn't be private photos. Agreed?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

If it -- it would depend on what type of service you're speaking of. I do know there's some things that you have to pay to be able to view these images. So I'm not sure what platform these images were given on.

BY MR. MOST:

Q Right. But if they were on the Internet not behind a pay wall, then they're not private images. Would you agree?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Correct. Yes, sir.

BY MR. MOST:

Q So, if these are the photos that Dawn

Pierce was accused of sharing, she should not have been arrested under this statute, should she have?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

The -- I'm sorry. The photos that you showed me, does not appear to show the statute that -- what would -- an arrest would be made in person.

BY MR. MOST:

Q Okay. So, other than Mr. Detweiler, the lawyer, and Tristin Gaspard, did you talk to anybody else at any time about the arrest of Dawn Pierce?

A No, sir.

Q Did you ever talk to Chief Lafont about it?

A The only time I spoke with Chief Lafont was whenever I went to an incident, um, a couple of -- a couple of months or -- after starting with Golden Meadow, there was a couple of instances where I responded to, I guess, the alleged victim's residence for calls. And then that's when I was informed that they were -- they were part -- they

were the reason that, um, the lawsuit is being done, that they were the victim of this alleged lawsuit -- of this lawsuit. But other than that, I have not spoken with her regarding this case.

Q Okay. So when you say the "alleged victim," who do you mean?

A I don't even know her name.

Q Yeah. Is it the young woman we just looked at in those pictures?

A Um, she looks nothing like that whenever I looked at -- when I went on scene. I mean she was in night clothes and it was dark, so.

Q Okay.

A To say for sure that's who that was, I wouldn't -- I would not be able to sit here under oath and say yes for sure.

Q That's fine. The person you're talking about, is it Amber Sibley? Do you know that name?

A That name -- yes. Amber is the one I spoke to on the, um -- on the instances after I started with the town of Golden Meadow.

Q Okay. So -- and you joined Golden Meadow Police Department roughly when?

A It was in August. Mid part to end, I believe. I don't exactly recall the date.

Q Okay. So, if I'm understanding you correctly, you're saying a couple of months after August 2025, you went to a call for service at Amber Sibley's house?

A It was sometime after I started. I can't give you the exact time. But I did go to the houses, yes.

Q And what was that about?

A The first incident was some type of domestic issue between her and a male subject, and the second time was a medical issue.

Q Okay. And so, did you make any arrests during either of those visits?

A No, sir.

Q Okay. And so, then at some point you talked to Chief Lafont about those visits to Ms. Sibley's home?

A She -- she spoke with me and told -- whenever she, I guess, reviewed the reports. Um, so I briefly described to her what happened. And that's when I was -- she asked me if I knew who they were. I told her no, and she said, Well, that's -- they are in the -- with the lawsuit, um, against the town for an arrest that I, um -- I assisted with.

Q Was that the first you learned that there was a lawsuit about the arrest of Dawn Pierce?

A I knew there was a -- I knew there was a, um, an email sent by Mr. -- by the attorney with the sheriff's office. And I knew that there was talking -- in talks of a lawsuit. But I didn't know the -- the, you know, how far it went into the lawsuit. But I did know that, um -- I then found out that it was regarding a lawsuit with the town of Golden Meadow.

Q Sure.

A She was one of the people involved.

Q And what did Chief Lafont say about the lawsuit?

A She didn't tell me anything about the lawsuit. She just said that they were involved in it, and, um -- I mean, it's none of my business.

Q Okay. Have you ever talked to Mayor Bouziga about Dawn Pierce or the lawsuit?

A No, sir. My whole time being here for the year, I may have seen him once or twice and spoke with him once, maybe. I work straight nights, so he's out the office.

