UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

*****************************************************

DAWN PIERCE, CASE NO. 25-CV-02178-WJC-DPC

Plaintiff

v.

TOWN OF GOLDEN MEADOW, ET AL.,

Defendants.

*****************************************************

DEPOSITION OF SERGEANT TRISTIN GASPARD, taken on Tuesday, July 14, 2026, before Lisa M. Nealy, RPR, CCR, in and for the State of Louisiana, via Videoconferencing, commencing at 3:40 p.m. and concluding at 4:37 p.m.

INDEX


| | PAGE: |
|---|---|
| CAPTION | 1 |
| EXHIBIT INDEX | 3 |
| APPEARANCES | 4 |
| EXAMINATION: | |
| By Mr. Most | 6 |
| WITNESS' CERTIFICATE | 58 |
| REPORTER'S CERTIFICATE | 59 |

EXHIBIT INDEX


| Exhibit: | | Page: |
|---|---|---|
| Exhibit P | Police Report | 15 |
| Exhibit B | Revised Statute 14:283.2 | 16 |
| Exhibit C | H&M Ad | 20 |
| Exhibit D | Pink Bandeau Top Bikini Ad | 21 |
| Exhibit M | Photograph | 21 |
| Exhibit N | Photograph | 23 |
| Exhibit I | Social Media Post Photos | 27 |
| Exhibit ZE | "Billboard" Text Messages | 32 |
| Exhibit ZF | "Never ending" Text Messages | 35 |
| Exhibit ZN | Answers to Discovery | 50 |

APPEARANCES:

REPRESENTING PLAINTIFF:

MOST & ASSOCIATES
By: William Most, Esq.
201 St. Charles Avenue, Suite 2500
New Orleans, Louisiana 70170
williammost@gmail.com

REPRESENTING DEFENDANTS:

NIELSEN & TREAS, LLC
By: Keith M. Detweiler, Esq.
3838 North Causeway Boulevard, Suite 2850
Metairie, Louisiana 70002
kdetweiler@nt-lawfirm.com

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby taken, for all purposes, under the applicable Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the witness RESERVES the right to read and sign the transcript;

That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * *

LISA M. NEALY, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

SERGEANT TRISTIN GASPARD,
after having been first duly sworn by the
above-mentioned Certified Court Reporter, did
testify as follows:

EXAMINATION

BY MR. MOST:
Q Good afternoon. Could you give us your
name and rank for the record, please?
A Tristin Gaspard. I currently am a
sergeant. But at the time I was an officer.
Q Great. Okay. Sergeant, my name is
William Most. I'm the attorney for Dawn Pierce in
this case. How are you doing today?
A Good.
Q Great.
MR. MOST:
And this is a question for Mr.
Detweiler: Mr. Detweiler, do you have
any objection to this deposition being
conducted and recorded by Zoom?
MR. DETWEILER:
No objection.
MR. MOST:
Great.
BY MR. MOST:

Q Sergeant, have you ever given a deposition before?
A No, sir.
Q Okay. So, a deposition is an opportunity for the lawyers to ask questions of a party or witness. And I'll be asking you questions, and then Mr. Detweiler, if he wants to, can ask questions; he doesn't have to. And we'll take it from there.
Do you understand that you're under oath here today?
A Yes.
Q Okay. Do you understand that your answers here today have the same force as if we're in a courtroom with a judge and jury?
A Yes.
Q Is there anything, whether it is substances, fatigue, illness, health conditions, or medication -- anything that would prevent you from giving us truthful and complete answers?
A No.
Q Okay. And this is similar to a courtroom questioning in some ways, but unlike a courtroom, we can take breaks whenever we need to. So if you need to take a break to use the restroom, get a

drink of water, some police business, just let me and Mr. Detweiler know and we'll take a break. Although, I'll tell now, I will ask you after every break who you talked to and what you reviewed. Okay?

A Yes.

Q And I don't think this is going to be a super long deposition, so we may not need that.

Something you're already doing perfectly is you are waiting for me to finish asking my question before you answer, and then I'll try and do you the same courtesy. That way, we'll have a clean record for the transcript. Okay?

A Yep.

Q If I ask you a question that is not clear or you don't understand it, will you agree now to tell me that that's the case, rather than just trying to answer it anyway?

A Yes, sir.

Q Thank you. And also, because this deposition is by Zoom, I can't see what else is going on in the room around you. So is there anyone besides Mr. Detweiler in the room with you?

A No, sir.

Q Okay. If, during this deposition, anyone

tries to communicate with you, whether it's by a note, a hand signal, headshaking or head nodding, text message, anything else, will you tell us that that is going on?

A Yes, sir.

Q Thank you. Have you brought any documents with you to this deposition?

A No, sir.

Q Did you look at any documents to prepare for this deposition?

A Not recently, no.

Q What about prior to recently?

A I read a little bit of the, um -- I don't know what you would call it, but the discovery paper stuff. But that was probably, like, months ago.

