UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DAWN PIERCECase No. 2:25-cv-02178-WJC-DPC
Plaintiff

v
TOWN OF GOLDEN MEADOW, et al
Defendant

30(B)(6)DEPOSITION OF THE TOWN OF GOLDEN MEADOW/GOLDEN MEADOW POLICE DEPARTMENT, through its designated representative CHIEF OF POLICE MICHELLE LAFONT, given via Zoom Videoconferencing in the above-entitled cause, pursuant to the following stipulation, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, commencing at 1:35 o'clock p.m., on Friday, the 28th day of August, 2026.

INDEX


| | Page |
|---|---|
| Caption | 1 |
| Appearances | 3 |
| Agreement of Counsel | 4 |
| Examination | |
| MR. MOST | 5 |
| Reporter's Certificate | 59 |

APPEARANCES (via Zoom Videoconferencing):

For the Plaintiff:

MOST & ASSOCIATES
Attorneys at Law
BY: WILLIAM MOST, ESQ.
201 St. Charles Avenue, Suite 2500, #9685
New Orleans, Louisiana 70170

For the Defendant:

NIELSEN & TREAS, L.L.C.
Attorneys at Law
BY: KEITH M. DETWEILER, ESQ.
3838 N. Causeway Boulevard, Suite 2850
Metairie, Louisiana 70002

Reported By: Raynel E. Schule
Certified Shorthand Reporter
State of Louisiana

S T I P U L A T I O N

It is stipulated and agreed by and between Counsel for the parties hereto that the 30(b)(6) DEPOSITION OF THE TOWN OF GOLDEN MEADOW/GOLDEN MEADOW POLICE DEPARTMENT, through its designated representative, CHIEF OF POLICE MICHELLE LAFONT is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of reading and signing are specifically waived;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

* * * * *

Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

CHIEF MICHELLE LAFONT, having been first duly sworn by Raynel E. Schule, was examined and testified on her oath as follows:

EXAMINATION

BY MR. MOST:

Q. All right. Good afternoon, Chief. How are you doing today?

A. Good.

Q. Good. Could you give us your name, your full name and title for the record, please.

A. Michelle Lafont.

Q. You're the Chief of Police for the Golden Meadow Police Department?

A. Yes, sir.

MR. MOST:

Okay, and this is a question for Mr. Detweiler. Mr. Detweiler, is there any objection to conducting this deposition by Zoom and recording it by Zoom?

MR. DETWEILER:

No, Dave.

BY MR. MOST:

Q. Okay. So Chief, I know you've given a

deposition before, correct?
A. Yes, sir.
Q. So you understand that again today you are under oath with your answers having the same force as if we were in a courtroom with a Judge and Jury?
A. Yes, sir.
Q. Is there anything that would prevent you from giving us your full attention and complete and truthful answers, whether it's illness, medication, fatigue, substance, anything else?
A. No, sir.
Q. Okay. As before, you know, we can take a break if you need it for -- to use the restroom, get a drink of water, for police business. I just warn you that I will ask after every break if you talked to anyone, what you talked about, and if you looked at any documents, okay?
A. Fair.
Q. And as before, will you agree now that if I ask you a question that is either confusing or you don't understand the question, you'll tell me if that's the case rather

than just try to answer the question?
A. Yes, sir.
Q. Thank you. And as before, this is a Zoom deposition. We can't see your entire room. So is there anyone in the room with you besides Mr. Detweiler?
A. No, sir.
Q. Okay, and if anyone, Mr. Detweiler or anybody else, I don't expect this to happen, but if anyone tires to communicate with you off camera, whether it's note, a text message, a hand signal, a nod of the head or shake of the head or anything else, will you tell us that that's going on?
A. Yes, sir.
Q. Thank you. And you were deposed previously in this case as yourself, right?
A. Correct.
Q. Do you understand that today you're here to represent the knowledge of the Town of Golden Meadow?
A. Yes, sir.
Q. And you're here to provide the testimony of the Town of Golden Meadow?
A. Yes, sir.

Q. And so you understand that when I ask a question of you today, I'm asking a question of the Town of Golden Meadow, correct?
A. Yes, sir.
Q. And when you give answers today, you're not giving the answers of Chief Lafont necessarily, you're giving the answers of the Town of Golden Meadow, correct?
A. Correct.
Q. Okay, and aside from talking to Mr. Detweiler, did you talk to anyone to prepare for this deposition?
A. No, sir.
Q. Did you look at any documents to prepare for this deposition?
A. Just the email that had the questions.
Q. Sure. So I'm going to pull up what has been designated as "Exhibit ZW." Can you see that this is a document that says, "Notice of Deposition"?
A. Yes, sir.
Q. And it has got a total of nine different questions or topics?
A. Yes, sir. Yes, sir.