Q Have you ever talked to Amber Sibley or Dylan Rousse about the arrest of Dawn Pierce or the

lawsuit?
A No.
Q Okay. And speaking of the mayor, do you know where the mayor lives in Golden Meadow?
A No, sir. It's none of my business, really. Unless I go to his house for a call.
Q Sure. And you haven't done that, as far as you know?
A No, I haven't.
Q Okay. Okay. And when you worked at the Lafourche Parish Sheriff's Office, the sheriff's office had a policy manual, right?
A They had -- it's all online, but they do have a, um -- yes. They do have a manual.
Q And so they had a manual that had like a use of force policy and an arrest policy and policies for different aspects of policing?
A There is a -- several hundred pages. It's -- it's a good form. They do have a lot of paperwork regarding all kind of instances that could occur.
Q Yeah. And so that -- like, their use of force policy gave you guidance about when use of force was appropriate or not. Right?
A It states -- it gives a generalized idea

of what should be done, what shouldn't be done, and, um, you know, just some guidelines; yes.

Q And my understanding is that Golden Meadow Police Department does not have a policy manual like that. Is that right?

A I was never provided any type of policy and procedure manual.

Q Okay. Has Chief Lafont verbally told you what her policies are?

A She just states, follow the law.

Q Okay. Has she ever verbally told you a use of force policy?

A She just states to follow the law and, you know -- and my -- my prior knowledge of, you know, working with the, you know, agencies I have.

Q So, do you know what Golden Meadow Police Department's use of force policy is?

A I don't have -- I've never reviewed or seen any policy or procedure with the Golden Meadow Police Department, and I was just told to, you know, abide by the law and do what we -- you know, what you can within the scope of the law.

Q And so, you don't recall being verbally told any specific use of force policy either, right?

A Oh, no. No, sir.
Q Has the chief ever verbally told you what the police department's handcuffing policy is?
A For the town of Golden Meadow and the police department? Not -- not her policy or -- or procedures. I've never seen one. She hasn't explained to me either.
Q Sure. And the statute that you arrested Dawn Pierce under, have you ever made an arrest under that statute, before or since?
A Not that I recall. I know I've had several calls that, um, that I spoke to people regarding it, and some of them I would -- I sent up to detectives with Lafourche Parish Sheriff's Office because, um, you know, we -- with Lafourche, we take the initial, and sometimes, if it takes more investigation, then it would be forwarded up, especially if it's a felony.
Q Sure.
Okay. So the next section I want to talk about is looking at some sheriff's office documents, to see if you can help us understand them.
A Okay.
Q Have you ever worked in the jail for the

sheriff's office?

A I've worked at the jail with Lafourche Parish Sheriff's Office from December of '01 to -- to '04. But I don't remember the month.

Q Okay. So I'm pulling up what's Exhibit ZB, at page 63.

(Exhibit ZB was marked for identification.)

BY MR. MOST:

Q Do you see that this is an email from Elena Cortez to the detention division and Craig Webre and Roy Gros?

A Can you enlarge it just a little bit, if you don't mind? Thank you.

Yes. There is an email sent from Elena to the detention center and Sheriff Webre and the chief, Roy Gros.

Q Okay. And is this an email that sort of summarizes what happened the night before at the jail? I can scroll down.

A At my time working for the sheriff's office, I've never seen that with -- with the jail. Um, so this my be something that they do now. I've never actually seen that -- a form like that.

Q Okay. Some of these documents refer to a

"108F." Do you know what that is?
A I'm sorry, a what?
Q A -- on page 67, it says there's a "108F in SHU." Do you know what that refers to?
A That's a fight in process. Normally, 108 would be a deputy-involved incident where a physical altercation has occurred. Any "F" is a fight or some type of physical altercation.
Q And the "SHU," is that a secure housing unit?
A I believe that's what they called it. I just understood it to always be "the shoe," is what I've always heard of it called.
Q Okay. So backing out a little bit, so, July 8, 2025, you were working for the sheriff's office. Right?
A Yes, sir.
Q Okay. And then, it looked from phone records like two days later, you had a -- on July 10, 2025, you had a phone call with Chief Lafont. Do you recall that?
A I don't recall it. I do know, not long after that incident, I was in talks with her about employment with the Golden Meadow Police Department. So the exact time frame, I can't sit

here and tell you for sure.