Q Okay. Any other documents you recall looking at for this case?

A No, sir.

Q Other than Mr. Detweiler, did you talk to anybody to prepare for this deposition?

A No, sir.

Q Did you talk to the chief about it?

A I talked, um, how her deposition went, if it was -- you know, how long it took, really. That

was about it.
Q What did she say about her deposition?
A She said it was, um, a few hours and, you know, lengthy. But that's about it.
Q Did she say anything about her testimony in it?
A No. I didn't get into detail with her about that.
Q Did she say anything about the questions that she was asked?
A No, sir.
Q Okay. I don't expect this deposition to take as long as hers, which is probably welcome news to you.
A Yes, sir.
Q Have you used AI, artificial intelligence, at any point in preparing -- relating to this case?
A No. I just kind of, like, searched out what a deposition means, like, you know -- because I never been through anything like this. I was just curious, you know, like, what is a deposition, what does it do. That was it.
Q Sure. Anything significant that you learned?

A Well, it's just, you know, it's for a record, for discovery, and all that stuff. And just stuff like that. You know, that you use in trial.

Q Mm-hmm. And do you understand that you've been named as a defendant in this case?

A Yes, sir.

Q Okay. And just, sort of, what's your nutshell understanding of what this case is about?

A So, Chief had a case with this incident. Um, I really don't know much about the investigation part because I wasn't here. All I know is that she was working on the case. She, um, got the warrant approved by the judge. She told me that the warrant is approved, to get with Lafourche because it was out of our jurisdiction. Got with the sergeant, which was Michael Kreamer at the time with Lafourche. Got a copy of the warrant. It was a valid warrant signed by the judge. Met up with him prior to going make contact with Ms. Dawn. Gave him the copy of the warrant. He looked over it. And then went to her house. And then transported her to the lockup.

Q Okay. And when you say "Ms. Dawn," you're referring to Dawn Pierce, the plaintiff?

A Yes, sir.
Q Okay. And the other person you were describing there, that's Chief Michelle Lafont?
A Yes. The one that was investigating the case, yes.
Q So it sounds like Chief Lafont investigated and obtained a warrant for the arrest of Dawn Pierce. Right?
A Yes, sir.
Q And then the chief asked you to go have Mrs. Pierce arrested for the warrant. Right?
A Yes.
Q Okay. And this happened on July 8, 2025; is that right?
A What I recall, yes. I don't remember the exact date, but I know it was somewhere around that date, yes.
Q Okay. And at that time, your phone number was 985-278-2421?
A Yes.
Q Did you have any other phone numbers at the time?
A I don't remember -- I don't think we had the work phones at that time. I don't recall. I don't know that phone offhand, to be honest with

you. But I don't think we had work phones at that time, so -- I believe that's the only phone I had at that time.

Q Do you have work phones now?

A Yes.

Q Okay. Do you know what Dawn Pierce was arrested for?

A I don't know the exact wording on the charge, but it's something -- disclosure of a private image or something like that. That's really a charge that I really never -- I never arrested anybody on that charge. I'm not really too familiar with that case -- you know, a case like that. But I know it's something about pictures, sharing pictures. Yeah.

Q Okay. So, you've never arrested someone under that statute before Dawn Pierce, right?

A No, sir.

Q What about after Dawn Pierce?

A No, sir.

Q And roughly how long have you been a police officer?

A Um, patrol, probably roughly six years, five years.

Q And what about your law enforcement

career, total?
A Since 2018, so going on eight years. I was in corrections before.
Q Okay. So in your -- in the entirety of your career as a law enforcement officer, this is the only time you've participated in the arrest of someone under this statute. Correct?
A Yes.
Q Okay. And did you look the statute up at any point?
A No, sir.
Q And what documents did you see prior to participating in the arrest of Dawn Pierce? Did you have any documents, look at any documents?
A When I came in, she showed me a little bit of the pictures, of the lingerie pictures. And that was it. I didn't look at none of, like -- if she had any other evidence, I didn't look at that. I didn't look at the report. I didn't read the report. I don't -- I don't know. That was the only thing I really looked at.
Q Okay.
A And I didn't really look into it into detail really, because, you know, it's not my case. Something like that, I really don't want to get

involved in it, you know.

Q Got it. So the chief showed you a couple -- like, two lingerie photos?

A I believe so. I don't recall how many pictures it was. But yes.

Q Okay. And was that on her computer, on her phone? How did --

A It was on a -- it was printed on a sheet of paper, so it was kind of hard to, like, really see actual, like, detail. So.

Q Did the chief show you her warrant application?

A No. I just got a copy of the warrant after it was approved.

Q Okay. So, setting aside the photos, the only document you looked at related to this case -- I'm pulling up what's been designated as Exhibit P, as in Paul, at page 16.

(Exhibit P was marked for identification.)

BY MR. MOST:

Q Can you see this document?

A Yes, sir.