Q. Is this the document that you reviewed to prepare for today's deposition?
A. Yes, sir.
Q. Okay, and did you look at literally anything else other than that one document to prepare for this deposition?
A. No, sir.
Q. Okay. Roughly how much time did you spend preparing for this deposition?
A. About a hour.
Q. Okay. So that consisted of looking at this one document and then talking to your attorney?
A. Correct.
Q. Okay. And those topics that we just looked at, the nine different topics, are you prepared to testify about those today?
A. Yes, sir.
Q. Do you understand that in a normal deposition where it's an individual being deposed, "I don't know" is a perfectly good answer, but here you have an obligation to actually have looked into these topics to find that information. You understand that?

A. Yes, sir.
Q. Okay. Did you take any notes to prepare for this deposition?
A. No, sir.
Q. Did you use AI in any way to prepare for this deposition, whether it was Chat GPT or QuAD or Grok or Gemini or anything else?
A. No, sir.
Q. Okay. Anything you want to tell me before we dive into the topics?
A. No.
Q. Okay. So we're going to go a little bit out of order starting with some of the easier ones. So pulling up "Exhibit ZW," one of the questions is, "Any examples of GMPD ever arresting anyone other than Dawn Pierce for a violation of R.S. 14:283.2." Do you see that question?
A. Yes, sir.
Q. So has Golden Meadow Police Department ever arrested anyone besides Dawn Pierce for a violation of Revised Statute 14:283.2?
A. Yes.
Q. And how many other people?
A. One.

Q. And roughly when was that?
A. March 4th of 2020.
Q. And what -- what were the circumstances of -- of that arrest broadly?
A. It was images that were sent to a former boyfriend, and the former boyfriend sent them to a -- a new boyfriend via text messages I believe.
Q. So are you reading from something in front of you?
A. Yes, sir.
Q. So did you --
A. I have -- I have a police report from that case.
Q. Okay. Did you bring any other documents besides that police report with you to this deposition?
A. No, sir.
Q. That's the only document you brought?
A. Correct.
Q. Okay. So that was -- and did you see the images from that case?
A. No, sir.
Q. Okay. Do you know if they showed nipples or genitals or what they showed?

A. According to the police report, her breasts were exposed. I really didn't read the whole thing. I didn't look at the whole report or the whole case. I just saw that there was an arrest on it and printed the police report.
Q. Okay, and so that's a document you searched for and reviewed to prepare for this deposition?
A. No, sir. I just found the case and printed the report.
Q. Okay, but you looked at it before today, right?
A. Yes.
Q. Okay. So when I asked you earlier did you review any documents to prepare for this deposition, that's one document that you reviewed to prepare for this, right?
A. I found the arrest, and I printed the case, but I didn't -- I saw that it was for that R.S., but I didn't look into the case. I didn't read into it or review it. I just saw that it was an arrest on that same R.S. Number.
Q. Okay. So I want to go back to what you did

to prepare for this deposition. So you talked to Mr. Detweiler, right?
A. Correct.
Q. You looked at the nine questions?
A. Correct.
Q. At least for this question you searched for documents and pulled one document, right?
A. Yes, sir.
Q. Did you do anything else to prepare for this deposition?
A. No, sir.
Q. For any of the other questions, did you go looking for any other information?
A. No, sir.
Q. Okay. So in the history of GMPD, there has only been one other arrest for what Ms. Pierce was arrested for. Is that fair to say?
A. Correct, that I could -- that I could find.
Q. Then moving on to another question, which is, "The Town/GMPD's indemnification policies and practices," are you prepared to testify about that?
A. Yes, sir.
Q. Okay. So I'm going to pull up what has

been designated "Exhibit ZT." You see this, it says, "Hold Harmless Ordinance Ordinance No. 231"?
A. Yes, sir.
Q. Are you familiar with this ordinance?
A. Vaguely.
Q. Okay.
A. Can you enlarge it.
Q. Yeah, there you go. At any point in this deposition you need me to zoom in or enlarge, just let me know.
A. Yes, sir.
Q. So do you see that this -- well, let me ask you, does this statute, this ordinance indicate that the Town will indemnify any elected official for damages if the damages are the result of official acts and performance of duties as long as said acts and performances are within the scope of the elected office and are in no other way arbitrary and capricious in form?
A. Yes, sir.
Q. Okay, and you are an elected official, correct?
A. Correct.

Q. And your actions with regard to Dawn Pierce were the result of your official acts and performances of your duties, correct?
A. Correct.
Q. And your acts with regard to Ms. Pierce were within the scope of your elected office, correct?
A. Yes, sir.
Q. And the Town does not contend that Chief Lafont's actions were in any way arbitrary or capricious, correct?
A. Correct.
Q. Okay. So the Town will indemnify you and pay for any damages that are awarded against you in this case, correct?
A. Correct.
Q. Okay, and the Town is aware of Chief Lafont's arrest of Dawn Pierce, correct?
A. Yes, sir.
Q. Does the Town approve of Chief Lafont's arrest of Dawn Pierce?
A. Yes, sir.
Q. Does the Town approve of the basis for Chief Lafont's arrest of Dawn Pierce?
A. Yes, sir.