Q Sure. But you had been in talks with Golden Meadow about employment prior to the arrest of Dawn Pierce, correct?

A I haven't -- I did speak with them prior, yes.

Q Okay.

A I've -- I'm sorry.

Q No, no. Go ahead.

A Okay. I actually have spoke with the prior chief of police, um, prior to my divorce. The one -- I didn't go forward with it because of a, um -- because of medical issues with my children -- well, my stepchildren. They needed to have -- I had to have insurance on them, so I wasn't able to do it. After my divorce, or the separation, I no longer needed to have that obligation. So I spoke with chief, um -- it was before the July incident. You know, to tell -- because I knew that she didn't have a supervisor or anybody under her other than officers. So I called and spoke with her to see if she would be interested or if she had any interest in hiring any type of supervisor. And at the time, she said that she was not looking for that, she was looking just

to hire officers. And I expressed to her that it's something that I would not be able to go from a sergeant and making a certain amount, to an officer making less amount. I'm okay with making somewhat of a lateral move, I just can't go down in pay. So at that point, our conversation ended.

And, um, sometime in July, I believe, maybe -- it was in July sometime after that incident, where she called -- she -- I got word that she wanted to talk with me, um, from someone within the sheriff's office about employment. And that's when I called her -- or she called me. We conversated about a position with the town of Golden Meadow for the police department as a sergeant on patrol.

Q And it looked to me from the records like you took a very slight pay cut to go to Golden Meadow. Is that accurate?

A At the first, I did take a slight pay cut. And that pay cut was only because of the state supplemental pay not being involved in my pay. With the Lafourche Parish Sheriff's Office, your state supplemental pay is put into place the day of hire. And I was with them for multiple years. So I've had several, you know, small raises

within that time frame. So when I came to the town of Golden Meadow, my pay rate was a little bit lower, only until I can get the state supplemental, because they do not front that at -- front that. They -- from my understanding, they receive the check and then they put it on our check. So I had to wait for that to come in. But I did receive those funds, um, several months later, of the back pay for the state supplemental pay.

Q Your choice to go over to GMPD, or Chief Lafont's decision to recruit you to GMPD, do you know if that had anything to do with the arrest of Dawn Pierce, or was it completely unrelated?

A It was completely unrelated. Absolutely no -- no -- I didn't even know anything about the incident. It was completely unrelated. It was more of an issue with -- with, um, my ex-wife now, she was, um -- separated -- she works for Lafourche Parish Sheriff's Office. And there was a conflict between the -- the divorce, which prompted me to decide to go into, you know, other options. It just so happened Golden Meadow was the option that -- she gave me an option. But I was currently looking for a job.

Q Okay. And now I want to sort of -- the

last section I want to talk about is sort of your background training and history. So, how long have you worked in law enforcement, total?
A I started in law enforcement December of 2001.
Q So you've been in law enforcement for almost 25 years?
A I had a couple of small stints where I was not employed with a law enforcement agency, um, so I would -- I would probably say closer to 23 years total. But the -- a couple of years was, you know, outside of law enforcement.
Q And did you go through an academy when you became an officer?
A I went through multiple academies.
Q Which academies?
A I've -- first I went through an -- it was called a Corrections Academy, um, when I started working with the sheriff's office in '01. It was basically just like introduction to law enforcement/corrections. After that, I went through a 218 POST Corrections Academy. That basically is an academy where you -- you go through legal, um, use of force, um, firearms training, and pretty much everything leading up to, you know,

being able to become POST certified, minus -- it was two -- it was a 218-hour course. And at the time, I believe you had to do -- it was either 280 or 320, to be complete POST 1 certified.

And then after that, I went to the, um -- what you call it, um -- I can't exactly remember, where I only had to do portions of the academy to become full POST. Like -- almost like a refresher, but they did actually have a name for it. I can't recall what that name is. Where I then became full POST certified in 2005, I believe. If I remember correctly.

Q And throughout your roughly 23 years as a law enforcement officer, have you done in-service training each of those years?