Q Okay. And throughout this deposition, if you need me to zoom in, just let me know.

A Okay.
Q So aside from a couple of photos that the chief showed you, you saw the arrest warrant that we're seeing on the screen here. Correct?
A Yes.
Q Any other documents you looked at related to this case before participating in the arrest of Dawn Pierce?
A No, sir.
Q Okay. So, you knew that Dawn Pierce was being arrested for nonconsensual disclosure of a private image, correct?
A Yes.
Q And you see Exhibit B here, that this statute is the same statute that was used for the arrest of Mrs. Pierce?
A Yes.
(Exhibit B was marked for identification.)
BY MR. MOST:
Q Okay. And have you ever looked at the statute before?
A No.
Q Okay. Have you read the complaint in this case?

A I don't recall. If I did it was maybe after. But I did not do it before. I don't remember if I did or not.

Q Sure. Do you know what a --

MR. MOST:

Sorry, Keith?

MR. DETWEILER:

Can you clarify; the complaint from Amber or the complaint meaning the lawsuit?

MR. MOST:

Yeah, let me clarify that.

BY MR. MOST:

Q Do you understand that when a federal lawsuit is initiated, one of the first documents is called a "complaint," that lays out sort of the plaintiff's theory of what the case is about? Are you familiar with that?

MR. DETWEILER:

The lawsuit.

THE WITNESS:

Oh. I remember when I was notified about the lawsuit. I remember the chief reading an email about, like, you know, the lawsuit. And then later on, I think

the discovery paper, I got a -- I
actually got a copy of that. Now, I
didn't read all through it, you know,
like, but -- I just read, like, the
section of what my part was.

BY MR. MOST:

Q Your part, like what you needed to answer?

A Yes.

Q Did you ever look at the complaint, which is sort of the document that started the lawsuit?

A If I did, it was read to me by Chief Lafont.

Q Okay. Do you remember what she said about the lawsuit?

A To be honest with you, not really, no. I mean, it was kind of a while back.

Q Sure. Okay.

So, turning back to Exhibit B -- which is Revised Statute 14:283.2, right?

A Mm-hmm.

Q And do you see that this is the criminal statute about nonconsensual disclosure of a private image?

A Yes.

Q And do you see that it says, "A person commits the offense of nonconsensual disclosure of a private image when all of the following occur"?

MR. DETWEILER:

Can I show him the copy, just so it's easier?

MR. MOST:

Absolutely.

BY MR. MOST:

Q Has Mr. Detweiler handed you a copy of the same thing we see on the screen?

A Yes, sir.

Q Okay. So, you see that under Subsection A, it says all of the following have to occur for the crime to be committed. Correct?

A Yes.

Q Okay. And one of the requirements is that it has to show intimate parts or sexual conduct. Right?

A Yes, sir.

Q Under A(1)?

A Yes.

Q And down at the bottom, it defines "intimate parts" to mean fully unclothed, partially unclothed, or transparently clothed genitals, pubic

area, or anus; or, for female people, nipples. Correct?

A Yes.

Q Okay. And then if you go to -- right below there, it defines "sexual conduct" to mean actual or simulated vaginal, anal, or oral sexual intercourse, deviant sexual intercourse, sexual bestiality, masturbation, sadomasochistic abuse, or exhibition of the genitals. Correct?

A Yes.

Q So if someone is going to be arrested for showing a photo under this statute, it at least has to show these specifically defined intimate parts or sexual conduct. Right?

A Yes.

Q Okay. So we're going to look at Exhibit C here.

(Exhibit C was marked for identification.)

BY MR. MOST:

Q Do you see that this is what looks like an H&M advertisement for a bikini?

A Yes, sir.

Q Do you see any intimate parts or sexual conduct as defined by the law in this photo?

A No.

Q Okay. So you couldn't arrest someone for sharing this photo, right?

A No.

Q Exhibit D, as in dog.

(Exhibit D was marked for identification.)

BY MR. MOST:

Q Do you see that this appears to be another swimsuit advertisement?

A Yes.

Q And you don't see any intimate parts or sexual conduct as defined in the statute here, right?

A No.

Q Okay. And then, pulling up Exhibit M, as in Mary.

(Exhibit M was marked for identification.)

BY MR. MOST:

Q In this photo, do you see any intimate parts or sexual conduct as defined by the statute?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:
Um, not through the computer, no.
At this time, no.
BY MR. MOST:
Q Okay. Well, we can zoom in. As we zoom in, do you see any?
A Um, I might see like a nipple right there, on the, um -- where I'm looking at on the left side. But I can't tell if that's a nipple or not.
Q So there's something that could be a nipple, but you don't actually see any nipples. Correct?
A Correct. Yeah.
Q And what about other intimate parts?
A I don't see anything down there, no.
Q Right. Because this is not see-through underwear. Agreed?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
As what I can tell, I mean, it can't be -- it can't -- I know a lot of underwear like that, you know, can match

your skin color. So I can't really --
you know. I don't know.
BY MR. MOST:
Q Right. But you can't tell if this woman has pubic hair or not, for example. Right?
A No.
Q So it's not see-through underwear. Right?
A Correct.
Q Okay. And then with Exhibit N, as in Nancy, do you see this photo here, Officer?
A Yes.
(Exhibit N was marked for identification.)
BY MR. MOST:
Q Do you see any intimate parts or sexual conduct as described in the statute in this photo?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Not that I make clearly, no -- make out clearly, no.
BY MR. MOST:
Q Sure. And if we zoom in, you still don't

see any?