Q. Okay. Okay. So turning back to ZW, we're
going to move on to another topic, which is
No. 6, which is "The reasons for the
presence or absence of probable cause to
arrest Dawn Pierce for sharing photos of
Amber Sibley, including whether the photos
do or do not match the criteria of R.S.
14:283.2." Are you prepared to testify
about that topic?
A. Yes, sir.
Q. Okay. So I believe in your individual
deposition you testified that even knowing
what you know now, you would still do
everything all over again with regards to
Ms. Pierce, correct?
A. Yes, sir.
Q. You still feel that way today?
A. Yes, sir.
Q. Okay. So you still contend it is illegal
to share the photos of Ms. Sibley that Dawn
Pierce shared, correct?
A. Yes, sir.
Q. Is it illegal today as it was a year ago,
correct?
A. Yes, sir.

Q. So anyone who shares those photos should be arrested, correct?

MR. DETWEILER:

Objection.

You may answer.

THE WITNESS:

Sure.

BY MR. MOST:

Q. That's a yes?

A. Yes.

Q. Okay, and so if it turns out anyone has shared those photos, will you seek an arrest warrant for their arrest?

MR. DETWEILER:

Objection.

THE WITNESS:

Yes, sir.

BY MR. MOST:

Q. Okay, and you understand that we've asked other law enforcement officers about those photos?

A. Yes, sir.

Q. You understand we talked to Lieutenant Ray Traigle with LPSO, Sergeant Gaspard, and Sergeant Kreamer of GMPD?

A. Yes, sir.
Q. You understand that none of them looked at those photos and saw the required elements that would make them illegal to share?
A. I'm not aware.
Q. Okay. You don't know what they testified?
A. Not all three of them, no.
Q. You're aware of some of their testimony?
A. Yes.
Q. Which one?
A. Ray Traigle.
Q. You're aware he saw no nipples in those photographs, right?
A. Yes, sir.
Q. And they looked like public images to him, right?
MR. DETWEILER:
Objection.
If you know, you can answer.
THE WITNESS:
I'm not sure what he testified to.
BY MR. MOST:
Q. What do you mean you're not sure what he testified to?

A. I know what you told me that he testified on, but as far as his testimony, I don't know what his exact words were or what he -- what he testified about.
Q. Okay. So you haven't reviewed the testimony of the other officers?
A. No, sir.
Q. Okay. Would it surprise you to know that none of them could see the nipples in those photos that you say you can see?
A. No, sir.
Q. That wouldn't surprise you?
A. No.
Q. Why not?
A. Because we see different things.
Q. And you can see nipples that three other officers cannot see?
A. I did, yes, sir.
Q. Bryce Autin, I don't know if I'm pronouncing his name right, he's the Town Attorney, right?
A. Bryce Autin, yes.
Q. Autin, okay. And he responds to Public Records Requests for the City?
A. Yes, sir.

Q. And, of course, the Town of Golden Meadow wouldn't share documents in response to a Public Records Request if sharing those documents was a crime, right?
A. Correct.
Q. Like if someone did a Public Records Request to the police department for child pornography, obviously the Town wouldn't share it, right?
A. Right.
Q. Because if -- and if photos are truly private, the Town can't share them in response to a Public Records Request, right?
MR. DETWEILER:
Objection, objection.
You can answer.
THE WITNESS:
Depending on who's requesting it.
BY MR. MOST:
Q. Yeah, so if it's a private record that's not private to the person requesting it, the Town can't share it, agreed?
MR. DETWEILER:
Objection.

You can answer.
THE WITNESS:
Depending on who's requesting it.
BY MR. MOST:
Q. Okay. So are you aware that Ms. Pierce's lawyer made a Public Records Request to the Town of Golden Meadow?
A. Yes, sir.
Q. Okay. I'm pulling up what is designated as "ZU." Going down to the bottom, Pages 4 to 5, you see that this is an August 18th, 2025, Public Records Request to Bryce Autin?
A. Can you make it larger, please.
Q. Yeah.
A. Yes, sir.
Q. And so did Bryce come to you for help in collecting these records to respond to the Public Records Request?
A. Yes, he did.
Q. Okay, and you understood he was asking for documents for a Public Records Request?
A. Yes, sir.
Q. Okay, and you gave him some documents including the investigation report into

Dawn Pierce?
A. Yes, sir.
Q. And -- and he provided among other things this document, "ASibley PRR 11.3.25.pdf"?
A. He did.
Q. Okay, and one of the things you gave to Bryce to produce in the Public Records Request was the -- the investigatory file into Dawn Pierce, right?
A. Correct, as far as I remember, yeah.
Q. Okay. So I'm going to pull up "Exhibit ZD." Do you see that the file name here matches what was produced in response to the Public Records Request?
A. Can you make it larger, please.
Q. The file number is in the upper left-hand corner. You can see, Chief, that this is the same document that was produced in the Public Records Request?
A. Yes, sir.
Q. Okay, and this was your investigatory file that included information about the arrest and the primary -- primary narrative and supporting narratives, right?
A. Yes, sir.