A I have done in-service training for a good majority of those years. Some -- some agencies I've worked for, we didn't have in-services as much as Lafourche did. But with Lafourche, it was very regular. The other agencies weren't as regular.

Q Yeah. And are you part of any organizations or training groups outside those law enforcement entities that you worked for? Are you part of fraternal organizations related to law

enforcement, or training organizations or anything like that?

A I have several training certifications but nothing outside of law enforcement.

Q And have you, in your role as an officer over those roughly 23 years, have you participated in investigations of cases involving sexual imagery, like, I don't know, child sexual abuse material or anything like that?

A I went to and did -- I was the, um -- we were considered the primary officer, but I would only go there to collect information. I was basically like a secretary. I'd collect the information, write down what was told, and then it was forwarded to an investigator for -- with the sheriff's office, or with a couple of other agencies that I have worked for.

Q And in any of your training, whether academy training or in-service training, did -- did pornography or child pornography or child sexual abuse material ever come up in that training? Was that part of your training?

A During the POST academy, we have had, um where we had to review videos of, you know, bestiality and, um, several other things to show,

um -- but they never really showed any type of images regarding any type of sexual acts towards children.

Q Sure. So setting aside children, part of your training was about identifying sexual imagery to determine whether it's illegal or not illegal and whether an arrest should be made for it. Is that right?

A They have, yes.

Q And that was part of your training, right?

A That was part of my training, yes. And in my, you know, 23 years, I've done multiple trainings. So, um, we have spoke and seen, you know, images.

Q Okay. Any other relevant training or expertise related to your role as law enforcement, things you've done to stay abreast of changes in the law, or, you know, current best practices for police, outside of what you've described?

A I've, um -- I'm a certified DNA CODIS instructor, um, to take DNA from subjects. I am a certified driving instructor for the EVOP, which is the emergency vehicle operations. I'm a SFST, Standard Field Sobriety Test, instructor. I've

taught at multiple academies for, um -- um, what you call it -- um, felony and regular traffic stops, compliant/noncompliant traffic stops. I've, um -- motorcycle driver instructor for police motorcycles. I've done, um, the -- what you call it, where you put the beer goggles on. I'm trying to remember the exact name of it. But where I would go to these schools with several people of MADD and demonstrate and teach the kids why not to drink and drive. I went through, um, several classes with State Police, showing, you know, most of my -- most of my trainings were with traffic enforcement, is what I -- I have done a lot of. I didn't really per se go into the investigation aspect of the criminal code.

Q Okay. Anything else you want to tell us about Dawn Pierce or anything else we've talked about here today?

A I'm not very familiar with it, so I can't, you know, really talk on -- on behalf of her, because I don't know her that well. I don't know her really at all except for that one interaction.

Q Sure. Okay. Well, thank you very much.

MR. MOST:

Keith, you know, with the caveat that we may designate the sergeant as an expert witness, a non-retained expert witness, would you like to ask him any questions?

MR. DETWEILER:

No, I don't have any questions at this point.

MR. MOST:

Okay.

Sergeant, thank you very much for your time here today. I appreciate it. And, you know, there may be a trial in this case where you may be called as a witness, but I'm sure Mr. Detweiler will be in touch with you if -- if we're headed that direction. So thank you for your time here today.

THE WITNESS:

Yes, sir. Thank you.

(Whereupon, the deposition was concluded.)

* * *

WITNESS' CERTIFICATE

I, SERGEANT MICHAEL KREAMER, do hereby certify that the foregoing testimony was given by me, and that the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

Dated: __________ Signed:________________

SERGEANT MICHAEL KREAMER

_______ Signed with corrections as noted.

_______ Signed with no corrections noted.

DATE TAKEN: July 14, 2026

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, LISA M. NEALY, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that SERGEANT MICHAEL KREAMER, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 54 pages;

That this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangement for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

Lisa M. Nealy

LISA M. NEALY, RPR, CCR
Certificate No. 23040

NDTCA Transcript Signed Electronic