MR. DETWEILER:

Same objection.

You can answer.

THE WITNESS:

I can see maybe what could possibly be a nipple, but I'm not 100 percent sure.

BY MR. MOST:

Q Sure. So you see an area that could be a nipple, but you don't see any nipples. Correct?

A Correct.

Q Okay. And these last two photos, you -- do you recognize the person in them?

A Yes.

Q You recognize that as Amber Sibley?

A Yes.

Q And those were the photos that the chief showed you?

MR. DETWEILER:

Objection.

THE WITNESS:

I don't recall if that's the same photos or not.

BY MR. MOST:

Q Are those consistent with the photos that's your recollection of whatever the chief showed you?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

I'm not sure if that was the same pictures or not. But it's similar.

BY MR. MOST:

Q Sure. So, if those were the photos that the chief says she saw intimate parts in and see-through underwear, that's not what you see. Right?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

No, that's not what I see. I don't believe that's -- you know. If it was my case -- you know. But it's not my case, so.

BY MR. MOST:

Q Sure. If it was your case, you would not have arrested someone for sharing these photos.

Right?

A I would have to look at some more evidence. But as of just those two pictures, I would not see enough.

Q Okay. And so, at the very least, the chief should not be telling the judge that these were photos of Amber in see-through underwear. Agreed?

MR. DETWEILER:

Objection.

THE WITNESS:

I don't agree, but, then again, it's not my case, so.

BY MR. MOST:

Q You don't agree that they're see-through underwear. Right?

A As of the two pictures that I seen, yes.

Q Okay. Okay. And so, then, it's also not legal under the statute to arrest someone if the photos were public. Right?

A Say that again? I'm sorry.

Q Sure. So, the statute that Dawn Pierce was arrested under, it's for disclosure of private images. Right?

A Correct.

Q So if someone shared the photos on the Internet, where anyone 18 or over could see them, they're not private photos. Agreed?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Correct.

BY MR. MOST:

Q Okay. So, pulling up Exhibit I, do you see that these are photos that Amber has posted on Twitter?

A Um, yes.

(Exhibit I was marked for identification.)

BY MR. MOST:

Q And you can tell that from looking at this, right?

A I can see -- I can tell some social media platform. I'm not familiar with X or Twitter, but yes.

Q Okay. So this would suggest to you that these were not private photos. Right?

MR. DETWEILER:

Objection.

THE WITNESS:

Correct.

BY MR. MOST:

Q Okay. So going down to Exhibit P at page three, are you aware that Amber had an OnlyFans account?

A Yes. That's what the chief told me. Yes.

Q So the chief knew that Amber had an OnlyFans account?

A Yes.

Q And do you see that this says "Sub to my OF and make me daddies little slut"?

A Yes.

Q Okay. And do you understand that to mean, subscribe to my OnlyFans and make me daddy's little slut?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

It seems that way, yes.

BY MR. MOST:

Q Yeah. And so, did you understand that these lingerie photos were sort of like public

advertisements for Amber's private nude photo business?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Yes.

BY MR. MOST:

Q Okay. And Chief Lafont understood that too, based on what she said to you?

MR. DETWEILER:

Objection.

THE WITNESS:

I don't know. That's -- that's her, um ...

BY MR. MOST:

Q But Chief Lafont said something about OnlyFans?

A Yes.

Q Okay. Do you recall what she said about OnlyFans?

A All I remember her saying is something about, "Those are OnlyFans pictures."

Q And so going down to page four, do you see that this is another post by Amber?

A Mm-hmm. Yes.
Q And there's a button that says "Subscribe to see user's posts."
A Yes.
Q And so, that button suggests that what we're looking at is not behind a pay wall. Right?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
You mean like -- can you reword that? Like -- I'm sorry.
BY MR. MOST:
Q Yeah. So if there's a button that says "subscribe to see user's posts," right, that means you -- you would understand that to mean you click on that button if you want to go see private stuff. Right?
A Correct.
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Correct.
BY MR. MOST:

Q So these photos, where there's the button that says "subscribe to see user's posts," those are not the private part. Right?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

I mean, yeah.

BY MR. MOST:

Q Okay. And going down to page nine, you see that these are more photos posted by Amber to a social media account?

A Yes.

Q And there's a button that says "Share this post with anyone, even if they aren't on X yet"?

A Yes.

Q And X is a reference to what Twitter is now called?