Q. And it includes among other things the photos of Ms. Sibley, correct?
A. Correct.
Q. Including the ones that you felt were the basis to arrest Dawn Pierce, correct?
A. Correct.
Q. So you thought it was a crime for Dawn Pierce to share these photos, correct?
A. Correct.
Q. And you arrested her for that crime?
A. Yes, sir.
Q. But then you gave them to the City Attorney to produce in a Public Records Request?
A. Yes, sir.
Q. So they were public records?
A. Once it became a police report, yes, sir, and the reason they were given to the attorney was for -- for him to review them for them to be public records.
Q. And you understand that he turned this over to Ms. Pierce's lawyer?
A. Yes, sir.
Q. You told me earlier if it was a crime to share photos, they would not be produced in response to a Public Records Request,

right?
A. Depending on who is requesting them.
Q. Who was requesting them that had permission to have these photos?
A. Dawn Pierce's attorney and the Town Attorney.
Q. You said anyone who shared these photos should be arrested, right?
A. Yes, sir.
Q. And you shared them with the Town Attorney?
A. Which is practice for any Public Records Request.
Q. Okay. So should you be arrested for sharing the photos?
A. No, sir.
Q. And then the Town Attorney handed them over to someone who asked for them in a Public Records Request, right?
A. Dawn Pierce's attorney.
Q. So should the City Attorney be arrested for sharing the photographs?
A. No, sir.
Q. And then if I have shared them with anybody, should I be arrested?
A. Depending on who you're sharing them with,

yes.
Q. Are you going to get an arrest warrant for me?
A. No, sir.
Q. Okay. Are you -- why not?
A. Because as far as I know you're using them to create a case, not putting them on public display on social media.
Q. Ah, so it's not about whether they're public or private. It's about where they've been posted. Is that what you're saying?
MR. DETWEILER:
Objection. You're being argumentative.
You can answer.
THE WITNESS:
Yes, sir.
BY MR. MOST:
Q. Where in the statute does it say that it turns on whether -- I'm going to pull up -- you've reviewed the statute many times, correct?
A. Correct.
Q. Does it say anything about posting them on

social media?
A. No, sir.
Q. Does it say anything about posting them publicly?
A. Sure.
Q. Well, the -- the crime that you described earlier where an ex-boyfriend shared them with a new boyfriend, that wasn't public or on social media, right?
A. No, sir.
Q. The statute doesn't say anything about whether they're publicly shared or privately shared, right?
A. I'm not sure.
Q. Okay. Did the Town Attorney make a mistake when he produced these photos in response to a Public Records Request?
A. No, I wouldn't think so.
Q. No, because they were public records, right?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
For the case, yes.

BY MR. MOST:
Q. And so anyone who made a Public Records Request for these could get them, correct?
A. No. As I've said, it depends on who's requesting them.
Q. So there's something in the public records law that says certain people can ask for them and certain people can't?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
No, but there are certain things that the attorney will redact from the case before sending them on to anyone else.
BY MR. MOST:
Q. Right, and if there's no redaction, that means they're public records, right?
A. Correct.
Q. Right, and there are no redactions of the images in what the Town turned over as a Public Records Response, correct?
A. Correct.
Q. So these are public records, right?

MR. DETWEILER:
Objection, asked and answered.
You can answer.
THE WITNESS:
To the attorneys, yes.
BY MR. MOST:
Q. Where are you getting this public records to the attorneys idea? Where is that coming from?
A. Because as I said, depending on who's requesting it, the attorney will redact before submitting them.
Q. Right. Like if -- if the person the photos are of requests them, they might not be redacted, right?
A. Possibly not.
Q. But if anyone else asks for sensitive photos, they should be redacted if they're not public records, right?
A. Correct.
Q. Okay, and in this case, the person asking for the photos is not the person the photos were of, right?
A. No, they weren't.
Q. Okay. So do you see any problem with you

arresting a woman for sharing photos that the Town turned over in a Public Records Request?

MR. DETWEILER:

Objection.

You may answer.

THE WITNESS:

Do I see a problem with her being arrested because she shared the photos? No, I don't see a problem with her being arrested for them.

BY MR. MOST:

Q. Do you see a problem with arresting Dawn Pierce for sharing photos, and then the Town sharing the same photos in response to a Public Records Request?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

Because they were requested by you so you can form your case.