A Yes. Twitter is now called X.

Q Yeah. And so this button -- or this indication to share this post with anyone, this also suggests these are not private photos that we're looking at. Agreed?

MR. DETWEILER:

Objection.
You can answer.
THE WITNESS:
Agreed.
BY MR. MOST:
Q And are you aware that these are the photos that were attached to Chief Lafont's police report?
A No, I was not aware of what pictures were, and how many pictures there was. No.
Q So, on page two to three of -- or one to two of this document, Exhibit P, you wrote a supporting narrative?
A Correct.
Q And so when you wrote this, you didn't look through the police report to see the photos?
A No.
Q Okay. I'm going to pull up what's been designated as Exhibit ZE.
(Exhibit ZE was marked for identification.)
BY MR. MOST:
Q Do you see that -- well, let me ask the question. Are these text messages between you and Chief Lafont?

A Yes.
Q Okay. So it looks like, before the arrest of Dawn Pierce, you and the chief were texting about the Dawn Pierce situation. Right?
A That's not correct. That was way after the arrest was made. This was -- like had, um, Dylan Rousse, um, keep on calling in complaints, because apparently Dawn's husband -- I don't recall his name -- kept on harassing him, so he kept on calling and complaining, saying that Dawn's husband was harassing him. And apparently Dawn's husband owns, or did own, a billboard company and was saying that he was going to put Amber's pictures -- what I gathered on this was, he was going to put Amber's pictures on a billboard because, you know, he -- obviously he was upset that his wife was -- got arrested for this incident. And it was kind of getting aggravating because, you know, like, Dylan kept on calling, and there's really nothing we can do at that point, you know? So this was towards, you know, Dylan, you know, keeping on calling us for harassment complaints.
Q So you're saying these text messages we're looking at on this exhibit are after, um, the arrest?

A That is correct.
Q So Chief Lafont said, "I didn't know if there was anything I could charge her with," after she got the warrant for Dawn Pierce?
A Apparently so, yes. That's what she said. But this was after the arrest.
Q So even after Dawn Pierce was arrested, Chief Lafont was texting you to say she didn't know if there's anything to charge Dawn Pierce with. Is that correct?
A I don't remember that text message, but apparently so, yes.
Q Okay. But you're sure that this (indiscernible) photo was after the arrest of Dawn Pierce, right?
A I'm one hundred percent sure this was after the arrest. Correct.
Q And so the lower down text messages are definitely after the arrest, right?
A Yes.
Q Okay. And so, you wrote these -- this text message with the four crying with laughter emojis, correct?
A Uh-huh.
Q And you talk about laughing LOL.

Correct?

A Yes.

Q And "LOL" stands for "laughing out loud"?

A Correct.

Q So you and the chief are joking about this situation. Correct?

A I'm joking about that -- you know, I thought it was funny the husband said that he was going to, you know, post Amber's pictures on -- because, I mean, you have to have some type of sense of humor, you know.

Q Of course.

A But we were not laughing towards Dawn or the husband's or that situation anyway. We was laughing at that specific call. You know?

Q Okay. And I'm going to pull up Exhibit ZF.

(Exhibit ZF was marked for identification.)

BY MR. MOST:

Q These are more text messages between you and the chief?

A Yes. I believe this is definitely after the arrest. I don't recall if this was after the one that you just showed me or before. I want to

believe that it's after. But it was definitely after we made the arrest. I believe that's the -- the same type of call of Dylan calling in, the same stuff. I believe that was Dylan that called it in, yeah.

Q Okay. And the chief texted you, "It's going to be the complaint that will last forever! This is ridiculous!" Right?

A Yes, because it was getting to the point where Dylan was, you know, making it, you know, never-ending.

Q And did it raise a red flag for you that the chief had you arrest someone and then she said she wasn't sure if there was anything that that person could be charged with?

A I mean, yeah.

Q Why was that a concern to you?

A I guess because she made that comment, and I guess, you know, if you don't have enough evidence, I mean, you shouldn't, you know, arrest somebody. That's how I practice as a law enforcement, you know? Um...

Q Right. As a law enforcement officer, you want to make sure that you have enough evidence to charge someone with before you arrest them. Right?