BY MR. MOST:

Q. Okay. When -- when the Town Attorney asked -- asked you to pull together records for

the Public Records Request, did he tell you who was asking for them?
A. Yes, sir.
Q. Who did he say?
A. Dawn Pierce's attorney wants these records.
Q. So it said in the Public Records Request that this is Dawn Pierce's attorney?
A. Correct.
Q. Turning back to that Public Records Request, do you see it on the screen now?
A. Yes, sir.
Q. Do you see anywhere, and I'll scroll through it, where the person making the Public Records Request says that they're Dawn Pierce's attorney?
A. It has your name William Most. So I mean, William Most was representing Dawn Pierce.
Q. How did you know that?
MR. DETWEILER:
Objection.
THE WITNESS:
Because we did. We knew that there was a case being formed, and you were representing her.
BY MR. MOST:

Q. How did you know that?
A. I don't know. I can't answer that, but I knew what it was.
Q. You were guessing that I was her attorney or you somehow knew that I was her attorney?
A. We knew that you were her attorney.
Q. And you don't remember how?
A. No, sir.
Q. Okay.
A. We knew a case was being made against me for the arrest and that you were her attorney.
Q. But you have no recollection of how you knew that at all?
A. I think it came from the Public Records Request that Dawn Pierce's attorney was asking for the records.
Q. So if you knew that William Most was Dawn Pierce's attorney, it would say that in the Public Records Request, right?

MR. DETWEILER:
Objection.

THE WITNESS:
Or the attorney knew that you

were representing her.

BY MR. MOST:

Q. Well, you just told me it came from the Public Records Request, right?

A. Came from the Public Records Request that you were an attorney seeking the information from the arrest, and we knew that there was a case being formed against us, yes.

Q. Okay. So the fact that William Most represented Dawn Pierce was not in the Public Records Request?

A. I'm not aware. I -- I can't tell you if it was or not at this point.

Q. Okay. Are you aware that in the course of this case -- well, let me back up. In the course of this case, you've been asked for more documents than were produced in the Public Records Request, right?

A. Correct.

Q. And you gave to your attorney, Mr. Detweiler, higher-resolution images of -- versions of these images, correct?

MR. DETWEILER:

Objection.

THE WITNESS:
No, I didn't.
BY MR. MOST:
Q. You didn't. Okay. Are you aware that Mr. Detweiler has turned over higher-resolution versions of the images in this case?
MR. DETWEILER:
I object to that because that's not true.
BY MR. MOST:
Q. Okay. Are you aware of that, Chief?
A. No.
Q. Okay. Are you aware that no party has moved for a Protective Order in this case seeking to limit the distribution of these photos?
A. Correct.
Q. Okay. So anybody could just file them into the public record at this point, correct?
A. Yes, sir.
Q. And that would not be a crime?
MR. DETWEILER:
Objection.
THE WITNESS:
I'm not sure what our attorney

would say if anything would be redacted. I'm sure the private photos would not be just turned over.

BY MR. MOST:

Q. Do you know what a Protective Order is?

A. Yes, sir.

Q. Do you understand that it's a -- parties can ask the Court to say, hey, please don't let any party publicly post or put into the public record certain sensitive documents, right?

A. Correct.

Q. And at no point in this case did you ask the Court to issue an order like that, right?

A. No, sir.

Q. Because these photos are public, there's no need for a Protective Order, right?

MR. DETWEILER:

Objection. Leading.

THE WITNESS:

Not all of the photos were public.

BY MR. MOST:

Q. Okay, but you haven't asked the Court to say, hey, we've got to limit the distribution of these photos, right?
A. No. They're out.
Q. And you would if these photos could not be legally shared, correct?
MR. DETWEILER:
Objection.
THE WITNESS:
No, I wouldn't.
BY MR. MOST:
Q. Why not?
A. Because it's the plaintiff's case to ask for that.
Q. You think a plaintiff has to ask for a Protective Order?
A. Yes, sir.
Q. Where do you get that idea from?
A. Because that's how we do it.
Q. Okay. In past cases?
A. Yes, sir.
Q. Okay. What other cases?
A. Any case, any Protective Order that is requested is requested by the complainant, not by the police department.

Q. Okay, but you're talking about specific past cases, right?
A. I'm talking about any Protective Order.
Q. Okay. What past cases are you talking about?
MR. DETWEILER:
Objection.
THE WITNESS:
Any Protective Order that has been issued has been issued because the complainant applied for it.
BY MR. MOST:
Q. Give me an example.
A. You want a person's name? You want --
Q. Yeah.
A. We have another case in the Town. We have several Protective Orders that were issued where a boyfriend was abusing the girlfriend. So the girlfriend seek -- sought out a Protective Order.
Q. Are you talking about a Temporary Restraining Order that keeps people apart?
A. I am talking about a Protective Order.
Q. A Protective Order, like, saying you can't get this many feet away from this person?

A. Correct.
Q. Okay. I'm talking about something completely different, okay?
A. Okay.
Q. Which is are you aware that in civil cases if a party thinks that documents are sensitive or should not be shared, they can ask the Court for an Order saying nobody can share these documents. Are you aware of that?
A. No, sir.
Q. Okay, and you have -- in this case, you have made no effort to limit the distribution of these potentially sensitive photos in any way, agreed?
A. No, sir.
Q. So you agree with my statement?
A. Agree with which statement?
Q. That you have not made any efforts to limit the distribution of these photos in this case, correct?
A. No, sir, I haven't.
Q. Okay. We're going to move on to another topic, which is "Communications between Joni Alario and any person about the

accusations against Dawn Pierce, and the investigation into and arrest of Dawn Pierce." Are you prepared to testify about that topic?