A Correct.
Q It's not okay to arrest someone and then say, "I don't know if there's anything I can charge them with." Agreed?
A Correct.
Q That might indicate a false arrest. Correct?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
It can, yeah.
BY MR. MOST:
Q The chief, did she give you a printed out copy of the warrant?
A I don't recall how I got a copy of the warrant. I don't know if she would have emailed it to me or if she would have linked it to the case of the database that we use and I was able to print it out like that. I don't remember how I got a hard copy of it, but I did get a hard copy of it.
Q And the chief asked you to carry out the arrest of Dawn Pierce, right?
A Correct.
Q She didn't give you the option to just

give Dawn Pierce a warning. Correct?
A Say that again? A warning?
Q Yeah. Did the chief give you the option to just give Dawn Pierce a warning about this?
A No. I mean, it was a signed warrant. And when a signed warrant is signed by the judge, you know, we got to make the arrest. But she did call me, um, that the arrest was signed, and for me to get with Lafourche Parish and go make the arrest with Lafourche. Have Lafourche make the arrest.
Q Okay. Now, sometimes when Golden Meadow gets an arrest warrant for someone outside of Golden Meadow, sometimes they coordinate with the Lafourche Parish Sheriff's Office and go arrest the person. Right?
A Correct. We will get with Lafourche, the supervisors that was on -- either working that area or the lieutenant that's working the whole shift, let them know what we got, and then we'll come up with a game plan, depending on what the case circumstances is. But yeah.
Q Yeah. And then some other times, you might -- Golden Meadow Police Department might get an arrest warrant for someone outside Golden Meadow, but not actually, like, that minute or that

day, go out and arrest them; you could just wait for that person to, you know, be picked up potentially some other time. Right?

A Correct.

Q And that's -- that second version of -- is more common than the first, right?

MR. DETWEILER:

Objection.

THE WITNESS:

Yes, we usually will -- you know, before we'll type a whole warrant -- like I said, depending on what the charges are, we'll get with Lafourche before we type up the warrant, and try to get Lafourche to go talk to them and, you know, figure out what's going on. And if we can't do that, they can't -- if they can't make contact with them, or if we can't make contact with them, then we'll just put out a warrant and -- I guess it would depend on the severity of the call. But most of the time, you know, we just wait until they come through our town, or when the warrant gets approved, Lafourche might pick them up; you know, put out

warrants.

BY MR. MOST:

Q So Chief Lafont was the person that decided that Dawn Pierce needed to be arrested that night. Correct?

A Correct. She called me, yes.

Q And the chief did not give you the option to just issue a summons, correct?

A Negative. Because it was a felony warrant.

Q Okay. So it sounds like you talked to Chief Lafont about this in person and on the phone on July 8, 2025. Correct?

A Yes.

Q And by text, right?

A Yes.

Q Do you recall how many phone calls you had with the chief about it that day?

A I do not.

Q Did you talk to her about it after that day?

A Not that I recall.

Q Okay. Did you ever talk to Mayor Bouziga about Amber or Dylan or Dawn Pierce?

A No.

Q And Michael Kreamer was the sheriff's officer who assisted you with the arrest. Correct?
A He was the one that made the arrest; correct, yes.
Q And what did you tell him about?
A After I hung up the phone with Michelle -- Chief Lafont -- um, I called him, let him know what happened. What's the charges, I got a copy of the warrant. He's like, "Okay. What address?" Gave him the address. Met him in front the street. Kind of told him, you know, like, this is the charge, whatever. I didn't know much about the case. So I just gave him the warrant so he could look at it so he could verify, okay, is this an active warrant, and then we went to the house.
Q Do you have any sense of why Chief Lafont got a felony arrest warrant for Dawn Pierce based on lingerie photos and had you execute an arrest that night?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
No, I do not.
BY MR. MOST:

Q Does it seem strange to you?
MR. DETWEILER:
Objection.
THE WITNESS:
Um, I -- I don't really know. You know. Yeah, I guess, you know. Like, usually we don't really do that, but...
BY MR. MOST:
Q Because it just seems like not a big deal for her to do that kind of police action?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
Correct. For not a violent charge, you know. If it was a violent charge, then obviously you want to apprehend that suspect as soon as possible. But I don't think this is really, um, a violent offense, you know?
BY MR. MOST:
Q So Chief Lafont had you sort of execute the arrest warrant the way you would for a violent offender?
MR. DETWEILER:

Objection.

THE WITNESS:

Not necessarily. I mean, if it would have been a violent offender, we would approach the house in a way different aspect. I mean, I tried to make it as peaceful as I could. We tried to make it as peaceful as I could. I tried to make it as -- most comfortable for Ms. Dawn. I know she wasn't -- you know, I wasn't going to try to make it uncomfortable for her.

BY MR. MOST:

Q Yeah. And she didn't resist; correct?

A No. Not at all, no. It was very peaceful.

Q And then, you transported Mrs. Pierce to the jail in your vehicle, right?

A Correct. The (inaudible) substation, which is a little substation where you can get booked and bonded out so you don't have to go all the way up to Thibodaux to the main jail, the big jail.

Q And did you participate in the booking process there?

A No.

Q When someone is booked there, they get fingerprinted, I guess?

A Correct. We don't do it. We just drop them off, give the necessary paperwork that they got to do, and we leave.

Q And do they get strip-searched?

A I don't believe so at the substation. No, I don't believe that she would have, because she's a female. They usually just keep the females on the bench. You know, they wouldn't get strip-searched usually until they get to the main jail where there's a female deputy to where, if they got instated, they would get strip-searched over there. But again, that's out of my call. I don't know.

Q Sure. Okay.