A. Sure.

Q. Okay. Do you recall communicating with Joni Alario about the events leading up to the arrest of Dawn Pierce?

A. I'm aware of the text message.

Q. Okay, and do you recall corresponding with Ms. Alario about that?

A. Yes, sir.

Q. Okay. I'm going to pull up what has been designated as "Exhibit ZV." Okay. I'm going to turn to Page 1 of "Exhibit ZD." These are -- these are a separate set of texts you exchanged with Ms. Alario, correct?

A. Can you enlarge it, please.

Q. Sure. You recall these text messages?

A. Yes.

Q. Okay. These are text messages you exchanged with Ms. Alario on March 3rd of this year, 2026?

A. Yes.

Q. Okay, and so this is well after the arrest of Dawn Pierce, correct?
A. Correct.
Q. Ms. Alario, she works at I guess Town Hall and takes calls from people calling to get the Town government?
A. Yes, she's the Town Clerk.
Q. Okay, and on March of -- March of this year she reported that Amber Sibley called to talk to someone about an issue with her fiancee, correct?
A. Correct.
Q. And then you and Ms. Alario texted about that, correct?
A. Yes, sir.
Q. And going down to Page 2, I guess you and Ms. Alario were talking about whether to send out an officer or whether Ms. Sibley should just call 911 dispatch, right?
A. Can you enlarge it. Okay. She wanted to speak to a police officer over the phone I believe.
Q. Okay, and then you responded, "But it's still a complaint even if it goes through the sheriffs office they're gonna dispatch

it and tell them to call instead of going.
it makes it a lot easier on you not to
mention that we are in a lawsuit with these
people"?
A. Yes.
Q. Okay. When you say, "we are in a lawsuit
with these people," what did you mean?
A. That there's a lawsuit against us with
these people.
Q. And when you say, "these people," who are
you talking about?
A. Amber and Billy Sibley.
Q. Okay, and do you think that they are
parties to this lawsuit?
A. Yes, sir.
Q. Like they're the plaintiff or the defendant
in the case?
A. Like, they are part of the case.
Q. Okay. How do you think that -- in what
sense are they part of the case in your
understanding?
A. They're the reason the pictures were sent
out. So part of the defendant.
Q. Okay. What were you trying to suggest to
Ms. Alario when you said, "makes it a lot

easier on you not to mention that we are in a lawsuit with these people," what were you trying to convey to her?
A. To just make sure that she kept that out of it and to just talk about what they're calling for.
Q. Keep what out of it?
A. The lawsuit.
Q. So you were suggesting to Ms. Alario that she not talk to Amber Sibley about the lawsuit?
A. Correct.
Q. And then she said, "Ok. I didn't know all that," and then you wrote, "I know it all seems innocent until the shit goes down," right?
A. Correct.
Q. What -- what did you mean when you said, "it all seems innocent"? What were you referring to there?
A. Because they call and talk about all of these things and until it gets serious, then everybody gets pulled into it, because Amber just wanted someone to talk to. She didn't want a complaint filed. She didn't

police officers at her house. She just wanted to talk about it, and she was literally telling Joni everything that she needed to say, and she didn't need to get involved in it.

Q. When you were saying, "it all seems innocent," were you referring to what Amber was doing or what Joni was doing?

A. Amber.

Q. So you were suggesting that what Amber was saying seemed innocent, but maybe it wasn't?

A. I was suggesting that Joni not get involved in it and just let her call the Sheriff's Office and file a complaint through the Sheriff's Office.

Q. Okay, and you were characterizing Amber's actions as seemingly innocent, right?

A. Correct.

Q. But not actually innocent?

A. That it could lead to something more than what Joni wanted to get involved in.

Q. Okay. Okay. Moving on to another topic, this topic is, "How the Town/GMPD provides guidance to police officers in the absence

of a policy manual, and what guidance it provides." Are prepared to testify about that topic?

A. Yes, sir.

Q. So GMPD currently has no policy manual, right?

A. Correct.

Q. And the former Chief, Troy Dufrene, was working on a policy manual. He had a draft, correct?

A. Correct.

Q. Okay, and -- and he was showing that to officers so that they could use it even though while he was finishing work on it?

A. No, he did not.

Q. He did not show it to anybody?

A. No, not that I'm aware of.

Q. How do you know about it?

A. How do I know about it? Because when I came into office, the Town Clerk had everything because they purchased it, and she had the file for it.

Q. They purchased what?

A. The policy, the draft.

Q. The Town purchased the policy, draft policy

manual from Troy Dufrene?
A. For him, yes.
Q. So the Town purchased from some third-party vendor a draft policy manual for Troy Dufrene?
A. Correct.
Q. Okay, and if Sergeant Gaspard testified that Troy Dufrene showed Gaspard the policy manual, would you have any reason to disagree with that?
A. I have no clue about that.
Q. Okay. So -- so if the policy manual was purchased from a third-party vendor, it's a fairly complete set of policies for a police department?
A. No, sir. It's a draft.
Q. A draft from -- from where? Where did it come from?
A. From Lexipol.
Q. Okay. So it's like a -- a set of policies that a police department can revise and then implement, correct?
A. Correct.
Q. Okay, and Dufrene was revising it preparing to implement it as a policy manual, right?