A That's usually what the procedure is for that.

Q And have you worked at other police departments or law enforcement departments besides Golden Meadow?

A Yeah. Lafourche Parish Sheriff's Office and Grand Isle Police Department.

Q And when you worked for those agencies,

they had a, um, a policy manual, right?

A Lafourche Parish did, for sure. Grand Isle, I know they was working on one. So. I know the first time I worked with Golden Meadow Police Department, beneath Troy, we did have a policy manual.

Q And the policy manual at Lafourche Parish would have like a use of force policy, and a handcuffing policy, an arrest policy, to give you directions about how to be a police officer, right?

A Correct.

Q And Golden Meadow has no such policy manual. Right?

A As far as I knew, I thought they did. I thought it just carried over from Troy. Now, if they did whatever with it and tried to make a new one, I wasn't notified of that. I just go off of what the old policy is, which is pretty much -- every police department that I worked for is pretty much meat and potatoes the same thing, you know. You know, there might be a few different safety policies, but for the most part, it's the same.

Q Yeah. I mean, police departments will vary in some ways; some authorize police chases, some require special requirements for police

chases, right?
A Correct.
Q And I didn't totally hear you when you said it carried over. You thought it carried over from what?
A The policy that Troy had. I thought it was just, you know, the police department, um, policy manual. Like, I thought it would just be the same, you know? That's what I go off of, you know. Like, and of course my training for the amount of years, my POST academy. You know, follow the laws and everything like that. So. You know.
Q So when you say "carried over from Troy," you're referring to Troy Dufrene, the prior police chief?
A Yes.
Q And so did Troy Dufrene have a written policy manual?
A I believe so, yes. I never went through it all the way, but he did have a policy manual. I know he was in the process of changing a few things, like to rewrite some things and kind of do his own thing. But I don't think he ever really finished it.
Q But you at least saw a policy manual

under Chief Dufrene?
A Yes.
Q And so, are you aware that Golden Meadow has no policy manual now?
A Not that I know of, no. Not to my knowledge.
Q So, if someone asked you what is Golden Meadow Police Department's current use of force policy, what would you say?
A I would just -- you know, I -- I really don't know. I mean I would just go off of what, you know, what I think is necessary, you know, of use of force, you know, from my experience.
Q Has Chief Lafont ever told you what her use of force policy is?
A No.
Q Has she ever told you what her handcuffing policy is?
A No.
Q Okay. So, on July 8, 2025, did you know that the arrest of Dawn Pierce was related to Amber Sibley?
A Yes.
Q Okay. And you knew Amber Sibley before that, right?

A I knew her before that for going to complaints to her house before.
Q And the two of you had exchanged flirtatious messages on Snapchat, right?
A I don't recall flirtatious messages, but we did exchange a few messages through a couple of days, a few days. And that ceased way before this incident happened.
Q Yeah. And that was by Snapchat?
A Yes.
Q Do you recall her messaging you about liking to be cuffed?
A I do not.
Q Okay. You thought they were messages but not flirty messages?
A I don't -- I don't remember what the messages were about, to be honest with you.
Q And look, it's not a crime to flirt with someone, if --
A Yeah, yeah. But I really -- I really just don't remember, honestly.
Q Okay. So you don't have any memory of whether you flirted with Amber Sibley or not?
A I mean, I might have. But I don't recall, you know, like...

Q Okay. And so, before July 8, 2025, did you know before that day that Amber had an OnlyFans account?
A I did not.
Q Okay. Have you ever looked at her OnlyFans account?
A No.
Q Did you ever go on a date with Amber Sibley?
A I did not.
Q Okay. Or any sort of physical, sexual contact?
A No.
Q Okay. So, in this case, you were asked certain questions. Right? Written questions, right?
A For the discovery?
Q (Nodding.)
A Yes.
Q And you were asked for certain documents. Right?
A Certain documents? Um, I don't remember, to be honest with you.
Q Yeah. It's okay. Look, nothing here today is a pop quiz. So we can --

A Yeah.

Q So, pulling up Exhibit ZN, as in Nancy, do you see that these are answers to discovery on behalf of the defendants, including you?

A Yes.

(Exhibit ZN was marked for identification.)

BY MR. MOST:

Q Okay. And do you see that on page eight, you were asked for certain text messages, emails, social media messages, et cetera?

A Uh-huh.

Q And how did you go about looking for these -- or did you go about looking for these?

A I tried to go back and go through them, through my phone to see if I had them. But that was it. That's the way I did it.

Q And when you say "tried to look back," did you just scroll back, or did you put in search terms and search for words?

A No, I tried to, like, scroll back. Just scroll back.

Q So you didn't put in each of these search terms and search for each of these phrases; correct?