A. I'm not sure. I just know he had it.
Q. Okay, and so what did you do with that draft policy manual?
A. I still have it. I have not done anything with it.
Q. You haven't done any work to work on it?
A. I looked at it for a little while, but no, I haven't. It's 8,000 pages long, and I would have to go through each page and make it part of my policy. So I have not had time to do that.
Q. So instead you just have no written policies at all for GMPD?
A. Correct. It was still a work in progress.
Q. What do you mean, "a work in progress"?
A. It's because I have a draft to work on. It just has not been done.
Q. The Lexipol draft?
A. No. I'm not using that one.
Q. Okay. So you have another draft policy manual --
A. From RMI.
Q. I'm sorry.
A. From RMI.
Q. Okay, and so have you been working on it?

A. No, I haven't.
Q. Okay, and you've been Chief for how long?
A. Since January of '25.
Q. Okay. So in a year and a half you have made no efforts to publish any policies in writing to your officers, correct?
A. I have made some effort, but that's not top priority, no.
Q. What effort?
A. I'm sorry.
Q. What effort?
A. I've looked at it. I've taken some time to try to modify it, but I haven't completed any of it.
Q. So you have revised drafts of it?
A. No. I've just gone through it. I haven't revised any of it.
Q. I thought you said you were --
A. I was -- I was working on it, but no, like I said, I haven't had time to make it even part of my policy yet.
Q. So when you say, "working on it," you just mean reading it?
A. Correct.
Q. And you testified previously that you

issued verbal policy to your officers, right?
A. Correct.
Q. For example, that officers can use whatever force they think is appropriate with no limits?
A. Correct.
Q. Okay. From the Town of Golden Meadow's perspective that is quite a problematic policy; would you agree?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
The Town of Golden Meadow doesn't have a policy for our police department.
BY MR. MOST:
Q. Say that again.
A. The Town of Golden Meadow does not have a policy for the police department.
Q. Does the Town of Golden Meadow have any problem with the fact that the police department's use of force policy is anything an officer thinks is appropriate

without limits?

MR. DETWEILER:

Objection.

You can answer.

THE WITNESS:

I'm not aware.

BY MR. MOST:

Q. In your deposition -- in your individual deposition, you described to us what your use of force policy is that you verbally conveyed and what your handcuffing policy is that you verbally conveyed, right?

A. Correct.

Q. And you -- you -- it's your testimony that you told that to Sergeant Gaspard and Sergeant Kreamer, right?

A. Correct.

Q. Are you aware that both of them testified they have no recollection of you ever saying that to them?

A. No, I'm not aware.

Q. Okay. Would it surprise you to learn that's their testimony?

A. No.

Q. Why not?

A. I don't know. They're both experienced police officers. They are professional police officers, and they have every discretion as a professional to handle every incident.
Q. So why are you working on a policy manual at all if your policy is just for the officers to do what they think is right?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
That's why it's not priority, the top priority.
BY MR. MOST:
Q. So if either of those officers say Chief Lafont never told us this verbal policy, they would be lying, correct?
MR. DETWEILER:
Objection.
THE WITNESS:
Not necessarily.
BY MR. MOST:
Q. How would they not be lying if their testimony is directly opposite of yours?

MR. DETWEILER:
Objection.
THE WITNESS:
It's just a verbal. Maybe I didn't tell them that. Maybe we talked about it in a meeting, and they don't remember me telling them that. I don't know what -- why they answer questions the way they do or why I had. We answer them the best we can.
BY MR. MOST:
Q. But you're a hundred-percent confident that you verbally told Kreamer and Gaspard your handcuffing and use of force policies verbally?
A. We've discussed it.
Q. And you've never given a verbal or written policy about officers having the right to refuse to comply with an unconstitutional directive, correct?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:

No.

BY MR. MOST:

Q. No, you've never given that policy, correct?

A. Correct.

Q. Okay. Do you think you should?

MR. DETWEILER:

Objection.

THE WITNESS:

As I said, they're professional police officers. They have a job to do. I'm not on the road with them a hundred percent of the time. They have to make decisions on their own, and sometimes their lives depend on the decisions they may make.

BY MR. MOST:

Q. So no need to provide them with policies that might guide their decision making?

MR. DETWEILER:

Objection.

THE WITNESS:

As I said, I'm working on it, but it's not top priority.