A No.
Q Okay. Did you look through your email?
A I looked through my email yesterday to try to find -- to see if, um, if Michelle -- if Chief Lafont sent me the email. I wasn't able to find it, but I believe that's the only time that I looked back in the email in reference to this case. Which, this was yesterday.
Q Okay. So prior to yesterday, you have not searched your personal or official emails?
A No. For this case, no.
Q Okay. Have you ever, for this case, searched social media messages?
A No. I don't believe so.
Q And once you found out that there was a lawsuit, either anticipated or actually happening, did you start saving documents?
A No. I mean, I wasn't saving nothing.
Q Okay.
A I wasn't deleting nothing, but I wasn't -- you know.
Q Mm-hmm. Are you aware that your Golden Meadow emails get deleted after a certain period of time?
A Not that I recall, no.

Q Do you take handwritten notes as part of your job as an officer?
A No.
Q Okay. So, I want to talk a little bit about your history as a law enforcement officer. So you've worked in three different departments: Grand Isle, Lafourche Parish Sheriff's Office, and, um, and --
A Golden Meadow.
Q Golden Meadow. For a total of about eight years, right?
A Correct.
Q And I might be mixing up my notes here, but did you say you were a correctional officer before that?
A Yes, I was a correctional officer with Lafourche Parish Sheriff's Office. That's the start of my career, yes.
Q Okay. So -- and that's a different kind of being a law enforcement officer, right?
A Correct, yes.
Q So if you add the correctional officer part in, how long have you been a law enforcement officer, total?
A Going on eight years. Seven years.

Seven, eight years.

Q Okay. And did you go through the academy at one of those jobs?

A Yes. I went through the academy with Lafourche Parish Sheriff's Office.

Q And have you received in-service training?

A Yes. Every year we got to have in-service, a certain amount of in-service training.

Q And are you a member of any organizations or training groups or anything else outside of those agencies?

A I'm a part-time firefighter with Fire Department District Three. But any other organizations, no.

Q Okay. And in the course of your training or experience, have you done any training or had any experience with investigating, you know, sexual imagery, like, I don't know, child sexual abuse imagery or -- or anything else?

A No. We go over sex crimes in the academy, but that's really not -- that's not my cup of tea, to deal with. Like, if I have a case like that, I'll get the general information and, you

know, call the detectives, you know, and let them handle it. I really don't feel comfortable dealing with cases like that. It's not my -- not my thing. You know?

Q Okay. Have you done -- and you're POST certified? Is that correct?

A Correct.

Q Which means that you have met certain criteria for training, according to the state agency?

A Correct.

Q One second here. Okay. I'm going to pull up on the screen here -- do you see a text exchange here that says: Dawn Friel has posted nudes on Facebook. Her godson Dylan Rousse's fiancee?

A Yes, I see that.

Q And then there's a response. It says: I'm dealing with this and told her I was. This woman needs to chill.

Do you see that?

A Yes.

Q Were these text messages with you? I'm not sure who they're with.

A I don't recall having those text messages

but -- I don't recall those text messages.

Q Okay. And do you know how Chief Lafont got the photos of Amber Sibley?

A I do not.

Q Okay. But they didn't come through you; correct?

A No.

Q Knowing everything you know now, would you have done anything differently with regard to the arrest of Dawn Pierce?

MR. DETWEILER:

Objection.

THE WITNESS:

I would have probably investigated it more to make sure, you know, it was correct. But -- yeah. If it was my case, yes.

MR. DETWEILER:

You mean if he was investigating or -- or when he was given the prospect of a warrant?

MR. MOST:

Just anything.

BY MR. MOST:

Q It sounds like --

A If I was investigating, I would have investigated it differently, and would have tried to gather more evidence, if more evidence was there. And I would have went off of what I had and -- to make the final decision of what I was going to do.

Q Because you think the investigation that did occur of Dawn Pierce was inadequate to conclude that there was probable cause for an arrest. Correct?

MR. DETWEILER:

Objection.

THE WITNESS:

Can you repeat that again? I'm sorry.

BY MR. MOST:

Q Sure. And you're saying that because you think that the evidence that there was in the investigation of Dawn Pierce was not sufficient for probable cause. Agreed?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

What I saw now, no.

BY MR. MOST:

Q Okay.

MR. MOST:

Okay. Keith, there's a possibility we might designate Sergeant Gaspard as a non-retained expert witness. Do you want to ask him any questions?

MR. DETWEILER:

I do not.

MR. MOST:

Okay.

Sergeant, thank you very much for your time here today. I really appreciate it.

(Whereupon, the deposition was concluded.)

* * *

WITNESS' CERTIFICATE

I, SERGEANT TRISTIN GASPARD, do hereby certify that the foregoing testimony was given by me, and that the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

Dated: __________ Signed:________________

SERGEANT TRISTIN GASPARD

_______ Signed with corrections as noted.

_______ Signed with no corrections noted.

DATE TAKEN: July 14, 2026

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, LISA M. NEALY, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that SERGEANT TRISTIN GASPARD, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 58 pages;

That this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangement for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

LISA M. NEALY, RPR, CCR
Certificate No. 23040