BY MR. MOST:

Q. Okay. Turning to another topic, this is -- we're getting closer to the end. Does anybody need to take a break?
A. No, sir.
Q. The next topic is, "The Town/GMPD's actions to preserve or destroy documents and ESI, and its efforts to search for documents and ESI responsive to discovery requests in this case (including but not limited to the emails transmitting the photos of Amber Sibley)." Are you prepared to testify about that topic?
A. Can you explain what ESI is.
Q. Sure. Electronically stored information.
A. Okay.
Q. Are you prepared to testify about that topic?
A. Yes, sir.
Q. Okay. So the charges against Dawn Pierce were dropped, right?
A. Yes, sir.
Q. And at that point the -- the Town could reasonably anticipate litigation over her arrest, agreed?
MR. DETWEILER:

Objection.
You can answer.
THE WITNESS:
Sure.
BY MR. MOST:
Q. Okay, and the Town of Golden Meadow automatically deletes some of its emails, right?
MR. DETWEILER:
Objection.
You can answer.
THE WITNESS:
There were emails that were automatically deleted, yes.
BY MR. MOST:
Q. Is that still happening?
A. No, sir.
Q. When did the City turn off its automatic deletion of emails?
A. They didn't. There's no way to turn it off, but instead of deleting the emails, I'm now archiving them instead of deleting.
Q. So when you say you're archiving them instead of deleting them, you mean that previously you were going through and

choosing emails and deleting them?
A. Once I responded to an email, and there was no further response needed, I deleted it. After it's in the deleted file for so many days, then it's automatically completely deleted. So instead of doing that, the Town Attorney asked me to archive them.
Q. Okay, and so after the charges were dropped against Dawn Pierce, you went through and deleted the communications from Amber Sibley, correct?
A. No, sir.
Q. When did you delete the communications with Amber Sibley?
A. Once the information was downloaded into our RMS, then I deleted them.
Q. So before the arrest of Dawn Pierce?
A. No, sir.
Q. After the arrest of Dawn Pierce?
A. After the arrest.
Q. After the arrest but before the charges were dropped?
A. Correct.
Q. Okay. When she was arrested, could you reasonably anticipate litigation at that

point?
A. No, sir.
Q. Okay. So when did you stop -- or let me rephrase it. When did you start archiving emails instead of deleting them?
A. After my deposition.
Q. Have you -- and you also historically would throw away your paper notes, correct?
A. Correct.
Q. Have you stopped throwing away your paper notes?
A. I haven't. I haven't -- I haven't thrown any away.
Q. Okay. Are you going to stop throwing away your paper notes?
A. It depends. As I said in my first deposition, if our notebooks get wet or something happens that our notebooks get destroyed, then the notes are gone.
Q. You also testified that you just throw away your notebooks once they're full, right?
A. Yes, sir.
Q. Okay. Are you going to stop doing that?
A. I'm not sure. I don't -- there is no reason for keeping the notebook. There --

it would be impossible to go back and find the information or it would take a lot of time to go back and find information that is used just to write a report, and then everything is taken from those notes and put into a report. What -- we see no point in keeping the notebook once it's all -- once the notes are made into a report.

Q. Shortly after you were elected Police Chief, the former Police Chief was arrested for destroying police records, right?

A. Correct.

Q. And then you just went on deleting emails and having them permanently deleted after that point?

A. Yes, sir.

Q. Okay, and so you chose to delete the emails by which Amber Sibley sent you the lingerie photos, correct?

A. Correct.

Q. Prior to your deposition, did the Town do anything to preserve documents specific to this case?

A. No, sir.

Q. Were there emails related to this case that

you deleted in between the charges being dropped against Ms. Pierce and your deposition?

A. No, sir.

Q. How do you know that?

A. Because there were no emails that came through from -- from Amber Sibley to me or anybody in the case.

Q. Well, surely you corresponded with Mr. Detweiler about this case by email, right?

A. Correct.

Q. Did you delete those emails?

A. Yes, sir.

Q. Okay. So there were emails related to this case that you deleted in between Dawn Pierce's charges being dropped and your deposition, correct?

A. Yes, sir.

Q. What about any others?

A. Any others such as?

Q. I -- I don't know, but you just told me a moment ago you didn't delete any emails related to this case, and then we just established that you did. I want to know were there any others?

A. Any emails that I received that were answered that were finished with that didn't need any further response were deleted.
Q. Okay. Were there any of those besides your emails with Mr. Detweiler?
A. Maybe through Bryce Autin.
Q. Okay. Anybody else?
A. Not that I can recall, because there were no one else -- there were no other communications with anybody about this case.

MR. MOST:

Okay. Keith, would you like to ask any questions?

MR. DETWEILER:

No. I'm good.

BY MR. MOST:

Q. Okay. Chief, thank you very much for your time here today. We appreciate it, and I hope you have a good weekend.
A. Thank you.

(Whereupon, the taking of the witness' testimony was concluded.)

C E R T I F I C A T E

THIS CERTIFICATION IS VALID ONLY FOR A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS PAGE.

I, RAYNEL E. SCHULE, Certified Court Reporter, #77005, in good standing, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that CHIEF MICHELLE LAFONT, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 58 pages; that this testimony was reported by me in stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the Board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the Board; that I am not of counsel, not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

9-18-2026 ____________________________

Date

Raynel E. Schule, CSR
Certified Shorthand Reporter
State of Louisiana